IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
FILE NO. _____4:22-cv-48_____


JACK ANTHONY WILLIAMS,      )
                  Plaintiff     )
                            )
vs.                          )         **COMPLAINT**
                          )    **(Jury Trial Requested)**
SIG SAUER, INC. and       )
WINTRODE ENTERPRISES, INC.  )
               Defendants.  )


COMES NOW Plaintiff, Jack Anthony Williams (hereinafter "Williams" or "Plaintiff"),

by and through the undersigned counsel, seeking damages, equitable relief, and judgment against

Defendants, SIG SAUER, Inc., (hereinafter "SIG") and Wintrode Enterprises, Inc., (hereinafter

"Wintrode"), and hereby alleges as follows:

## <u>NATURE OF ACTION</u>

1.     This action arises from SIG's and Wintrode's negligence and unfair and deceptive

trade practices regarding SIG's P320 semi-automatic pistol (hereinafter "P320" or "the gun") and

Wintrode's Bulldog® Belt Holster.

2.     On May 25, 2019, Williams arrived in New Bern, North Carolina, on vacation,

with his P320 loaded with 9mm Luger ammunition for self-protection.

3.     On that day, while sitting on his parked, unengaged motorcycle in New Bern,

North Carolina, Williams had his P320 in his Bulldog® Belt Holster.  Williams then placed his

holstered P320 in his right back pocket.  When Williams adjusted his right leg on his

motorcycle's running board, the gun suddenly discharged.  The gun discharged without Williams

1

or anything touching the trigger of the gun.[1]

4.     That uncommanded discharge ripped the bottom seam of his Bulldog® Belt Holster and resulted in a round exiting through the holster and entering into Williams's right leg, passing through his femur, shattering the lower portion of the bone, and becoming lodged in his patella.  Williams was taken to the local hospital in New Bern, where he underwent emergency surgery to have the round removed from his knee-cap.  After five days in the hospital, Williams was released to go home to Kentucky, where we would undergo extensive follow-up medical care and physical therapy.  Williams sustained such permanent damage to his right leg and knee that the knee cannot be surgically repaired.  Williams' doctor recommends that he receive a full knee-replacement; however, Williams is unable to afford such a surgery at this time.    As the proximate result of the actions and omissions of the Defendants, Williams has sustained injuries and damages which include but are not limited to, permanent physical injuries and disability, past and future medical and hospital expenses, extreme pain and suffering, lost wages, reduced earning capacity, emotional distress, and the value of care rendered to him subsequent to his injury on May 25, 2019 and ongoing into the future.

5.     Unbeknownst to Williams at the time he bought his P320, SIG was well aware of the original P320's design defects and failed to acknowledge or correct the original P320 design defects through a voluntary recall.  Rather, SIG created a "Voluntary Upgrade Program" (hereinafter "VUP") that drastically changed the internal safety features of the P320.

6.     Based upon these facts and under the laws of the State of North Carolina, Williams asserts claims for negligent design; breach of warranty, both express and implied; failure to warn; unfair and deceptive trade practice; negligence; fraudulent misrepresentation;

---

[1] In the weapons industry, an inadvertent, unintended, or uncommanded discharge is a discharge in which the weapon fires without a trigger pull.  *See e.g., O'Neal v. Remington Arms Co., LLC,* 817 F. 3d 1055, 1060 (8th Cir. 2015) (referring to "inadvertent discharge" of weapon "without the trigger being pulled").

2

and emotional distress against SIG and Wintrode, who are each liable in damages, including but not limited to, under the provisions and remedies contained with the North Carolina Unfair and Deceptive Trade Practice Act and the Products Liability Act.

**JURISDICTION**

7.     Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. At the time of his gun's uncommanded discharge, the Plaintiff was a resident and citizen of the Commonwealth of Kentucky.  Today, Williams is a resident and citizen of the State of Ohio. SIG is incorporated in the State of Delaware and maintains its principal place of business in the State of New Hampshire.  Wintrode is incorporated in, and maintains its principal place of business in, the Commonwealth/State of Virginia.  Therefore, complete diversity of citizenship existed at the time of the incident in issue and all time thereafter, through and including the filing of this Complaint.  The amount in controversy herein exceeds $75,000.00 exclusive of costs and interest.

8.     Federal question jurisdiction also exists pursuant to 28 U.S.C. § 1331 by virtue of Plaintiff's seventh cause of action herein.

9.     North Carolina law applies to the adjudication of the claims in this civil action. The occurrence giving rise to the matters set forth herein occurred in North Carolina, and the transaction causing the personal injury to Williams in this State has an "appropriate relation" to North Carolina within the meaning of N.C. Gen. Stat. § 25-1-301.  Bernick v. Jurden, 306 N.C. 435, 293 S.E.2d 405 (1982).

10.     This Court has personal jurisdiction over SIG pursuant to N.C. Gen. Stat. § 1-75.4(4)(a), (b) because Williams's injury occurred in North Carolina and because SIG maintains sufficient minimum contacts with the State of North Carolina, including but not

3

limited to the sale of firearms (including the P320s) to consumers within the State.[2]

11.    This Court also has personal jurisdiction over Wintrode pursuant to N.C. Gen. Stat. § 1-75.4(4)(a), (b) because Williams's injury occurred in North Carolina and because Wintrode maintains sufficient minimum contacts with the State of North Carolina, including but not limited to the sale of holsters and gun vaults (including the Bulldog® Belt Holster) to consumers within the State.[3]

## VENUE

12.    Venue is proper in the Eastern District of North Carolina under 28 U.S.C. § 1391(b)(2) because the gun's uncommanded discharge, which caused Williams's injuries giving rise to the present cause of action, occurred within this District.

## PARTIES

13.    At the time of the injury in issue, Williams was a 44-year-old resident and citizen of the State of Kentucky and is now a 47-year-old resident and citizen of the Commonwealth of Kentucky.   Prior to his gun's uncommanded discharge on May 25, 2019, Williams was an

---

[2] Since March 2007, SIG has maintained a registered agent in Charlotte, North Carolina.  Moreover, SIG conducts ample sales through licensed dealers in North Carolina (seventeen are listed on SIG's official website) and maintains a Statewide Term Contract for Ammunition & Firearms, which has been in effect since August 1, 2016.  See 680A-Ammunition & Firearms, N.C. Dept. of Admin., https://ncadmin.nc.gov/media/2984/open (last accessed on May 6, 2022).  Hankins v. Somers,  39 N.C. App. 617, 252 S.E.2d 640, cert. denied 297 N.C. 300, 254 S.E.2d 920 (1979) (finding a plaintiff's allegation that defendants were engaged in the business of selling products and that such products were sold and used in North Carolina in the ordinary course of trade to a substantial extent satisfied the state's long-arm statute and the requirements of due process).

Additionally, because "there is no requirement that the cause of action . . . be related to the activities of the defendant which give rise to the in personam jurisdiction," SIG's contacts with North Carolina have adequately availed SIG to the State's jurisdiction.  Dowless v. Warren-Rupp Houdailles, Inc., 800 F.2d 1305, 1307 (4th Cir. 1986) (quoting Hankins, 39 N.C. App. at 621, 251 S.E.2d at 643); Ray Communs., Inc. v. Clear Channel Communs., Inc., 2009 U.S. Dist. LEXIS 4746, *5 (E.D.N.C. Jan. 19, 2009).

[3] Wintrode not only lists 30 North Carolina dealers of its Bulldog® products on the Bulldog® Website, https://www.bulldogcases.com/dealer-locator/#nc, but also maintains a registered office in High Point, North Carolina, which are sufficient contacts with the State to subject Wintrode to the laws of the State of North Carolina and to personal jurisdiction of the courts within the State of North Carolina, inclusive of the Court in which this action has been filed.

4

automotive mechanic by profession and trade. Williams has been responsibly owning, handling, and shooting a variety of guns—including at least seven semi-automatic handguns—since he was 18 years old, having learned how to shoot from his father.

14.     SIG's principal place of business is in Newington, New Hampshire, and is incorporated under the laws of Delaware. SIG designs and manufactures firearms for personal, business, law enforcement, and military use. SIG markets and sells its products worldwide—including a substantial amount of sales in North Carolina.

15.     Wintrode's principal place of business is in Danville, Virginia, and is likewise incorporated under the laws of Virginia. Upon information and belief, Wintrode designs and manufactures firearm holsters and vaults and owns the trademark registration for Bulldog® Cases.[4] Upon information and belief, Wintrode markets and sells its products nationwide—including a substantial amount of sales in North Carolina.

## STATUTES OF LIMITATIONS & REPOSE

16.     Williams commenced this action within North Carolina's three-year statute of limitation for personal injury actions, as the uncommanded discharge causing his personal injuries occurred on May 25, 2019. See N.C. Gen. Stat. § 1-52(16).

17.     Williams is also within North Carolina's twelve-year statute of repose for product liability actions, as the P320 chambered in 9 x 19 Parabellum was introduced to the North American market on January 15, 2014, Williams bought the gun and the holster sometime in late 2018 or early 2019,[5] and his personal injury action did not accrue until May 25, 2019. See N.C. Gen. Stat. § 1-46.1(1).

---

[4] See Serial Number 78973685 with the United States Patent and Trademark Office.

[5] Moreover and as aforesaid, SIG did not begin producing the P320 until 2014; therefore, even if Williams had bought his gun prior to 2018, Williams's would be within the twelve-year statute of repose as to the production of the original P320s for the North American market.

5

## PRIOR CLASS ACTION SETTLEMENT

18.    On June 5, 2020, the United States District Court for the Western District of Missouri ordered the final approval of a class action settlement in <u>Hartley v. Sig Sauer, Inc.</u>, 2020 U.S. Dist. LEXIS 111920*; 2020 WL 3473652.

19.    Williams's claims for his personal injuries were excepted from the class certification in that case, <u>see</u> <u>Id.</u> at *13, thus his claims are not barred by that settlement and he may bring and maintain the present action.

## ALLEGATIONS

20.    Williams reincorporates by reference the allegations of paragraphs 1 – 19 as if expressly recited herein.

### Williams's P320 discharged without command, altering his life completely.

21.    Williams bought his SIG P320 at a private sale sometime in late 2018 or early 2019, without any knowledge of the P320's design defects.  That sale included a Bulldog® Belt Holster:

 

22.    On May 25, 2019, Williams had just arrived on vacation to New Bern, North Carolina, when he moved his holstered P320 from his vest pocket to his back-right pants pocket.

23.    After moving the holstered gun to his back pocket, Williams moved his right leg

to adjust his position on his parked motorcycle, and the gun inadvertently discharged without anything touching the trigger.

24.     Upon information and belief, at the time Williams adjusted his leg, the gun's frame and slide and/or the trigger's inertia moved rearward and the gun suddenly, and without command, discharged while in Williams's holster, with the gun's firing mechanisms (striker) striking the primer of the chambered Luger 9mm round.

25.     The uncommanded discharge resulted in a round/projectile being fired into Williams's right leg, the round then entered his right femur, exited and shattered the lower portion of his right femur, before ultimately becoming lodged in his right patella.

26.     At the time of the uncommanded discharge Williams's Bulldog® Belt Holster ripped at the bottom seam:



27.     For the gun to discharge in this manner while it was holstered in a product specific for that type of firearm, meant there was a failure of any and/or all discharge safeties of the gun.

28.     Williams was rushed to the local hospital in New Bern for emergency surgery to have the round removed from his patella.  He remained hospitalized for approximately five days.

When discharged from the hospital, Williams traveled the long ten-hour drive home to Kentucky, writhing in pain the entire way.

29.     In Kentucky, Williams had to continue medical treatment and physical therapy. Initially, Williams could not walk; however he managed to build up his strength to use crutches to get around.  During that time, his girlfriend (now wife) acted as his sole care-giver, helping him use the bathroom, prepare his meals, and get him to his various doctors' appointments.

30.     For at least six months after the uncommanded discharge, Williams remained on crutches, unable to walk without assistance.

31.     As a direct and proximate result of the uncommanded discharge, the fault of the Defendants and the injuries it caused, Williams suffered immense pain.  To date, Williams continues to experience that pain, and he refuses to use prescription pain medications for ethical and personal health reasons.

32.     As a direct and proximate result of the uncommanded discharge and the injuries it caused, Williams was unable to continue his work as a mechanic.  To date, Williams is still unable to continue his learned trade.

33.     As a direct and proximate result of the uncommanded discharge and the injuries it caused, Williams has trouble sleeping and suffers from the psychological effects of being shot and enduring continuing pain and lack of mobility.

34.     After his girlfriend exhibited such care and affection during his recovery period, Williams and she were married in 2021; however, because of his injuries from the uncommanded discharge, their intimate relationship is strained.

35.     After the uncommanded discharge, Williams learned of the P320's design defects and its tendency to discharge without pulling the trigger and without warning.  Had he known

8

those facts at the time, Williams would not have bought the P320.

**SIG's Original P320 Pistol**

36.    SIG designs, manufactures, and markets a striker-fired pistol known as the P320.

37.    The P320 is one of the most popular handguns in the United States and is the selected service model for several law enforcement agencies and the United States Army.[6]

38.    The P320 is a striker-fired pistol, meaning "there is no hammer present. When the slide is racked back and released forward, the firing pin remains back and under spring tension. The trigger releases this tension and allows the pin to push forward resulting in firing the round in the chamber."[7]

39.    "Because there is no hammer to cock or release, the trigger pull of most striker-fired pistols are incredibly easy to pull and have low pull-weights."[8]

40.    Despite having a trigger that is "easy to pull," SIG's P320 as sold to Williams does not contain a trigger toggle—a small tab in the face of the trigger that has to be fully depressed for the trigger to move rearward and fire the pistol. Upon information and belief, the exclusion of that safety feature was an intentional choice by SIG to support the P320's "shoot-ability" design feature.

**SIG's original P320 contained no external safety mechanisms**

41.    SIG's P320 design deviates from the industry standard, as other manufacturers of striker-fired pistols include trigger toggles as an added safety feature. See, e.g., SIG's P320 (left) versus Glock's comparable striker-fired pistol (right) below:

---

[6] In fact, SIG was awarded a $580 million military contract to make the U.S. Army's new service pistol based on the Company's P320 handgun. Matthew Cox and Hope Hodge Seck, *Army Picks Sig Sauer's P320 Handgun to Replace M9 Service Pistol*, Military.com (Jan. 19, 2017), https://www.military.com/daily-news/2017/01/19/army-picks-sig-sauer-replace-m9-service-pistol.html (last accessed May 4, 2022).
[7] *Hammer vs. Striker*, Triangle Shooting Academy, https://www.triangleshootingacademy.com/ccms/index.cfm/news-articles/resource-center/hammer-fired-vs-striker-fired/ (last accessed on May 4, 2020).
[8] *Id.*

 

42.     In addition to the Glock, featured above, other popular versions of striker-fired pistols come with external safety features such as a trigger safety toggle and/or a manual safety:

| Striker-Fired Pistol Model | External Safety Feature |
|---|---|
| CZ P10C | Trigger toggle |
| Heckler & Koch VP9 | Trigger toggle |
| Smith & Wesson M&P | Manual safety |
| Walther PPQ | Trigger toggle |
| **Sig Sauer P320** | **NONE** |

43.     Thus, SIG's design decision to eliminate the trigger toggle means that the SIG's original P320 design (like the one owned by Williams) lacked <u>any</u> external safety features (i.e., no trigger toggle and no manual safety) rendering the product unsafe and defective and susceptible to uncommanded discharge.

44.     SIG did not warn, advise, or tell consumers about the increased likelihood of the P320 inadvertently discharging due to the absence of these external (or lack of internal) safety features.

45.     For example, in the P320 Operator's Manual, SIG tells consumers that "[b]y understanding the dangers inherent in the use of any firearm, <u>and by taking the precautions described in this manual, you can experience a higher level of safety in the use of</u>

your firearm."[9]

46.    However, the Operator's Manual <u>never</u> discloses to consumers that the P320 (1) lacks any external safety feature that are available on other firearms and (2) the P320 has a higher risk of uncommanded discharges due to the absence of an external safety feature.  Thus, the Operator's Manual never explains additional precautions that consumers can take to  allow them to "experience a higher level of safety . . . ."[10]

47.    The Operator's Manual also advises consumers that the P320 "comes equipped with effective, well-designed safety features" and that "[m]any safeties are incorporated into your firearm."[11]  However, it never warns consumers that the P320 <u>lacks</u> external safety features available on other firearms.  Without this corresponding warning about what the P320 lacks, SIG's safety promises are meaningless, misleading and false.

48.    Moreover, SIG provided other express statements regarding the safety of the P320.  For example, SIG asserted and still contends that "[t]he striker safety lock and disconnect safety <u>ensure</u> safe carrying of the weapon and provide instant readiness without actuating a manual safety."[12]

49.    In its marketing of the P320, SIG contends that "[s]afety isn't negotiable.  The P320 maximizes peace of mind with a robust safety system[.]"[13]

50.    However, SIG intentionally changed its military-version of the P320 to include an external safety mechanism, on both sides of the firearm, but failed to do the same for its

---

[9] *SIG SAUER P320 Operator's Manual: Handling & Safety Instructions*, p. 2 (2018), https://www.sigsauer.com/media/sigsauer/resources/OPERATORS-MANUAL-P320-UPDATED-12-26-2018.pdf (last accessed on May 4, 2022).
[10] *Id.*
[11] *Id.*
[12] *Id.* at p. 18 (emphasis supplied).
[13] *P320* SIG SAUER, https://www.sigsauer.com/firearms/pistols/p320.html (last accessed May 9, 2022) (hereinafter "P320 Website").

11

commercial version of the gun for consumers.

**The U.S. Army discovers SIG's P320 model inadvertently discharges when dropped.**

51.    SIG's Product Catalog touts: "[T]he state-of-the-art SIG SAUER P320 has quickly become one of the most sought-after firearms on the market today. Chosen by all branches of the U.S. military, as well as law enforcement agencies across the country and around the world, the P320 redefines the modern handgun."[14]

52.    SIG's Product Catalog goes on to say that all branches of the U.S. Military have adopted firearms based on the P320 as their official service weapon:

> After one of the most rigorous and highly competitive selection processes in the history of small arms, the SIG SAUER P320 based M17 and M18 were awarded the Modular Handgun System (MHS) contract by the U.S. Army. The M17 and M18 have now been adopted by all branches of the U.S. Military.[15]

53.    However, in its marketing about the military's adoption of the P320, SIG does not disclose that, in April 2016, the U.S. Army discovered that the military-version of the P320 would fire on its own when dropped.[16]

54.    The Department of Defense report on the P320 stated that "[d]uring drop testing in which an empty primed cartridge was inserted, <u>the striker struck the primer causing a discharge</u>."[17]

55.    In response to the Army's findings, SIG "implemented an Engineering Change Proposal (ECP) to <u>correct this deficiency by implementing lightweight components in the trigger</u>

---

[14] *SIG SAUER 2021 Product Catalog*, p. 14, SIG SAUER, https://cloud.3dissue.com/184198/184677/215529/2021Catalog/index.html (last accessed on May 4, 2022).
[15] *Id.* at p. 5.
[16] Jose Pagliery, *Trigger warning*, CNN (June 6, 2018), https://www.cnn.com/interactive/2018/06/investigates/sig-sauer-p320-drop-fire/ (citing *XM17/XM18 Modular Handgun Systems (MHS)*, Dept. of Def. Rpt. On XM17 https://www.documentcloud.org/documents/4437522-DOD-Report-on-XM17.html) (last accessed on May 4, 2022).
[17] *Executive Summary* of Dept. of Def. Rpt. available at https://www.documentcloud.org/documents/4437522-DOD-Report-on-XM17.html.

12

group mechanism."[18]

56.     Additionally, SIG added an "ambidextrous external safety" to the military-version of the P320.[19]

57.     SIG did not, however, alter its original defective design for the civilian P320, which did not contain an "ambidextrous external safety."  In fact, SIG later added that only as an "optional" feature for new P320s:[20]



58.     Thus, unlike its primary competitors and even SIG's M17 and M18 counterparts, the original civilian version of the P320 lacks any external safety features: no trigger toggle and no manual safety, nor does the civilian model contain the internal safety features implemented by Sig to secure its lucrative $580 million contract with the U.S. miliary.

59.     The absence of these external safety features causes and/or contributes to the P320 being more susceptible than its marketplace and military-version counterparts to uncommanded discharges.

60.     SIG omitted any information about the enhanced safety steps a consumer should

---

[18] *Id.*
[19] *See* 2021 Product Catalog at p. 17 (listing features of the M17 and M18 versions of the P320).
[20] *SIG SAUER P320 Operator's Manual: Handling & Safety Instructions*, p. 20, https://www.sigsauer.com/media/sigsauer/resources/OPERATORS-MANUAL-P320-UPDATED-12-26-2018.pdf (last accessed on May 4, 2022).

13

use if the P320 does not have a manual safety, nor did it provide any warning about the absence of a manual safety. Rather, it merely advises about the option of a manual safety without discussing any of the consequences of carrying a firearm without one.

### SIG knew or should have known about the P320's defect.

61.     SIG has touted the M17 and M18—the military-version of the P320—as "among the most tested handguns in history" that have "been proven to be unmatched in both accuracy and reliability."[21]

62.     On its own website, SIG proclaims that the P320 is "**TESTED AND ABUSED**." Under this banner, the company further states:

> With its unmatched modularity, unprecedented accuracy, and uncompromising reliability, the state-of-the-art SIG SAUER P320 has quickly become one of the most sought-after firearms on the market today. Chosen by all branches of the U.S. military, as well as law enforcement agencies across the country and around the world, the P320 redefines the modern handgun.[22]

63.     In its 2021 Product Catalog, SIG states that the P320 "surpassed some of the most rugged and grueling testing protocols in the history of firearms."[23]

64.     The Catalog also stated that the P320 was "[t]ested to ensure extreme reliability and accuracy."[24]

65.     Additionally, Sig Sauer should have tested the P320 properly, adequately and/or consistent with all applicable safety standards and other protocols, including the standards promulgated by the Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI).

---

[21] *Sig Sauer's P320-M18 Is the U.S. Military's Gun of Choice. Soon You Can Find Out Why.* (Jan. 13, 2020), https://nationalinterest.org/blog/buzz/sig-sauers-p320-m18-us-militarys-gun-choice-soon-you-can-find-out-why-113156 (last accessed on May 4, 2022) (citing SIG's December 2019 Press Statement, available here: https://nationalinterest.org/blog/buzz/sig-sauers-p320-m18-us-militarys-gun-choice-soon-you-can-find-out-why-113156).
[22] P320 Website, *supra* note 13.
[23] *SIG SAUER 2021 Product Catalog*, p. 17.
[24] *Id.* at p. 45.

66.     SAAMI is "an association of the nation's leading manufacturers of firearms, ammunition and components. SAAMI was founded in 1926 at the request of the federal government and tasked with:

- Creating and publishing industry standards for safety, interchangeability, reliability and quality.

- Coordinating technical data.

- Promoting safe and responsible firearms use.[25]

67.     SAAMI's purpose is to "create and promulgate technical, performance and safety standards for firearms, ammunition, and components . . ."[26]

68.     SIG is a member of SAAMI.

69.     SAAMI issued a series of test protocols called "Voluntary Performance Standards Criteria for Evaluation of New Firearms Designs Under Conditions of Abusive Mishandling for the Use of Commercial Manufacturers"[27]

70.     The SAAMI Standard applies to pistols like SIG's P320.

71.     The SAAMI Standard contains provisions regarding drop tests, and other tests to evaluate a gun's safety under abusive conditions.

72.     Upon information and belief, SIG employed the SAAMI Standard testing protocols against the P320 before marketing it.

73.     SIG's P320 webpage even touts that the gun was "test[ed] above and beyond standard . . . (SAAMI) . . . protocols."

74.     Upon information and belief, SIG conducted tests pursuant to the SAAMI

---

[25] *About SAAMI*, https://saami.org/about-saami/ (last accessed on May 4, 2022).
[26] *Id.*
[27] *SAAMI Z299.5-2016*, SAAMI https://saami.org/wp-content/uploads/2019/01/SAAMI-Z299.5-Abusive-Mishandling-Approved-3-14-2016.pdf

15

protocols, which included the "Jar-Off Test" that is designed to "simulate[] the abusive impacting (bumping) of the firearm against a hard surface with the firearm in a condition of maximum readiness."

75.   Upon information and belief, based on internal tests, including but not limited to the SAAMI test protocols, SIG knew or should have known about the dangers of the P320 described herein and concealed these defects from consumers and end-users such as Williams.

### The civilian P320's defect is revealed to the public.

76.   On August 4, 2017, SIG issued a press release reassuring users that the P320 exceeded safety standards: "SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform.  There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date."[28]  Upon information and belief, SIG made that representation even after two reported instances of police officers being shot by their P320 (which were not SIG's military version P320) after an uncommanded discharge.[29]

77.   Three days later, gun store Omaha Outdoors released a YouTube video of its own drop testing, which revealed "that the P320 will fire if it is dropped at a certain angle[,]"[30] which is an angle that is not found in any commercial or governmental drop test standard:



[28] PRESS RELEASE: *SIG SUAER Reaffirms Safety of P320 Pistol*, SIG SAUER (Aug. 4, 2017).
[29] *See* Pagliery, *supra* note 16.
[30] *Sig Sauer P320 Fails Drop Test*, Omaha Outdoors (Aug. 7, 2017)
https://www.youtube.com/watch?v=ch7si_VQsGA&t=85s (last accessed on May 4, 2022).

16

78.     Andrew Tuohy, with Omaha Outdoors (hereinafter "Omaha"), who is featured in the store's drop test video, explained that the store decided to undergo the drop testing after reading rumors on the Internet about the uncommanded discharges associated with the P320.

79.     Additionally, Tuohy stated that Omaha had "been in communications with SIG about the results of [Omaha's] drop testing."[31]

80.     The Omaha video explains that "if the pistol is allowed to drop with the bore in an upward direction, and the frame and the slide contact the ground at the same time, the trigger continues to move to the rear and the pistol will fire."[32]

81.     Despite SIG's express "reaffirmations" of the P320's safety, the very next day after Omaha's video, SIG announced its P320 "Voluntary Upgrade Program" (hereinafter "VUP"), five days after its August 4, 2017, press release.

82.     In that press release, SIG admitted that "[r]ecent events indicate that dropping the P320 beyond U.S. standards for safety may cause an unintentional discharge. . . . [However,] [t]he M17 variant of the P320, selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), is not affected by the voluntary upgrade." -- the reason being that SIG had already included the various upgraded repairs to the Army in 2016.  SIG affirmatively chose not to engage in a product recall of the affected P320's such as the one owned by Williams.

83.     Upon information and belief, SIG coordinated with Omaha on the timing of its press release, Omaha's video review, and SIG's subsequent VUP.

**SIG launches the VUP for the P320**

84.     On August 8, 2017, SIG initiated its VUP in response to complaints about uncommanded discharges when the P320 was dropped and discharges "out of battery," meaning

---

[31] *Id.* at 0:37-0:40.
[32] *Id.*

the gun's slide was not aligned with the body of the firearm.

85.     SIG describes the VUP as containing "[s]everal important changes . . . to bring an original SIG SAUER P320 pistol to its new upgraded status.   These changes include an enhanced, upgrade trigger and slide[:]"[33]



86.     Notably, upon information and belief, these upgrades are the very changes Omaha Outdoors and the U.S. Army commented were the cause of the uncommanded discharges.[34]

87.     In an official company video in April 2022, SIG's then Pistol Product Manager, Phil Strader,[35] describes the P320's voluntary "upgrades."[36]

**The VUP changes the trigger.**

88.     Strader explains that "[t]he upgraded guns have a much smaller and lightweight trigger, [being] reduced in weight by about 35 percent, [the reduced-weight trigger is] going to

---

[33] *P320 Voluntary Upgrade Program*, SIG SAUER, https://www.sigsauer.com/p320-voluntary-upgrade-program (last accessed on May 4, 2022).
[34] See allegations contained within paragraphs 32-33 and 36.
[35] Mr. Strader is now listed as the Director of Firearms Product Management at SIG.
[36] *P320 Voluntary Upgrade Program* at https://www.sigsauer.com/p320-voluntary-upgrade-program.

reduce inertia to the rear[:]"



89.     Additionally, Strader explains, "you'll notice a disconnector cut that's in the back bottom of the slide[:]"



90.     Comparing to a "non-upgraded" P320 (right in picture below), Strader describes the mechanical disconnector of the upgraded pistol as having "nothing to do with drop safety, [but] simply a matter of a mechanical disconnection of the trigger from the sear when the slot is moved to the rear."  However, Strader explains that the older style pistol's trigger was actually resetting the sear in place, while the upgraded pistol with the disconnector prevents the sear from resetting, making it so that trigger only drops the sear and doesn't reset it.



91.     Although Strader explains that the new disconnector only "gives you a much different feeling trigger, [a] <u>better trigger</u>[,]" upon information and belief, this modification actually aids in preventing uncommanded discharges and was a feasible alternative design known to SIG but which SIG did not implement in its consumer P320's such as the one sold to Williams.

<u>**The VUP changes the design of the safety levers.**</u>

92.     Strader explains that SIG's VUP to the P320 "incorporated . . . a trigger bar leg that uses the rearward pressure of the trigger bar <u>to ensure that these components can't just pop up on their own</u>."

93.     On the older version of the P320, as featured on the right below, the safety leg would "just come straight up," as Strader says in the official video, "it doesn't take a lot of pressure to pull that safety lever up.  Same could be said for the sear, the sear can be pushed down with not a lot of force[:]"



94.     On "[t]he new [P320] versions, <u>it's much more difficult to pull this safety lever up and push the sear down without the trigger actually being pulled</u>. So that's two big changes [SIG] made that are internal" as part of the P320 VUP.

95.     SIG's next change, as part of the P320 VUP, was by adding a second striker surface:



96.     "What [the second striker surface is] designed to do, is if all of these fail safes fail, for some reason, and the striker goes forward without the trigger being pulled, if it slips off that striker surface <u>that second surface is designed to actually catch the striker and keep it from striking the primer on the round</u>[,]" which prevents an uncommanded discharge.

21

97.    "Not only does the trigger bar leg on the sear and the safety lever <u>keep them from coming up inadvertently</u>, if everything goes wrong, <u>that second sear surface will catch the striker and prevent it from firing the gun</u>."

**The VUP changes the weight of the striker.**

98.    "Another component [SIG] added to the upgrade [of the P320] is the lightweight striker."

99.    "In short, [upgraded P320s] get a lightweight trigger, a lightweight striker, an improved sear, an improved safety lever, and a disconnector that gives [the user] an even better feeling trigger and what's most important is [the user hasn't] lost the <u>key fundamentals of the 320[:] shootability, modularity, and safety</u>."

100.    Williams's P320 was not upgraded as part of the VUP and Williams was unaware of the VUP at the time of the May 25, 2019 uncommanded discharge and his injuries, and was thereby unaware of the design defects existing in his P320:



**The VUP did <i>not</i> add any external safety mechanisms to the P320.**

101.    SIG's VUP neither added a trigger toggle nor a manual safety.

102.    In effect, the VUP did nothing to change the external safety features of the P320.

103.    Williams's P320 did not have an external manual safety:



**SIG continues to represent the P320 as a safe firearm, even though it is not.**

104.   Nonetheless, even without those external safety features, SIG's "Questions and Answers" associated with the VUP continued to represent to consumers that the firearms were safe and that the VUP would have minimal impact on the firearm, although no safety standard allows for the uncommanded discharge of a firearm such as the P320, especially so when the gun was not dropped:

FREQUENTLY ASKED QUESTIONS

**Is my P320 safe in its current configuration?**

Yes. The P320 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices. Careless and improper handling of any firearm can result in an unintentional discharge.

*****

23

**What if I don't want to upgrade the trigger assembly on my P320?**

This is a voluntary service, as the P320 meets and exceeds all ANSI/SAAMI, NIJ, DOJ, California, Massachusetts, and safety standards. Sig Sauer welcomes all of its P320 owners to take advantage of this program.

Sig Sauer P320 Voluntary Upgrade Program.[37]

105.   However, SIG admits the original design of the P320 are capable of uncommanded discharges when dropped at certain angles:

**Why is this upgrade happening?**

Through additional testing above and beyond standard American National Standards Institute (ANSI)/Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), Department of Justice (DOJ), Massachusetts, California, and other global military and law enforcement protocols, we have confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped. Although it is a rare occurrence, with very specific conditions, SIG SAUER is offering an upgrade to all of its current P320 owners.

106.   Upon information and belief, this "drop angle" is the angle in which the gun's bore hits a surface in an upward direction and the frame and the slide contact the surface at the same time.

107.   Upon information and belief, it is possible that if the gun is pushed back at that same or similar "drop angle" against a surface that is not necessarily the ground, the original P320 could inadvertently discharge.

108.   Whether due to this "drop angle" being achieved, or whether caused by the other design defects in Williams' P320, the gun yielded an uncommanded discharge proximately causing permanent harm and injury to Williams.

109.   Yet, SIG made no warning about the design failure and mechanisms resulting in Williams' injuries, only stating in the VUP that the P320 can inadvertently discharge when

---

[37]   *Id.*

dropped at that certain angle. Again, Williams did not drop his P320.

110. SIG did not warn that an uncommanded discharge could occur in another situation beyond or distinct from the "drop angle" described in its VUP.

111. SIG omitted, concealed, and/or failed to disclose several material facts about the P320 firearm:

    a.    It has a heightened risk of uncommanded discharges, even under normal and/or foreseeable use handling circumstances;

    b.    It requires a heightened degree of care than comparable firearms due to its lack of external safety features and inadequate internal safety mechanisms;

    c.    It lacks safety features widely available on other comparable firearms in the marketplace; and

    d.    It lacks the safety features SIG employed in the military version of the P320 to salvage its financially lucrative $580 million government contract.

112. SIG did not warn, advise, or tell consumers about the increased likelihood of the P320 inadvertently discharging due to the absence of these external safety features and/or the original design defectiveness of the internal safety mechanisms.

113. SIG also never warned consumers that they will need to engage in enhanced and heightened safety procedures because of the P320's lack of any external safety mechanisms and/or the original defectiveness of the internal safety mechanisms.

114. Williams was unaware of these omissions or concealments by SIG. Had he known of the defective design of the P320, Williams would have never bought his P320.

115. Since 2018, over twenty-eight uncommanded discharges of the consumer P320 have occurred and at least twenty lawsuits have been filed against SIG alleging the P320

25

discharged without the trigger being pulled:

| Case Name | Jurisdiction | Case No. |
|---|---|---|
| *Herman v. Sig Sauer* | W.D. Okla. | 21-CV-1038 |
| *Frankenberry v. Sig Sauer* | D. S.C. | 19-CV-2990 |
| *Hoefs v. Sig Sauer* | W.D. Wash. | 20-CV-5173 |
| *Schneider v. Sig Sauer* | D. N.H. | 20-CV-1190 |
| *Green-Berrios v. Sig Sauer* | D. P.R. | 22-CV-1002 |
| *Vadnais v. Sig Sauer* | D. Conn. | 18-CV-605 |
| *Powers v. Sig Sauer* | M.D. Fla. | 20-CV-2026 |
| *Haynes v. Sig Sauer* | N.D. Ga. | 20-CV-4218 |
| *Lang v. Sig Sauer* | N.D. Ga. | 21-CV-4196 |
| *Davis v. Sig Sauer* | E.D. Ky. | 22-CV-10 |
| *Mayes v. Sig Sauer* | W.D. Ky. | 19-CV-146 |
| *Ahern v. Sig Sauer* | D. Mass. | 21-CV-11007 |
| *Collette v. Sig Sauer* | D. Mass. | 21-CV-11392 |
| *Campbell v. Sig Sauer* | W.D. Mo. | 21-CV-5047 |
| *Guay v. Sig Sauer* | D. N.H. | 20-CV-736 |
| *Colwell v. Sig Sauer* | N.D.N.Y. | 21-CV-1200 |
| *Slatowski v. Sig Sauer* | E.D. Pa. | 21-CV-729 |
| *Hilton v. Sig Sauer* | E.D. Tex. | 21-CV-441 |
| *Watson v. Sig Sauer* | N.D. Tex. | 21-CV-106 |
| *Vadnais v. Sig Sauer* | E.D. Va. | 18-CV-540 |
| *Jinn v. Sig Sauer* | S.D.N.Y. | 20-CV-1122 |

116. These alleged uncommanded discharges occurred under lawful, ordinary and foreseeable handling circumstances and reasonably foreseeable uses of the P320 product, such as in the circumstances of Williams' injuries.

117. The uncommanded discharge of Williams's P320, likewise, occurred under

lawful, ordinary, and foreseeable handling circumstances. The condition of Williams' P320 was the in the same condition as when it left the hands and control of its manufacturer, SIG SAUER, Inc.

118. To date, SIG has yet to issue a voluntary recall of the original (non-upgraded) P320 pistols such as the one owned by Williams, and falsely, negligently, misleadingly and fraudulently assert that the Sig P320 is safe for its intended purposes even in the absence of the modifications made for the U.S. military weapons or through the VUP.

119. To date, SIG has yet to admit the original P320 design is unsafe to consumers and thereby such weapons continue to present an unchecked risk to consumers, end users, and the public. SIG's motives for failure to recall and remedy the defective P320 mechanisms with its own acknowledged feasible design alternatives, upon information and belief, were profit-based.

## FIRST CAUSE OF ACTION

## Design Defect under N.C. Gen. Stat. §§ 99B-6, 99B-11

### (Defendant SIG)

120. Williams reincorporates by reference the allegations of paragraphs 1 – 119 as if expressly recited herein.

121. SIG's original P320's actual design was defective, causing the P320 not to function in a manner reasonably expected by an ordinary consumer of firearms, and that defective design caused the uncommanded discharge and Williams's injuries and resulting damages.

122. At the time of SIG's P320's manufacture, SIG acted unreasonably in designing or formulating the P320, because SIG failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation.

27

123. SIG's VUP demonstrates a safer, practical, feasible, and otherwise reasonable alternative design or formulation of the P320, which SIG ultimately could have used back in the original manufacturing of the P320.

124. SIG's 2017 VUP design and formulation could have been reasonably adopted back in the 2014 original manufacturing.

125. In SIG's own words, the 2017 VUP design and formulation "provides an additional level of safety against cartridge failure events" or uncommanded discharges, and had SIG adopted said design in the original manufacturing of the P320 that would have prevented or substantially reduced the risk of harm to consumers inclusive of Williams.

126. After the production of the original P320s, SIG knew or should have known that the original design was defective and increased the likelihood of uncommanded discharges.

127. Adopting the 2017 VUP back during the original manufacturing of the P320 would not have substantially impaired the usefulness, practicality, or desirability of the original P320. As SIG represents, the "upgraded" P320 embodies the key fundamentals of the 320: shootability, modularity, and safety.

128. Given the information consumers have about the original P320 today—that the original P320 could inadvertently discharge when dropped or pressed against a surface at a similar "drop angle"—the original P320's design or formulation was so unreasonable that a reasonable person would not use the original P320 if its defects had been made known to the end user consumer. Williams was unaware of the design defects in the P320 at the time of its uncommanded discharge on May 25, 2019.

129. The egregious nature of SIG's conduct in the design, manufacture and sale of the P320 is further evidenced by the fact that U.S Army, in 2016 (prior to the VUP), conditioned its

28

contract on the original P320 defects being fixed, namely "implementing lightweight components in the trigger group mechanism" and adding an ambidextrous external manual safety. Yet, SIG failed to make those modification for its civilian consumers.

130. SIG's original P320's unreasonable design or formulation was the actual and proximate cause of Williams's uncommanded discharge that resulted in his injuries.

<u>**SECOND CAUSE OF ACTION**</u>

<u>**Design Defect under N.C. Gen. Stat. §§ 99B-6**</u>

**(Defendant Wintrode)**

131. Williams reincorporates by reference the allegations of paragraphs 1 – 130 as if expressly recited herein.

132. Wintrode as a holster manufacturer is not subject to the provisions of N.C. Gen. Stat. § 99B-11 but rather is subject to the general design defect statutory cause of action within N.C. Gen. Stat. § 99B-6.

133. At the time of the production of the Bulldog® Extreme Series Belt Holster, Wintrode acted unreasonably in designing or formulating the holster because Wintrode failed to adopt a safer, practical, feasible alternative deign and formulation to protect a user from a discharge of a firearm holstered in a Bulldog® holster.

134. Such design could and should have included safety protections such as a bullet deflector installed at the bottom of the holster.

135. Wintrode knew its holsters, including the at-issue Bulldog® Belt Holster, would be used for variety of handguns, specifically including SIG's P320.

136. Thus, Wintrode knew the nature and magnitude of the risks associated with its

29

holsters' designs—namely that a holstered firearm could discharge in its holster and knew or should have known of the propensity of the SIG P320 to yield an uncommanded discharge.

137. However, Wintrode did not take steps to reasonably design their holsters to protect the users from a holstered firearm discharging while inside its holster.

138. Wintrode advertises that its Bulldog® Extreme Belt Holster, specifically Holster Number 33, is compatible and fits with SIG's P320.

139. Williams's holster was a Bulldog® Belt Holster.

140. Upon information and belief, William's Bulldog® Belt Holster is a Holster Number 33, designed to fit William's P320.

141. Wintrode failed to account for such a heightened risk of a holstered firearm discharging.

142. Yet, Wintrode advertised and represented to its consumers that its Bulldog® branded holsters protected users—"Whether you zip it up or lock it down, nothing protects you like a Bulldog!"

143. Moreover, Wintrode explicitly states in its catalog for the Bulldog® Belt Holster that the holster's materials "Provides the Ultimate in Fit, Comfort & Protection for You & Your Pistol."[38]

144. Wintrode's Bulldog® Belt Holster failed to protect Williams from the very product it was designed to handle—a semi-automatic pistol, including William's P320.

145. Even though Wintrode made express representations and warranties that its holsters would protect users, Williams's holster did not protect him from an uncommanded

---

[38] Bulldog® 2021 Catalog, p. 42, available at https://www.bulldogcases.com/wp-content/uploads/2021/02/2021.BulldogCatalog.pdf  (emphasis supplied) (last accessed on May 12, 2022).

30

discharge of his holstered P320.

146. Wintrode was negligent in designing and producing its Bulldog® holsters for failing to design them in such a way that would prevent or substantially decrease the likelihood of an uncommanded discharge while a firearm was in a Bulldog® holster or prevent or substantially decrease the likelihood that an end-user, such as Williams, would be injured by a holstered firearm discharging—on command or uncommanded.

147. The nature and magnitude of the risks associated with an uncommanded discharge of a holstered firearm is great.

148. That nature and risk of harm requires increased care and safety mechanisms in the design and production of a holster that prevents, or at least substantially decreases the likelihood, of an uncommanded discharge of a firearm holstered in a company's product.

149. With the knowledge of that nature and risk of harm, holster manufacturers, like Wintrode, have a duty to design holsters that protect users from injury resulting from a discharge of the firearm while it is in its holster. The Wintrode holster utilized by Williams on May 25, 2019 was in the same condition when it left the hands and control of its manufacturer, Wintrode. Williams made a foreseeable use of the holster. The Wintrode holster utilized by Williams contained no warnings whatsoever to advise Williams of any risks or dangers attendant with the reasonable use of the Wintrode holster in combination with the SIG P320.

150. As a direct and proximate result of the Bulldog® Belt Holster's defective design or formulation, Williams suffered injuries from the P320's uncommanded discharge.

31

## THIRD CAUSE OF ACTION

## Defective Warning under N.C. Gen. Stat. §§ 99B-5

### (Defendant SIG)

151.   Williams reincorporates by reference the allegations of paragraphs 1 – 150 as if expressly recited herein.

152.   At the time of production, the original P320 was capable of an uncommanded discharge when dropped at a certain angle or pushed against a surface at the same angle.  The P320 was also capable of an uncommanded discharge without being dropped.

153.   At the time of the original P320's design and manufacturing, SIG had a duty to unambiguously and adequately warn consumers and/or intended users of the P320, including Williams, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

154.   Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents pre-dating this lawsuit and the injury to Williams by virtue of internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

155.   At the time of production, SIG did not warn consumers that if the original P320 was dropped at an angle in which the gun's bore is positioned in an upward direction, and the frame and the slide of the gun contact the ground at the same time the gun could inadvertently discharge.

156.   Likewise, SIG failed to warn consumers that if the gun were pushed at the same "drop angle" against a surface, the original P320 could inadvertently discharge.

32

157.   Moreover, SIG failed to warn that, due to the P320's lack of external safety mechanisms, the original P320 had an increased likelihood of an uncommanded discharge.

158.   SIG also failed to warn that, due to the P320's defective internal safety mechanisms, the original P320 had an increased likelihood of an uncommanded discharge.

159.   Failure to give those warnings was unreasonable because when the original P320 left SIG's control without those warnings it created an unreasonably dangerous condition to consumers.

160.   SIG should have known, as evidenced by its later VUP, that the original P320 without those warnings posed a substantial risk of harm to consumers, such a Williams.

161.   Moreover, upon information and belief, after the original P320s left SIG's control, SIG became aware of the P320's likelihood of uncommanded discharges and failed to give adequate warnings about the original P320's safety.

162.   Rather, SIG continued (and still continues) to maintain that the original P320s are safe, when if act they are not safe when used in a reasonably foreseeable manner.

163.   Based on prior similar incidents pre-dating this lawsuit and/or the injuries to Williams as well as internal testing an industry publications and research, SIG knew or should have known the original P320s posed a substantial risk of harm to users, such as Williams, and yet SIG did nothing to warn about that potential harm.

164.   SIG's failure to warn about the original P320's likelihood of uncommanded discharge was the actual and proximate cause of Williams's injuries.

**FOURTH CAUSE OF ACTION**

**Defective Warning under N.C. Gen. Stat. §§ 99B-5**

**(Defendant Wintrode)**

165.   Williams reincorporates by reference the allegations of paragraphs 1 – 164 as if expressly recited herein.

166.   At the time of the production of the Bulldog® Belt Holster, Wintrode did not provide an adequate warning or instruction that the holster would not protect end-users from harm caused by a holstered firearm discharging.   The Wintrode holster utilized by Williams contained no warnings whatsoever to advise Williams of any risks or dangers attendant with the reasonable use of the Wintrode holster in combination with the SIG P320.

167.   Wintrode failed to provide that warning or instruction even in light of its express representations and warranties that its Bulldog® holsters would protect users of its holsters.

168.   Wintrode's lack of warning or instruction created an unreasonably dangerous condition in that end-users would carry loaded firearms in Wintrode's Bulldog® holsters with the expectation that the holster would protect their firearm and themselves.

169.   Moreover, Wintrode's lack of adequate warning or instruction coupled with its express representations that its Bulldog® holsters would protect users further created a dangerous condition to end-users.

170.   Wintrode knew or should have known by exercising ordinary care in testing its holsters that a lack of a warning or instruction as to carrying loaded firearms in its holsters would create a substantial risk of harm to end-users.

171.   Such end-users, like Williams, are foreseeable to Wintrode, as it is common in

34

the gun industry to sell and trade holsters with their intended firearm.

172. Wintrode's failure to warn Williams, especially coupled with its representation that its holsters would protect users, was an actual and proximate cause of Williams's injuries.

## FIFTH CAUSE OF ACTION

### Negligence/Gross Negligence

### (Defendants SIG and Wintrode)

173. Williams reincorporates by reference the allegations of paragraphs 1 – 172 as if expressly recited herein.

174. SIG had a duty of care to act as a reasonably prudent manufacturer of the original P320.

175. Wintrode had a duty of care to act as a reasonably prudent manufacturer of Bulldog® holsters.

176. SIG owed its duty to its customers and foreseeable users of the original P320s, including Williams, to produce the original P320 with appropriate safety mechanisms that would prevent an uncommanded discharge.

177. Wintrode owed its duty to customers and foreseeable users of its Bulldog® holsters, including Williams, to produce Bulldog® Belt Holsters with the appropriate design that prevents holstered firearms from discharging and/or protecting users from discharges of a holstered firearm.

178. SIG breached its duty to its customers and foreseeable users of the original P320s, including Williams, by designing the P320 in a defective manner and placing the weapon in the stream of commerce, failing to warn users of potential uncommanded discharges, failing

to issue a voluntary recall regarding the original P320, continuing to represent the P320 as a safe firearm, and in additional ways to be developed throughout the course of discovery. SIG thereby acted negligently and with gross and/or reckless disregard for the safety and well-being of the purchasers and end users of its P320 firearms.

179. Wintrode breached its duty to its customers and foreseeable users of its Bulldog® holsters, including Williams, by failing to design its holsters to protect users from a discharge of a holstered firearm, as the company said it would and as outlined above, and in additional ways to be developed throughout course of discovery.

180. SIG's and Wintrode's breaches of their duties to end-users directly and proximately caused Williams's injuries resultant from his holstered P320's uncommanded discharge.

181. SIG's negligence is further evidenced by the numerous similar occurrences of the original P320s' uncommanded discharges that has caused damage to consumers nationwide. Wintrode's negligence is further evidenced by its failure to implement safety measures for its holster to be used in conjunction with the SIG P320 despite its actual or constructive knowledge of numerous similar occurrences of the original, holstered P320s' uncommanded discharges that has caused damage to consumers nationwide.

## SIXTH CAUSE OF ACTION

### Breach of Warranty, express and implied

**(Defendant SIG)**

182. Williams reincorporates by reference the allegations of paragraphs 1 – 181 as if expressly recited herein.

36

### *Breach of express warranty*

183.    SIG provides a written "Limited Lifetime Firearms Warranty," which states that SIG "warrants that the [P320] was originally manufactured free of defects in material, workmanship, and mechanical function."[39]

184.    That warranty, by its terms, remains in effect during the lifetime of the original P320.

185.    SIG breached that warranty when it manufactured and sold the original P320 because the original P320's internal safety mechanisms were defective in material, workmanship, and/or mechanical function, evidenced by the changes SIG made as part of the VUP.  See Paragraph Numbers 87–99, supra.

186.    That breach of warranty caused the uncommanded discharge that injured Williams because the materials and workmanship of the original P320 warranted were not free of the various safety defects that were subsequently identified by and within the VUP (i.e. mechanical disconnector, upgraded sear plate, and enhanced trigger).

### *Breach of implied warranties*

187.    SIG's written warranty attempts to disclaim any and all implied warranties and attempts to disclaim "incidental or consequential damages arising from or in connection with this limited warranty."[40]

188.    As SIG is selling a P320, which meets the statutory definition of "consumer product" under 15 U.S.C. § 2301(1), and is providing a written warranty, as defined by 15 U.S.C. § 2301(6)(A) and (B), SIG's warranty is subject to the consumer protections of the

---

[39] *SIG SAUER P320 Operator's Manual: Handling & Safety Instructions*, p. 75.
[40] *Id.*

Magnuson-Moss Warranty Act.

189. Namely, under the Magnuson-Moss Warranty Act, SIG cannot disclaim implied warranties, see 15 U.S.C. § 2308(a), (c).

190. Moreover, North Carolina law requires exclusion of implied warranties to be in writing and conspicuous. See N.C. Gen. Stat § 25-2-316.

191. SIG's "Limited Lifetime Firearms Warranty" on the P320 is on page 75 of its 76-page operator's manual and is in similar font to rest of the text in the manual:

**SIG SAUER® Limited Lifetime Firearms Warranty**

SIG SAUER warrants that the enclosed firearm was originally manufactured free of defects in material, workmanship, and mechanical function. For the lifetime of the original purchaser, SIG SAUER agrees to correct any defect in the firearm for the original purchaser by repair, adjustment, or replacement, at SIG SAUER's option, with the same or comparable quality components (or by replacing the firearms at SIG SAUER's option); provided, however, that the firearm is returned unloaded and freight prepaid to:

SIG SAUER
18 Industrial Drive
Exeter, NH 03833

This limited warranty is null and void if the firearm has been misused; damaged (by accident or otherwise); fired with handloaded, reloaded, or improper ammunition; fired with an obstruction in the barrel; damaged through failure to provide reasonable and necessary maintenance as described in the manual accompanying the firearm; or if unauthorized repair or any alteration, including of a cosmetic nature, has been performed on the firearm. This limited warranty does not apply to normal wear and tear of any parts. Subject to the foregoing, this limited warranty confers the right to have the covered firearm or its parts repaired, adjusted, or replaced exclusively upon the original purchaser, which right is not transferable to any other person. No implied warranties of any kind are made herein, and this warranty does not apply to any accessory items attached or appurtenant to the firearm. In no event shall SIG SAUER be liable for any incidental or consequential damages arising from or in connection with this limited warranty.

192. Such writing is not conspicuous, and as such is ineffective to disclaim implied warranties. Such disclaimer was also not provide to Williams as the end user.

193. Furthermore, SIG's attempted disclaimer is ineffective to disclaim the warranty of merchantability under N.C. Gen. Stat. § 25-2-316, because the writing does not "mention merchantability."

194. Likewise, SIG's attempted disclaimer is ineffective to disclaim the warranty of

38

fitness for particular purpose under N.C. Gen. Stat. § 25-2-316.

195.   As such, SIG's sales of the original P320s contained the implied warranty of merchantability because SIG is a merchant with respect to the P320s, i.e. goods of the kind, as defined by N.C. Gen. Stat. § 25-2-104.

196.   The implied warranties associated with the original P320s were owed to Williams as a buyer, as defined by the Uniform Commercial Code and N.C. Gen. Stat. § 25-1-201.

197.   As a buyer, Williams fell within the protected statutory class contained in N.C. Gen. Stat. § 99B-2(b), allowing implied warranties to flow to him without privity of contract with the manufacturer and/or seller.

198.   SIG breached the implied warranty of merchantability with the respect to the manufacture and sale of the original P320 because:

    a.    The original P320s would not pass without objection in the firearm industry given their increased likelihood of uncommanded discharges;

    b.    Such issues with the original P320s were not fit for their ordinary purpose in the firearm industry;

    c.    The original P320s were not adequately labeled with the appropriate warnings regarding the possibility of uncommanded discharges; and

    d.    The original P320s do not conform to SIG's promises of safety made within the P320's packaging and advertising.

199.   Moreover, while Williams used his P320 under ordinary and foreseeable use, his P320 malfunctioned.

200.   That malfunction under the ordinary and foreseeable use is a breach of the

Case 4:22-cv-00048-D   Document 1   Filed 05/18/22   Page 39 of 52

implied warranties associated with Williams' P320.

201.   SIG also breached the implied warranty of fitness for a particular purpose because at the time of the manufacturing and sale of the P320, SIG had reason to know a user, such as Williams, would acquire the P320 for shooting.

202.   Part of that purpose (shooting) includes transporting a firearm and simply holstering a firearm while it is not in use.

203.   It is implied that a firearm, while being transported or simply being holstered while not in use, will not inadvertently discharge.

204.   Buyers, such as Williams, rely/relied on the fact guns will not inadvertently discharge while being in the appropriate holster.

205.   The P320 did not comply with any of these implied warranties owed to Williams because the P320 was defective at the time of the sale.

206.   SIG's breach of the implied warranties associated with the original P320s was the direct and proximate cause of Williams's injuries.

207.   Williams notified SIG of the breach of its warranties, both express and implied, upon the filing of this lawsuit.

### SEVENTH CAUSE OF ACTION

### Substantive Claim under the Magnuson-Moss Warranty Act (hereinafter "MMWA")

### (Defendant SIG)

208.   Williams reincorporates by reference the allegations of paragraphs 1 – 207 as if expressly recited herein.

209.   While Williams maintains state law claims for breach of express and implied

40

warranties, William's also asserts a separate, substantive claim under the MMWA, namely a violation of § 15 U.S.C. 2308(a) thereby creating a federal cause of action under § 2310(d).[41]

210.   SIG provided a written warranty statement that the P320 was "originally manufactured free of defects in material, workmanship, and mechanical function."

211.   SIG attempted to disclaim implied warranties, in direct violation of § 2308(a) of the MMWA.

212.   Thus, SIG violated substantive provisions of the MMWA, which Williams is pursuing under § 2310(d).

213.   This Court has jurisdiction over Williams's substantive MMWA claim because the amount in controversy exceeds $50,000, exclusive of costs and interests, see 15 U.S.C. § 2310(d)(1)(B), (3)(B).

214.   Pursuant to 15 U.SC. § 2310(d)(2), Williams is entitled to recover reasonable attorneys' fees in the event he prevails on the substantive MMWA claim.

## EIGHTH CAUSE OF ACTION

### Fraud

**(Defendant SIG)**

215.   Williams reincorporates by reference the allegations of paragraphs 1 – 214 as if expressly recited herein.

216.   Upon information and belief, after rigorous testing, SIG knew that the original P320 would inadvertently discharge if hit at a certain angle or otherwise.

217.   The fact that the P320 could inadvertently discharge in this manner was a

---

[41] See Rokicsak v. Colony Marine Sales & Serv., 219 F. Supp. 810, 817 (Mich. E.D. 2002).

material fact under certain reasonably predictable and foreseeable circumstances, such as being dropped or bumped at a specific angle.

218.   Upon information and belief, SIG concealed that material fact from consumers by altering the military version of the P320, even though SIG intentionally did not fix the commercial version <u>and</u> did not disclose those changes for over a year thereafter.

219.   However, during that time, SIG represented that the P320 passed drop testing and was a safe firearm.

220.   However, said drop testing standards did not apply to the specific "drop angle" that results in the uncommanded discharge.

221.   Upon information and belief, SIG knew or should have known that the P320 would inadvertently discharge at a specific "drop angle" that was not required to be tested, and still represented the P320 was safe under those circumstances.

222.   Upon information and belief, SIG knew or should have known that the specific "drop angle" could also be triggered by an application of lateral force, not necessarily a drop, and/or in circumstances such as experienced by Williams.  Williams justifiably relied upon SIG under these circumstances and had a reasonable and justified belief that the P320 would not discharge in an uncommanded fashion and while holstered.

223.   Upon information and belief, SIG falsely represented to the general public that the P320 was safe when SIG knew it was not safe.

224.   Upon information and belief, SIG continues to falsely represent to the general public that the P320 is safe, asserting that a SIG P320 is "safety without compromise."[42]

---

[42] P320 Website, *supra* note 13.

225. Upon information and belief, even after the U.S. Army's drop testing reveled the increased likelihood of uncommanded discharges, SIG continued to represent that the P320 was safe and passed required and voluntary drop testing.

226. Even after Omaha's video, and the subsequent news coverage on the issue, SIG continued to represent that the P320 was safe.

227. SIG continues to represent, falsely, that the original P320 is safe.

228. Upon information and belief, SIG made these representations and concealments to deceive consumers and obtain sales and financial profit through sales of the P320 to consumers and end users, including Williams, fostering the belief and expressly representing that the P320 was an extremely safe gun when SIG knew it was not safe.

229. Consumers, including Williams, bought the P320, in part, because of its perceived safety features.

230. Consumers, including Williams, bought the P320, in part, in justifiable reliance that SIG adequately produced a firearm with safety mechanisms that would prevent or greatly decrease the likelihood of an uncommanded discharge.

231. SIG's false representations and concealment were false and fraudulent in nature directly and proximately caused Williams's injuries.

## NINTH CAUSE OF ACTION

### Negligent Misrepresentation

#### (Defendant SIG)

232. Williams reincorporates by reference the allegations of paragraphs 1 –231 as if expressly recited herein.

43

233.   Upon information and belief, SIG conducted inadequate safety testing, including but not limited to the SAAMI standards, on the P320.

234.   Upon information and belief adequate testing would have revealed the P320 uncommanded discharge issue.

235.   If said testing did not reveal the P320 uncommanded discharge issue, then SIG did not exercise reasonable care in testing the P320 to ascertain the uncommanded discharge issue.

236.   SIG was under a duty of care to its consumers, including Williams, to ascertain whether the P320 met all safety standards, including being free of uncommanded discharge issues.  No safety standard authorizes or adopts  as acceptable a firearm which will discharge on an uncommanded basis under foreseeable circumstances such as were presented by Williams' use of the P320.

237.   SIG's consumers, including Williams, reasonably relied on SIG's manufacturing and testing procedures to ensure the P320 was a safe firearm under the exercise of ordinary use.

238.   Williams's reliance on SIG's safety testing and SIG's exercise of reasonable care in the manufacturing of the P320, was to his detriment.    The actions and omissions of SIG proximately resulted in the uncommanded discharge of the P320 and the resulting injuries to Williams.

**TENTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Defendant Wintrode)**

239.   Williams reincorporates by reference the allegations of paragraphs 1 – 238 as if

44

expressly recited herein.

240.   Wintrode expressly represents that its Bulldog® Extreme Series Belt Holsters "Provides the Ultimate in Fit, Comfort & <u>Protection for You</u> & Your Pistol."[43]

241.   Wintrode made that representation in its 2021 Bulldog® products catalog, and upon information and belief, made the same representation in prior catalogs, including the years 2017 and 2018, to the effect that the holster would protect not only the firearm, but also the user of the holster.

242.   Upon information and belief, Wintrode made that representation without conducting adequate quality or safety tests on its Bulldog® Extreme Series Belt Holsters, without implementation of a feasible alternative design inclusive of a bullet deflector, and without first determining the safety of the holster when used with the SIG P320.

243.   Upon information and belief, as Wintrode made that representation in a products catalog, produced to entice customer sales, Wintrode made that representation without exercising reasonable care into the truth of said representation.

244.   Said representation was made to customers and end users with the expectation that they would rely on those representations to protect themselves from their holstered firearms.

245.   Williams, as an end user of Wintrode's product, justifiably relied on the fact that the Bulldog® Belt Holster was a safe holster for his P320—which Wintrode represented as such.

246.   Moreover, Wintrode markets its Bulldog® brand as an "industry leader" in holster manufacturing, claiming, "[w]hether you zip it up or lock it down, <u>nothing protects you like a Bulldog</u>!"   Such representations were more than marketing puffery inasmuch as the representations were materially consistent with the Wintrode product descriptions for the subject

---

[43] Bulldog® 2021 Catalog, *supra* note 38 (emphasis supplied).

45

holster.

247.   William's reliance of the safety of Wintrode's Bulldog® Belt Holster was to his detriment.  The actions and omissions of Wintrode proximately resulted in the resulting injuries to Williams.

**ELEVENTH CAUSE OF ACTION**

**Unfair and Deceptive Trade Practice under N.C. Gen. Stat. § 75-1.1**

**(Defendant SIG)**

248.   Williams reincorporates by reference the allegations of paragraphs 1 – 247 as if expressly recited herein.

249.   SIG's institution of the VUP after learning about the defects associated with the original P320 was unfair and deceptive to consumers of the original P320.

250.   SIG's continuing insistence that the original P320s are safe firearms is deceptive.

251.   With the knowledge from the U.S. Army's and Omaha's drop tests, SIG's continued advertising, manufacturing, and sale of the original model P320 is unfair and deceptive.

252.   SIG's failure to institute a voluntary recall and or other safety warnings regarding the original P320's design defect is unfair and deceptive.

253.   Moreover, SIG's violations of other areas of North Carolina law, including but not limited to the N.C. Products Liability Act and Williams's fraud claim, makes SIG's conduct a *per se* unfair and deceptive trade practice.  See Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985); Hardy v. Toler, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975).

46

254. SIG's action with respect to the manufacturing and the sale of the P320 is directly in or affecting commerce.

255. SIG's unfair and deceptive trade practices regarding the manufacturing and sale of the original P320 directly and proximately caused Williams's injuries.

256. Pursuant to N.C. Gen. Stat. § 75-16, Williams is entitled to trebled damages.

## TWELFTH CAUSE OF ACTION

## Unfair and Deceptive Trade Practice under N.C. Gen. Stat. § 75-1.1

### (Defendant Wintrode)

257. Williams reincorporates by reference the allegations of paragraphs 1 – 256 as if expressly recited herein.

258. Wintrode's representations in its course of marketing Bulldog® holsters, including the one Williams has for his P320, was deceptive because the holster's design does not protect users from a holstered firearm's discharge—commanded or uncommanded.

259. Those false representations were made in or affecting commerce because they were made in the course of marketing Wintrode's products to consumers.

260. Moreover, Wintrode's violations of other areas of North Carolina law, including but not limited to the N.C. Products Liability Act and Williams's negligent representation claim, should make Wintrode's conduct a *per se* unfair and deceptive trade practice because violations of those areas of law is inherently unfair and deceptive. See Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007); Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 469, 353 S.E.2d 174, 179 (1986); see also Warfield v. Hicks, 91 N.C. App. 1, 370 S.E.2d 689 (1988).

261. Wintrode's actions with respect to the manufacturing, the sale, and marketing of its Bulldog® Belt Holster is directly in or affecting commerce.

262. Wintrode's unfair and deceptive trade practices regarding the manufacturing, sale, and marketing of its Bulldog® Belt Holster directly and proximately caused Williams's injuries.

263. Pursuant to N.C. Gen. Stat. § 75-16, Williams is entitled to trebled damages.

## THIRTEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

**(Defendant SIG)**

264. Williams reincorporates by reference the allegations of paragraphs 1 – 263 as if expressly recited herein.

265. SIG's production of the P320 without any external safety mechanisms and/or defective internal safety mechanisms was extreme and outrageous conduct for a firearms producer.

266. Moreover, SIG's failure to issue a voluntary recall once the negligent production was discovered and/or the pattern of uncommanded discharges resultant from said production was discovered is likewise extreme and outrageous conduct.

267. SIG's conduct in producing firearms without an external safety mechanism or without proper internal safety mechanisms evinces a reckless indifference to the likelihood that the resultant uncommanded discharges would cause severe emotional distress.

268. Additionally, SIG's modifications to the original P320 after the discovery of the uncommanded discharge issue coupled with SIG's failure to issue a voluntary recall of the

original P320 demonstrates a reckless indifference to the likelihood that SIG's conduct would cause severe emotional distress to firearm users.

269.   In the present case, SIG's conduct and reckless indifference to the likelihood of causing serve emotional distress did, in fact, cause, both factually and proximately, Williams severe emotional distress.

## FOURTEENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

**(Defendant SIG)**

270.   Williams reincorporates by reference the allegations of paragraphs 1 – 269 as if expressly recited herein.

271.   SIG negligently produced the P320 without proper safety mechanisms to prevent and/or decrease the likelihood of an uncommanded discharge.

272.   Moreover, SIG's failure to issue a voluntary recall of the negligently produced firearm was itself negligent.

273.   SIG's concealment of the insufficient safety mechanism and the dangers associated with the original P320 design was also negligent.

274.   It was reasonably foreseeable that negligent production of a firearm, the subsequent failure to issue a voluntary recall, and the failure to disclose the safety defects in the P320 all would increase the likelihood of uncommanded discharges nationwide, and would cause firearm users severe emotional distress.

275.   It was and is further reasonably foreseeable that the actual event of an uncommanded discharge due to negligently produced firearms, the failure to issue a voluntary

49

recall, and/or the intentional concealment of the safety defects would cause firearm users severe emotional distress.

276.	In the present case, the actions and omissions of SIG resulted in an uncommanded discharge which directly and proximately caused Williams severe emotional distress, which could have been avoided with careful design, production and sales and/or a voluntary recall of the negligently produced firearm.

**FIFTEENTH CAUSE OF ACTION**

**Punitive Damages**

**(Defendants SIG and Wintrode)**

277.	Williams reincorporates by reference the allegations of paragraphs 1 – 276 as if expressly recited herein.

278.	SIG and Wintrode's conduct as to their defective products, inadequate warnings, and misrepresentations are grossly egregious and wrongful, such that punitive damages are necessary and/or requested to punish said conduct.

279.	Additionally, punitive damages are sought to deter SIG and Wintrode, as well as others, from committing similar wrongful acts.

280.	Moreover, SIG's fraudulent conduct in manufacturing, marketing, and concealing the defects associated with the P320s is sufficiently egregious and wrongful conduct for a request of punitive damages to punish and deter SIG, as well as other, from committing similar wrongful acts.

281.	As such, Williams is requesting punitive damages pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*, as well as pursuant to North Carolina common law.

WHEREFORE Plaintiff, Jack Anthony Williams, prays for this Court to grant him relief as follows:

1.      That this Court award him actual and compensatory damages against the Defendants SIG SAUER, Inc. and Wintrode Enterprises, Inc, jointly and severally, in the amount of at least $10,000,000.00 (Ten Million Dollars) or in such other or greater amount as determined by proof at trial or award by this Court, to compensate him for his temporary and permanent physical injuries and disability, past and future medical and hospital expenses, extreme pain and suffering, lost wages, reduced earning capacity, emotional distress, and the value of care rendered to him subsequent to his injury on May 25, 2019 and ongoing into the future; and

2.      That this Court award him such punitive damages against the Defendants, SIG SAUER, Inc., and Wintrode Enterprises, Inc., in an amount equal to or greater than $20,000,000.00 (Twenty Million Dollars) as determined by proof at trial or award by this Court, as authorized under N.C. Gen. Stat. § 1D-1, *et seq*. and the North Carolina common law, and the standards and procedures relating thereto; and

3.      In the alternative, that this Court award him trebled damages against the Defendants, as allowed under N.C. Gen. Stat. § 75-16; and

4.      For a trial by jury on all issues so triable; and

5.      For his costs herein incurred together with post-judgment interest in accordance with applicable law; and

6.      For his attorneys' fees, as provided by law; and

7.      For any and all other relief, either general or special, to which he may be entitled.

51

Respectfully submitted this 18th day of May, 2022.

SUMRELL SUGG, P.A.
*Attorneys for Williams*

By:    /s/J. Lawson Hester
        State Bar No. 57754
        Post Office Drawer 889
        New Bern, NC  28563
        Telephone: (252) 633-3131
        Fax: (252) 633-3507
        E-mail:  lhester@nclawyers.com

By:    /s/James H. Ferguson, III
        State Bar No. 57889
        Post Office Drawer 889
        New Bern, NC  28563
        Telephone:  (252) 633-3131
        Fax:  (252) 633-3507
        E-mail:  jhferguson@nclawyers.com

LSS No. 133529