IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
FILE NO. 4:22-cv-00048-D

| | | |
|---|---|---|
| JACK ANTHONY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **RESPONSE TO DEFENDANT SIG** |
| | ) | **SAUER, INC'S MOTION TO DISMISS** |
| SIG SAUER, INC. and WINTRODE | ) | **FOR LACK OF PERSONAL** |
| ENTERPRISES, INC., | ) | **JURISDICTION** |
| | ) | |
| Defendants. | ) | |

COMES NOW Plaintiff, Jack Anthony Williams (hereinafter "Plaintiff"), by and through the undersigned counsel, and hereby responds to Defendant Sig Sauer's renewed Motion to Dismiss for lack of personal jurisdiction [D.E. 21, 58].

## STATEMENT OF THE CASE

Plaintiff initiated the present action against Defendant SIG Sauer, Inc. (hereinafter "SIG") on May 18, 2022, alleging, *inter alia*, personal injuries resulting from a defect in SIG's P320 model pistol. [D.E. 1]. Plaintiff served SIG with process by Certified Mail on or around May 19, 2022, and SIG moved for dismissal of Plaintiff's Complaint on July 5, 2022, pursuant to Federal Rule of Civil Procedure Rule 12(b)(2). [D.E. 15].[1]

In response, Plaintiff amended his complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to add supplemental allegations that supported the Court's exercise of personal jurisdiction over SIG. [D.E. 16]. In response, SIG moved to dismiss Plaintiff's Amended Complaint for lack of personal jurisdiction. [D.E. 21]. Plaintiff then moved for, [D.E. 25], and the Court granted, an extension of time for Plaintiff to respond to SIG's Motion to

---

[1] Plaintiff also moved for jurisdictional discovery and an extension of time to respond to SIG's original motion to dismiss, [D.E. 17]; however, Plaintiff's amended complaint mooted that prior motion. [See D.E. 30].

Dismiss and to perform limited jurisdictional discovery. [D.E. 34].

Since that Order, the Parties have engaged in all jurisdictional discovery permitted by the Court, including a deposition of SIG pursuant to Federal Rule of Civil Procedure 30(b)(6).[2] The evidence obtained during that discovery shows unequivocally that this Court has personal jurisdiction over SIG.

## FACTUAL BACKGROUND

Plaintiff is presently a resident and citizen of Ohio. At all times relevant to this action, he was a resident and citizen of Kentucky. SIG is a Delaware corporation with its principal place of business in New Hampshire and "sells firearms, including P320 model pistols, to federally licensed distributors and dealers located throughout the United States," [D.E. 22-1, pp.1-2 ¶ 5], including extensive transactions in the State of North Carolina.

### 1. The underlying injury occurred in North Carolina.

In May 2019, Plaintiff was sitting on a parked, un-engaged motorcycle in New Bern, North Carolina, when his SIG SAUER P320 model pistol discharged without being touched. [D.E. 16, p. 1-2 ¶¶ 2-4]. As a result of that uncommanded discharge, Plaintiff suffered extensive injuries and was hospitalized in New Bern, North Carolina, prior to being discharged to continue treatment and recovery in his home state of Kentucky. [Id.].

### 2. Plaintiff's Action in his then-home state of Kentucky was dismissed.

Plaintiff initially sued SIG for his injuries in his then-home state of Kentucky; however, that action was dismissed, in part, because Plaintiff's "injury d[id] not 'arise from' [SIG's] transactions because Sig Sauer originally sold [Plaintiff's] P320 to a distributor in Ohio, not

---

[2] On March 22, 2023, this Court denied SIG's motion to dismiss, [D.E. 21], without prejudice. [D.E. 57]. At the conclusion of jurisdictional discovery (the date on which SIG's 30(b)(6) deposition occurred, March 28, 2023), SIG timely renewed its motion to dismiss. [D.E. 58]. By the Court's prior Order, Plaintiff's response to SIG's Motion to Dismiss is due on or before April 27, 2023, (thirty days from the date of the deposition). [D.E. 56]. Accordingly, Plaintiff's response is timely submitted to the Court.

Kentucky, *and* the injury occurred in North Carolina." Williams v. SIG SAUER, Inc., 2:20-cv-00078-BLD-CJS, Doc. No. 33 (E.D. Ky. March 9, 2022) (emphasis added), attached hereto as Ex. A.[3]

**3. Plaintiff now brings suit in the state in which his injury occurred.**

As a result, Plaintiff brought the present action in North Carolina to recover damages for personal injuries caused by SIG's faulty design, production, and manufacturing of Plaintiff's P320 model pistol. [D.E. 16]. In response, SIG moved to dismiss Plaintiff's action for lack of personal jurisdiction, arguing that both the North Carolina long-arm statute and the Due Process clause of the U.S. Constitution do not subject SIG to personal jurisdiction in the State of North Carolina. [D.E. 21, 22].

SIG's Motion to Dismiss is supported by a narrowly-written, conclusory declaration that SIG "does not have any contacts with the State of North Carolina related to the subject pistol or this lawsuit" and that SIG does not specifically design for or advertise the P320 model pistol directly to North Carolina markets. [D.E. 22-1, p. 2 ¶¶ 7-9]. Thus, SIG asserts that it has "taken no action to avail itself of the privilege of doing business in North Carolina." [Id. at pp. 2-3]. As revealed by jurisdictional discovery in this matter, nothing is further from the truth.

**4. SIG began exploiting the North Carolina firearms market in 2014 with its new P320.**

SIG began manufacturing the P320 in 2014, and since that time has sold, provided, or distributed over ▮▮▮▮[4] P320 model pistols in the State of North Carolina. Specifically, SIG has sold or distributed ▮▮▮▮ P320 model pistols to commercial customers, ▮▮▮▮ P320 model pistols to law enforcement customers, and ▮▮▮▮ P320 model pistols to military/government

---

[3] Filed as Ex. A pursuant to Local Rule 7.2(d).
[4] The actual number of P320 in North Carolina is likely higher given the fact that number does not include the number of P320s that have been sold through distributors to Federal Firearms Licensed ("FFL") dealers in the State. [Ex. C at p. 54]

customers in the State of North Carolina alone.  [SIG's Int. Resp. No. 3, Ex. C-2].  Those sales in North Carolina comprise an average ███% of SIG's gross profits from the P320 pistol as compared to SIG's total sales of the P320 pistol in all other forty-nine states since the gun's initial introduction to the market in 2014.  [Id.].  Since 2014, SIG has actively marketed the P320 directly to North Carolina dealers and specifically "cold-called" dealers in North Carolina to convince them to buy and sell SIG's products to North Carolina consumers, including the P320.  [Barnes Depo., pp. 96-99 (discussing Ex. C-1), 138, Ex. C].

During that time, SIG has maintained 51 dealers in North Carolina, ███ of which are "Elite Dealers," in the State of North Carolina, all of which have sold (and continue to sell) P320 model pistols.  In addition to those 51 dealers, SIG has sold P320 model pistols to ███████████ ████████████████ commercial entities located in the State of North Carolina.  [Ex. C-2 at No. 4; Ex. C at pp. 13-15, 36, 124-25].  Sig also utilizes form Purchase Orders for sales directly to entities in North Carolina and ships the P320 pistols sold directly to North Carolina from New Hampshire.  [See, e.g., Ex. D at 001128; Ex. F].

### 5.  SIG maintains N.C. dealers and directs employees and agents to act in N.C.

While a regular dealer of SIG's products buys either directly from SIG or through a "buy-group", [Ex. C. at pp. 28-29, 37], which requires a ██████████████████████ for SIG's products, an "Elite Dealer" maintains a closer, direct relationship with SIG.  [See, e.g., Ex. C-1].  Under the "ELITE Dealer Agreement," an elite dealer must maintain a "Store-In-A-Store" ("SIAS") strictly dedicated to SIG-branded products, like the P320.  [Ex. C-8, pp. 1, 11].  Within that dedicated space, SIG *itself* provides physical fixture sets for the SIAS, and "maintains ownership of the fixtures throughout the life of the program."[5]  [Id. at p. 11; Ex. C at p. 85

---

[5] This provision explicitly contradicts SIG's Executive Vice President and Chief Legal Officer's sworn statement that "Sig Sauer does not own property in North Carolina."  [D.E. 22-1, ¶7(f)].

4

(emphasis added)]. Additionally, under those agreements, SIG has final approval of all SIG marks within the Elite Dealer's location, provides *on-site* training to the dealers in North Carolina, and sends personnel on site in North Carolina for at least one scheduled event per year, known as a "SIG Day." The P320 is part of the SIG Day promotional events. [Id. at pp. 11, 15; Ex. C at pp. 84, 87-95].

Supplemental to SIG's commercial sales through the 51 private, North Carolina dealers[6] and the 224 other commercial entities in North Carolina during this time period, SIG had direct employees and/or agents responsible for selling and providing SIG's products, including the P320, directly to local law enforcement agencies[7] within the state. [Ex. C at p. 70-76; p. 119, 13:18; p. 120, 18:21; p. 121, 9:21; see also Ex. 4 of Ex. C]. Notably, SIG specifically used the City of High Point, North Carolina, as an advertising boon in 2015 for the launch of SIG's P320 model pistol, [Ex. B], offering to "upgrade" the City's Glock 22 pistol for the SIG P320 for free. Said upgrade included SIG "Armorer's Training for 17 instructors at no charge." [Id.].[8]

Additionally, SIG's North Carolina law enforcement sales included direct contacts from SIG employees relating to the sale of the P320 model pistol to employees of: the City of Greensboro [Ex. D at 001113, 001127, 001723], Cabarrus County [Ex. D at 001155], the Town

---

[6] See dealers listed in D.E. 16, n.2.

[7] In its motion, SIG contends that the company's contacts with local law enforcement agencies regarding the P320 model pistol is irrelevant here because Plaintiff is a "civilian" and not in law enforcement, [D.E. 22, p. 13]; however, as alleged in the Complaint, SIG only modified its P320 model pistols for its military contracts, not its civilian sales, which includes the nation's law enforcement agencies. Even if SIG did make specific changes to the P320 pistols for law enforcement agencies, then such evidence would only bolster Plaintiff's fraud claims—demonstrating SIG knew about a product defect and did nothing to correct it for regular consumer sales. That said, upon information and belief, there is no difference between the non-military, law enforcement P320 pistols and the consumer P320 pistols, like the one that injured Plaintiff. [See D.E. 16 pp.16-17, ¶¶ 54-57 (accompanying footnotes)]. Regardless, for the purposes of personal jurisdiction, SIG's law enforcement sales and communications with the State are relevant to the issue of whether SIG purposefully availed itself to the privilege of doing business in the State of North Carolina.

[8] Notably, in the five-months of jurisdictional discovery, SIG never identified this upgrade or its related communications in its discovery responses or provided a copy of the same as a response to request for production. Plaintiff, however, obtained said contract through a public records request to the City of High Point pursuant to N.C. Gen. Stat. § 132-1.

5

of Wendell [Ex. D at 001197-98], the City of Raleigh [Ex. D at p. 1848], the Town of Rolesville [Ex. D at 001856], and the North Carolina Highway Patrol [Ex. D at 001857-61].

**6. SIG has contractually agreed to be subject to suit in North Carolina.**

Moreover, SIG's law enforcement sales in the State included a 2016 master vendor contract directly with the State of North Carolina for various state agencies, which the parties renewed through July 31, 2023. [Ex. C-5].[9] Under this contract, which by its own terms could exceed $13 million during the initial three years, [Id. at p. 12, Sect. 4.2], SIG specifically provided its P320 model pistol to state agencies [Id. at p. 18] and consented to North Carolina being the situs and venue for legal disputes and agreed that North Carolina law would govern the contract. Restated, SIG has consented to be subject to suit in North Carolina. [Id. at p. 25, Sect. 5-6].

All of these contacts and contracts make clear, and SIG agrees, that North Carolina is "one of its markets for the SIG Sauer P320." [Ex. C at p. 269, 7:9].

## <u>ARGUMENT</u>

When a defendant properly challenges personal jurisdiction, the plaintiff must prove the grounds by a preponderance of the evidence. <u>Wallace v. Yamaha Motors Corp.</u>, 2022 U.S. App. LEXIS 447 (4th Cir. Jan. 6, 2022) (unpublished) (citing <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989)); <u>Grayson v. Anderson</u>, 816 F.3d 262, 268-69 ("The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court. . . . '[a court] may also consider jurisdictional evidence in the form of depositions, interrogatory answers, admissions, or other appropriate forms.").

---

[9] Again, SIG never produced a copy of this State-wide contract in the five-months of jurisdictional discovery.

"When the district court addresses the question of personal jurisdiction on the basis of the motion papers, legal memoranda, allegations in the complaint, and the jurisdictional discovery, the facts are to be viewed in the light most favorable to the plaintiff, and [a reviewing court] determine[s] *de novo* whether the plaintiff made a *prima facie* showing of personal jurisdiction." Human Res. Certification Inst. v. Human Res. P.A., 453 Fed. Appx. 349, 350 (4th Cir. 2011) (citing Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004); Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). Here, the jurisdictional discovery unequivocally shows that SIG conducted substantial and ongoing business in North Carolina, the very state in which Plaintiff was injured; therefore, it is reasonable for the Court to exercise personal jurisdiction over SIG in this Action.

I.   **The Court has specific personal jurisdiction over SIG because the exercise of the State's long-arm statute comports with due process.**

To exercise personal jurisdiction, "(1) a state's long-arm statute must authorize the exercise of the jurisdiction under the facts presented, and (2) the statutory assertion of personal jurisdiction must comply with due process." Id. (citing Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993)).

North Carolina's long-arm statue extends personal jurisdiction to the constitutional limits of federal due process, thus the Court's only inquiry should focus on due process. Vishay Intertechnology, Inc. v. Delta International Corp., 696 F.2d 1062, 1065 (4th Cir. 1982) (reversing a dismissal for lack of personal jurisdiction where a Delaware corporation sued a California corporation for injuries occurring within North Carolina) (citing Dillon v. Numismatic Funding Corp., 291 N.C 674, 231, S.E.2d 629, 630 (1977)).

Under the due process analysis, "a court may exercise personal jurisdiction 'if the defendant has "minimum contacts" with the forum, such that to require the defendant to defend its interest in that state "does not offend traditional notions of fair play and substantial justice."'"

7

Wallace, 2022 U.S. App. LEXIS at *4 - *5 (quoting Carefirst of Md., Inc. v. Carefirst Pregancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945))).  There are two types of personal jurisdiction—general and specific—Plaintiff asserts that specific jurisdiction applies here.

To determine whether specific jurisdiction applies, the Court must consider three elements: (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) the extent the plaintiff's claims arise out of or relates to the defendant's contacts with the forum; and (3) whether the exercise of jurisdiction would be constitutionally reasonable.  See Ford Motor Co. v. Mont. Eighth Judicial Dist. Court, 141 S. Ct. 1017, 1024 (U.S. 2021) (emphasis added); see also Wallace, 2022 U.S. App. LEXIS at *5.

### A.  The Court has jurisdiction under the North Carolina long-arm statute.

Preliminarily, SIG contends that N.C. Gen. Stat. § 1-75.4(4)(a), (b)—despite Plaintiff's reference to the entirety of the statute in his Amended Complaint [D.E. 16, pp. 3-4, ¶ 10 (and accompanying footnote)]—does not allow the Court to exercise jurisdiction because Plaintiff is not a resident of North Carolina.  [D.E. 22, p. 9].  In support of that assertion, SIG contends that the statute only allows for "North Carolina person[s]" to sustain a personal injury action in the State.

SIG's narrow reading of the long-arm statute, however, directly violates the "clear mandate that the North Carolina long-arm statute be given a liberal construction, making available to the North Carolina courts 'the full jurisdictional powers permissible under federal due process.'"  Vishay Intertechnology, Inc. 696 F.2d at 1065 (quoting Dillon, 291 N.C. 674, 231 S.E.2d at 630).  Thus, the long-arm statute cannot be read so narrowly as to exclude all out-of-state plaintiffs from accessing the state's courthouses.  See, e.g., The 'In' Porters, S.A. v.

8

Hanes Printables, Inc., 663 F. Supp. 494, 501 (M.D.N.C. 1987) (finding that North Carolina's long-arm statute allowed for an out-of-state plaintiff to sue an out-of-state defendant for an "in-state injury").

Moreover, such a narrow reading of the long-arm statute would not comport with the state's venue statute, which specifically contemplates an out-of-state plaintiff suing in a North Carolina state court. See N.C. Gen. Stat. § 1-80(3) (allowing an out-of-state plaintiff to sue a foreign corporation in the county where the cause of action arose). Therefore, it would be inconsistent to read the state's venue statute to allow a non-resident plaintiff to sue a foreign corporation in a North Carolina court but not allow said forum court to exercise personal jurisdiction over said foreign corporation simply because of the plaintiff's status as a non-resident. See generally, Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303, 315-16 (2006) ("under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if there were one law.'").[10]

That said, with the application of the state's long-arm statute, the only relevant inquiry here is "whether Defendants have sufficient contacts with the forum state so as not to offend traditional notions of fair play and substantial justice," which would comport with the Due Process Clause of the Fourteenth Amendment. Christian Sci. Bd. of Dirs. of the First Church of Christ, 123 F. Supp. 2d at 971, n.6.

---

[10] While the Wachovia Bank court distinguishes venue and subject-matter jurisdiction as two separate concepts, noting that "[v]enue is largely a matter of litigational convenience," venue and personal jurisdictional are concepts of the same order as both are waivable defenses. See, eg., Am. Int'l Specialty Line Ins. Co. v. A.T. Massey Coal Co., 628 F. Supp. 2d 674, 684 (E.D. Va. 2009) (". . . venue is similar to personal jurisdiction, which can also be waived, but it is unlike subject matter jurisdiction, which cannot be waived by the parties."). Accordingly, the state's long-arm statute and its venue statute, which are in the same statutory chapter a few provisions away from one another, should be read *in pari materia* to allow state courts to exercise personal jurisdiction over foreign corporations when a non-resident plaintiff suffers an injury in the forum state.

9

**B. Plaintiff's local injury has an appropriate "nexus" to SIG's substantial contacts with the State, as to subject SIG to this Court's personal jurisdiction.**

**1.      SIG's contacts with the State are substantial and ongoing.**

A defendant avails itself of the privilege of conducting business in a state when the defendant "deliberately has engaged in significant activities within a [s]tate or has created continuing obligations between itself and residents of the forum." Wallace, 2022 U.S. App. LEXIS at *6 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985)). That purposeful availment inquiry looks into whether the defendant had "'fair warning'—[that is] knowledge that 'a particular activity may subject [the defendant] to the jurisdiction of a foreign sovereign.'" Ford Motor Co., 141 S. Ct. at 1025 (quoting Burger King, 471 U.S. at 472) (affirming that Montana and Minnesota courts could exercise personal jurisdiction over a global car manufacturer for defective automobiles that caused injuries in those states).

Although Ford conceded this element on appeal, the underlying state court decisions found that Ford had purposefully sought to serve the automobile markets in Montana and Minnesota because the company marketed and advertised in the State; maintained dealerships in the states (thirty-six in Montana); specifically sold the at-issue automobile there (more than 2,000 '94 Crown Victorias in Minnesota); and provided certified repair, replacement, and recall services within the states. Ford Motor Co., 141 S. Ct. at 1023-24.

**i.      SIG's contacts with North Carolina are greater than Ford's contacts in Minnesota and Montana.**

Ford's contacts with Montana and Minnesota are analogous to SIG's contacts with North Carolina. As in Ford, SIG has extensively marketed its P320 model pistol to consumers and dealers in North Carolina,[11] retains a contractual agent, ████████, that travels to North Carolina for the sole purposes of marketing and selling SIG's products, including the P320, to dealers in

---

[11] Ex. C, pp. 98-99 (discussing Ex. 1 of Depo.).

North Carolina,[12] has direct employees who market and contract with local law enforcement offices and state agencies,[13] has sold over ███ P320 model pistols in the State of North Carolina since 2014,[14] grosses an average ███% profit on P320 sales in North Carolina as compared to P320 sales in the other fory-nine states,[15] and maintains continuous and ongoing business relationships with ███ commercial entities in the State and 51 SIG-approved dealers ███ of which SIG maintains direct control of physical areas of their stores through the SIAS model)[16]. The sheer volume of sales and number of dealer relationships alone demonstrates substantial activities within the state as to give SIG "fair warning" that is could be subject to suit in North Carolina.

Moreover, SIG's two contractual elite dealerships as well as its master vendor agreement with the State of North Carolina create continuing obligations for SIG in North Carolina. SIG's ELITE Dealership agreement not only obligates SIG employees to travel at least annually to North Carolina for marketing days and trainings[17] but SIG also owns the fixtures installed within the dealers' SIAS space. SIG provides armorer's training to ELITE dealers on site in North Carolina. SIG provides components parts of the P320 to its North Carolina armorers for repairs in North Carolina, upon request. [Ex. C at pp. 227, 265-66, 273-74]. SIG's contract with the State of North Carolina, valued at over $13 million, also requires SIG-approved armorer's training to various state agencies using SIG products (inclusive of the P320). [Ex. C-3 at p. 15, Sect. 4.20].

---

[12] Ex. C at p. 70-76; p. 119, 13:18; p. 120, 18:21; p. 121, 9:21; see also Ex. C-4.
[13] Ex. C at p. 70, 8:17 ████████████████████████████████████████████
████); p. 95, 3:12. Notably, SIG even marketed on the City of High Point's use of the SIG P320 when the pistol was initially launched into the marketplace. See Ex. B.
[14] Ex. C-2 at No. 3.
[15] Id.
[16] Id.; see also Exs. D and E.
[17] SIG specifically stipulates that, for the purposes of jurisdictional discovery, SIG stipulates that its employees visit North Carolina related to marketing, sales, advertising, and training. Shawver 2d Dec., attached here to as Ex. E.

ii.    **SIG maintains an agent and employees that routinely market and sell SIG's products into North Carolina.**

To this day, SIG maintains an agency relationship with a sales group, █████████, tasked with marketing and selling SIG's products to commercial dealers within North Carolina, [Ex. C at p. 95, 3:12; p. 121, 18:21; p. 160, 8:23; Ex. C-4], and employs individuals to market and sell to local law enforcement and various state agencies.  [Ex. C at p. 70, 8:17].  SIG also continues to "cold call" gun shops in North Carolina in an effort to create an ongoing dealership relationships to sell SIG's products, including the P320.  [Ex. C at p. 135, 1:10; pp. 223-24, 21:2].  These contacts are not "random, isolated, or fortuitous," rather SIG's contacts were (and continue to be) organized, deliberate attempts to exploit and avail itself of the State's firearm market.  Ford Motor Co., 141 S. Ct. at 1025.

The actions of SIG's contractual agent, █████████, can be directly attributed to SIG for purposes of personal jurisdiction.  See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P. A., 290 F.3d 42, 55 (1st Cir. 2002) ("Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct."); Int'l. Med. Group v. Am. Arbitration Ass'n, 312 F.3d 833, 845 (7th Cir. 2002) (attributing the actions of the defendant's attorneys to the defendant for purposes of determining the existence of personal jurisdiction.  Considering that SIG specifically directed ████████ to market and conduct in-state, territory meetings with SIG dealers at least ███████ times per month, which includes North Carolina, [Ex. C-4], there is nothing unfair with regard to principles of personal jurisdiction about requiring SIG to defend a suit in the same forum. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004).

12

### iii. SIG's warranty program specifically creates continuing obligations in north Carolina for SIG.

SIG also provides a warranty program, in which North Carolina consumers can complete and return a warranty card to register a recently purchased SIG product with the company, including the P320. That warranty registration triggers ongoing contacts and obligations for SIG with these consumers in that consumers receive additional advertising regarding SIG's products and can submit their firearm to SIG for warranty repairs. Specifically, these warranty registrations are how SIG prompted consumers of the P320 to "upgrade" their faulty P320 with a safer design as part of the Voluntary Upgrade Program. [Ex. C at pp. 190-201, 271-72; see also Exs. C-9 to C-15]. In fact, SIG's discovery responses show that over ▮▮▮▮ P320 model pistols shipped into North Carolina have been registered with SIG's warranty program—▮▮▮ of which have undergone the voluntary upgrade to repair their allegedly faulty P320. [Exs. C-9 to C-15]. That number clearly shows substantial, ongoing activities with North Carolina consumers with regard to very gun that injured Plaintiff.

### iv. SIG has consented to be subject to suit in North Carolina.

If that were not enough, SIG's $13 million contract with the State of North Carolina alone would be sufficient to subject SIG to personal jurisdiction in the State. See Ford Motor Co., 141 S. Ct. at 1025 ("[The contacts] must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there.") (citing Walden v. Fiore, 571 U.S. 277, 285 (alterations in original) (emphasis added)). In its state-wide contract, SIG contractually consented to the situs of the contract being North Carolina and consented to be subject to suit in North Carolina. [Ex. C-5, p. 25 Sects. 5-6]. That contract alone puts SIG on "fair warning" it could be haled into a North Carolina state court because SIG consented to it. SIG's $13 million contract with the

State coupled with SIG's arsenal of contacts with 51 North Carolina dealers, 224 commercial entities, and tens of thousands of individual consumers clearly demonstrates that SIG has purposefully availed itself to do business here—which means, as legal axiom, that SIG can reasonably be expected to litigate claims here as well.[18]

## 2. Plaintiff's claims relate to SIG's North Carolina contacts under <u>Ford</u>.

For a claim to arise out of <u>or relate to</u> a defendant's activities in the state, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." <u>Ford Motor Co.</u>, 141 S. Ct. at 1024 (quoting <u>Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.</u>, 137 S. Ct. 1773, 198 L. Ed. 2d 395, 399-403, 404.); <u>see also</u> 2022 U.S. App. LEXIS at *6. Here, SIG's substantial sales and contacts with the State of North Carolina clearly relate to Plaintiff's injury here.

### i. <u>Ford</u> rejects SIG's strict causal test for personal jurisdiction.

SIG contends that even if its contacts with the State of North Carolina were purposefully availing, those contacts had to directly cause Plaintiff's injury. [D.E. 22, pp. 12-15]. The Supreme Court in <u>Ford</u> specifically rejected that argument. <u>Ford</u>, 141 S. Ct. at 1026 ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof

---

[18] SIG outlines various factors for a court to consider when determining the purposeful availment element of personal jurisdiction. [D.E. 22, p. 10 (citing <u>Sneha Media & Entm't, LLC v. Associated Broad. Co. P. Ltd.</u>, 911 F.3d 192, 198-99 (4th Cir. 2018)]. Plaintiff would submit each applicable factor weighs in favor of finding that this element exists: (1) SIG maintained (and still maintains) an agent that markets, recruits, and contracts with various dealers in the State of North Carolina for SIG's products, including the P320, [Ex. C at p. 70, 8:17 ███████ ███████); p. 95, 3:12; p. 121, 18:21 ███████ ███████ p. 160, 8:23; Ex. C-4]; (2) SIG owns personal property in the State by way of its SIAS model, in which SIG owns the fixtures used in its SIAS for ELITE Dealers, [Ex. C-8 at p. 11 (SIG_WILLIAMS 000750)]; (3) SIG's employees routinely "cold call" North Carolina gun shops to carry SIG's products, [Ex. C at p. 135, 1:10; pp. 223-24, 21:2]; (4) SIG's elite dealership agreements as well as its $13 million State contract creates deliberate long-term business activities in the State, [Ex. C-8, E (contracting for a three-year term, and extended to July 2023)]; (5) within its state-wide contract, SIG has consented to a North Carolina choice of law provision, [Ex. C-3 at p. 25, Sects. 5-6]; and (6/7) SIG routinely sends employees and agents to the State for marketing and training pursuant to SIG's existing contracts, [Ex. C at p. 87, 16:19; pp. 112-14; pp. 142-43, 14:1; p. 144; p. 181, 9:11; p. 182, 1:4; p. 239, 8:11; <u>see also</u> Ex. C-1].

that the plaintiff's claim came about because of the defendant's in-state conduct."); <u>see also</u> D.E. 34. The crux of SIG's erroneous analysis on this element is that plaintiff's residency is dispositive to this element of personal jurisdiction; however, that analysis inverts the personal jurisdiction inquiry and completely misses the mark.

The <u>Ford</u> court made clear that the inquiry of personal jurisdiction is focused on the defendant's contacts with the forum state. When a company serves a market for a product in the forum State, it has clear notice of its exposure in that State to suits arising from "local accidents" involving its products. <u>Ford</u>, 141 S. Ct. at 1027 ("[W]hen a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled in [that State's] court[s]' to defend actions 'based on' products <u>causing injury there</u>.") (quoting <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 781 (1984)) (alterations in original) (emphasis added)).

Moreover, "plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." <u>Keeton</u>, 465 U.S. at 780 (reversing dismissal for lack of personal jurisdiction of a nonresident plaintiff suffering an in-state injury because the forum state had a substantial interest in deterring tortious acts within its borders, even to the extent that those acts harmed nonresidents); <u>ESAB Group, Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 624 (4th Cir. 1997) ("residency alone was not dispositive of the issue of whether the defendant had sufficient contacts to warrant jurisdiction."). Thus, the fact Plaintiff is not a North Carolina resident does not render the Court unable to exercise personal jurisdiction over SIG in this matter.

ii.     **Plaintiff's action is related to SIG's contacts with North Carolina because Plaintiff was injured in North Carolina.**

As stated in <u>Ford</u>, the issue for this element is whether a <u>defendant's contacts</u> are related enough to plaintiff's suit—"so what if . . . the place of a plaintiff's injury and residence cannot

create a defendant's contact with the forum state? Those places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit—including its assertions of who was injured where." Ford Motor Co., 142 S. Ct. at 1031-32 (emphasis added). Ford even points to Bristol-Myers' reasoning as to why the location of injury is relevant.

In Bristol-Myers, the Court found a lack of "connection" between defendant's contacts with the forum state and plaintiffs' claims, in part, because the plaintiffs were not residents of the forum state and the plaintiffs did not claim to have suffered harm in the forum state. Bristol-Myers Squibb Co. v. Superior Court, 137 S. Ct. 1773, 198 L. Ed. 2d 395, 405. SIG cites Bristol-Myers as support for its argument that Plaintiff's residency shoots down any "nexus" between SIG's contacts with the state and Plaintiff's suit. However, the Ford court clearly distinguished Bristol-Myers, and, likewise, Bristol-Myers is distinguishable from the case at bar because Plaintiff was injured in North Carolina.

Whereas in Bristol-Myers, in which the nonresident plaintiffs did not claim an in-state injury, here, Plaintiff's injury occurred in the forum state with the very firearm that SIG grosses an average ███% profit from North Carolina sales as compared to P320 sales in the other forty-nine states. The difference is that Plaintiff suffered his injury here in the forum state. That local injury was caused by the very product at the center of defendant's substantial contacts with the State. That local injury by the same type of product injected into the State's firearm marketplace is enough, under Ford, to establish the "nexus" between SIG's activities in North Carolina and Plaintiff's claims. Finding otherwise would be to require a strict causal connection to establish personal jurisdiction, which would directly contradict Ford's holding.

16

### iii. Plaintiff's residency does not impact personal jurisdiction here because Plaintiff was injured in North Carolina.

Moreover, the Fourth Circuit has already rejected SIG's residency argument. In <u>Wallace</u>, the Fourth Circuit rejected a resident plaintiff's claims for injuries that occurred outside the state because the lack of a local injury did not create the necessary "connection between the forum and the specific claims at issue." <u>Wallace</u>, 2022 U.S. App. LEXIS at *9. The Court explained the only material difference between the plaintiffs in <u>Bristol-Myers</u>, in which there was no local injury, and the plaintiff in <u>Wallace</u>, was the fact that the <u>Wallace</u> plaintiff resided in the forum state. "[Plaintiff's] residence does not dictate whether the [forum state's] courts can properly exercise personal jurisdiction over [defendant], rather 'the relationship must arise out of contacts that the "defendant [itself] creates with the forum State."'" <u>Id.</u> Thus, the local injury is what triggers the requisite "nexus." <u>Id.</u> ("specific jurisdiction attaches 'when a company like Ford serves a market for a product in the forum State <u>and the product malfunctions there</u>.'") (emphasis in original).

In the present case, Plaintiff, a non-resident, was shot in the leg when his P320 malfunctioned <u>in North Carolina</u>, the very same firearm that SIG has systematically and intensively marketed,[19] sold, and injected into the North Carolina marketplace since 2014. Accordingly, the Court should find that his suit arises out of or relates to SIG's contacts with the forum state. <u>See Id.</u> (opining that <u>Ford</u> may allow a plaintiff to sue in the state where the injury occurred but not their home state, if the two are different).

---

[19] SIG provides the marketing materials its dealers must use in marketing the P320 in North Carolina and engages in joint marketing campaigns with those dealers to facilitate the sale of the P320 in North Carolina. [Ex. C-1; Ex. C at pp. 4243; pp. 97-98; pp. 146-47; p. 247, 6:10].

### 3. The exercise of jurisdiction over SIG is constitutionally "reasonable."

Finally, a court considers the constitutional reasonableness of exercising jurisdiction by evaluating several factors: "[1] the burden on the defendant; [2] the forum State's interest in adjudicating the dispute; [3] the plaintiff's interest in obtaining convenient and effective relief; [4] the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies." Wallace, 2022 U.S. App. LEXIS at *6 - *7 (quoting Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001) (quoting Burger King, 471 U.S. at 477)). Essentially, "the exercise of jurisdiction should not make litigation so gravely difficult and inconvenient that a party is unfairly at a severe disadvantage in comparison to his opponent." Id. (cleaned up).

First, SIG, a global firearm manufacturer has the means and ability to litigate this case in North Carolina. Because of their defective P320 model pistol, SIG has already litigated (and is currently litigating) these types of cases in several states and will not be prejudiced to add one more to the growing stockpile. [See D.E. 16 at pp. 29-30, ¶ 115].[20] Additionally, SIG's substantial contacts with the State—including its $13 million contract with the State, which included a North Carolina choice of law and forum provision—put SIG on "fair warning" that it may one day have to litigate in North Carolina, and SIG voluntarily consented to that possibility. Thus, SIG should be estopped and precluded from now arguing such litigation would be unduly burdensome or unreasonable.

Second, North Carolina's venue statute, N.C. Gen. Stat. § 1-80(3), makes clear that the State has an interest in providing non-residents injured in the state a venue to seek redress in the

---

[20] See generally Champe Barton and Tom Jackman, "One of America's Favorite Handguns is allegedly firing on its owners," THE TRACE, https://www.thetrace.org/2023/04/sig-sauer-p320-upgrade-safety/ (Apr. 11, 2023).

very state in which they were injured. Moreover, SIG's ample contacts with the State of North Carolina, including its $13 million contract with the State, provides a compelling interest for the State's courts to review the allegedly defective design of the nearly ███ firearms being carried and used within the State—including many thousands in the hands of local law enforcement officers.

Finally, Plaintiff has already attempted to pursue his claims against SIG in his then-home state of Kentucky, and the Court dismissed that case for lack of personal jurisdiction. [Ex. A]. If Plaintiff cannot now sue in North Carolina—where the injury occurred and where SIG unequivocally has constitutionally-sufficient contacts—then the only viable jurisdiction remaining is SIG's home-state of New Hampshire. To allow that result would be to allow SIG to engage in reverse-forum shopping, with Plaintiff bearing the costs and burdens with litigating in SIG's own backyard.[21] Such a result would unfairly subject Plaintiff to a severe disadvantage compared to SIG and would not provide him with convenient or effective relief for a plaintiff injured in the State of North Carolina. Accordingly, the Court's exercise of personal jurisdiction over SIG would be constitutionally reasonable here.

## CONCLUSION

First, the State's long-arm statute extends to the outer bounds of the Fourteenth Amendment's due process clause. Thus, so long as the exercise of jurisdiction is constitutional, the state's long-arm statute allows SIG to be sued here.

Second, the exercise of the State's long-arm statute is constitutional because all three elements of personal jurisdiction exist here: (1) SIG has an arsenal of contacts with the State of

---

[21] Insomuch as SIG contends Plaintiff could sue in the State where he bought his P320, [D.E. 22 at p. 15], Ford has clearly rejected that argument. See Ford Motor Co., 141 S. Ct. at 1030 ("For each of those States, the suit involves out-of-state parties, an out-of-state accident, and out-of-state injuries; the suit's only connection with the State is that a former owner once (many years earlier) bought the [product] there. In other words, there is a less significant 'relationship among the defendant, the forum, and the litigation.'" (quoting Walden, 571 U.S. at 284)).

19

North Carolina that puts it on clear notice of the possibility of being sued here; (2) Plaintiff's local injury from the very defective firearm underlying SIG's contacts would adequately create a nexus between SIG's contacts with the State and Plaintiff's claims; and (3) the Court's exercise of personal jurisdictional over SIG is constitutionally reasonable, as it gives Plaintiff the only reasonable opportunity for redress now available to him.

Accordingly, the Court should find it may exercise personal jurisdiction over SIG under the express dictates of <u>Ford</u>, and deny with prejudice SIG's motion to dismiss, [D.E. 21], for lack of personal jurisdiction.[22]

This the 27th day of April, 2023.

SUMRELL SUGG, P.A.
*Attorneys for Williams*

By:    /s/J. Lawson Hester
State Bar No. 57754
Post Office Drawer 889
New Bern, NC  28563
Telephone: (252) 633-3131
Fax: (252) 633-3507
E-mail:  lhester@nclawyers.com

By:    /s/James H. Ferguson, III
State Bar No. 57889
Post Office Drawer 889
New Bern, NC  28563
Telephone:  (252) 633-3131
Fax:  (252) 633-3507
E-mail:  jhferguson@nclawyers.com

---

[22] If the Court determines that it cannot exercise personal jurisdiction over Defendant SIG Sauer in North Carolina, then Plaintiff respectfully requests, in the interests of justice, that the Court transfer his claims against SIG to the United States District Court for the District of New Hampshire to preserve Plaintiff's claims against SIG.  See <u>Trex Co., LLC v. Canton Lumber Co.</u>, 2001 U.S. Dist. LEXIS 26723 at *20 (citing 28 U.S.C. § 1631; <u>McCook Metals LLC v. Alcoa, Inc.</u>, 249 F.3d 330 (4th Cir. 2001); <u>Goldlawr, Inc. v. Heiman</u>, 369 U.S. 463, 466 (1962)).

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing **RESPONSE TO DEFENDANT SIG SAUER, INC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** was served upon all parties to this action via CM/ECF, which will provide electronic notice to:

> Ashley Kamphaus Brathwaite, Esq.
> Barrett Thomas Johnson, Esq.
> Ellis & Winters LLP
> 4131 Parklake Avenue, Suite 400
> Raleigh, NC 27612
> Email: ashley.brathwaite@elliswinters.com
> Email: barrett.johnson@elliswinters.com
> *Attorney for Defendant Sig Sauer, Inc.*
>
> Ericka A Esposito, Esq.
> Kristen E. Dennison, Esq.
> Littleton Park Joyce Ughetta & Kelly LLP
> 201 King of Prussia Road, Ste. 220
> Radnor, PA 19087
> Email: kristen.dennison@littletonpark.com
> Email: ericka.esposito@littletonpark.com
> *Attorney for Defendant Sig Sauer, Inc.*
>
> Jeffery I. Stoddard, Esq.
> William Walter Rapp, Esq.
> McAngus, Goudelock, & Courie
> PO Box 12327
> Wilmington, NC 28405
> Email: jeff.stoddard@mgclaw.com
> Email: walt.rapp@mgclaw.com
> *Attorneys for Defendant Wintrode Enterprises, Inc.*

This the 27th day of April, 2023.

> SUMRELL SUGG, P.A.
> *Attorneys for Williams*
>
> By:     /s/James H. Ferguson, III
>         State Bar No. 57889
>         Post Office Drawer 889
>         New Bern, NC  28563
>         Telephone:  (252) 633-3131
>         Fax:  (252) 633-3507
>         E-mail:  jhferguson@nclawyers.com

21

14656

22