IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:22-CV-48-D

JACK ANTHONY WILLIAMS, )
)
          Plaintiff, )
)
v. ) **ORDER**
)
SIG SAUER, INC., and )
WINTRODE ENTERPRISES, INC., )
)
          Defendants. )

On May 18, 2022, Jack Anthony Williams ("Williams" or "plaintiff") filed a complaint against Sig Sauer, Inc. ("Sig Sauer") and Wintrode Enterprises, Inc. ("Wintrode") (collectively "defendants") [D.E. 1]. Williams seeks relief under North Carolina law and asserts claims against Sig Sauer and Wintrode for design defect in violation of N.C. Gen. Stat. §§ 99B-6 and 99B-11, defective warning in violation of N.C. Gen. Stat. § 99B-5, negligence, gross negligence, negligent misrepresentation, and unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1. See [D.E. 1]. Williams also asserts claims against Sig Sauer for express and implied breach of warranty, violation of the Magnuson-Moss Warranty Act ("MMWA"), fraud, and intentional infliction of emotional distress. See id. Williams also asserts a negligent infliction of emotional distress claim against Wintrode. See id.

On June 10, 2022, Wintrode answered [D.E. 9]. On July 5, 2022, Sig Sauer moved to dismiss for lack of jurisdiction [D.E. 14] and filed a memorandum in support [D.E. 15]. See Fed. R. Civ. P. 12(b)(2). On July 22, 2022, Williams filed an amended complaint [D.E. 16]. On August 10, 2022, Wintrode answered the amended complaint [D.E. 23].

On August 5, 2022, Sig Sauer moved to dismiss the amended complaint for lack of personal jurisdiction [D.E. 21] and filed a memorandum in support [D.E. 22]. See Fed. R. Civ. P. 12(b)(2).

On April 27, 2023, Williams responded [D.E. 61, 63] and filed an appendix and exhibits [D.E. 62, 64]. On May 11, 2023, Sig Sauer replied [D.E. 67] and filed an exhibit [D.E. 68]. As explained below the court denies Sig Sauer's motion to dismiss, grants Williams's motion to seal, and grants Sig Sauer's motion to seal.

I.

On May 25, 2019, Williams traveled to New Bern, North Carolina for vacation. See Am. Compl. [D.E. 16] ¶¶ 2, 22. Williams brought his Sig Sauer P320 semi-automatic pistol (the "pistol") for self-protection. See id. On May 25, 2019, the pistol inadvertently discharged, hitting Williams and causing serious damage to his right leg. See id. at ¶¶ 3–4, 22–35.

Williams is a resident and citizen of Ohio and was a resident and citizen of Kentucky at the time the pistol inadvertently discharged. See id. at ¶ 13. Williams does not allege that he bought the pistol in North Carolina. See id. at ¶¶ 5, 12–13.

Sig Sauer is a firearm manufacturing company incorporated in Delaware that maintains its principal place of business in New Hampshire. See id. at ¶ 14. Sig Sauer manufactured the pistol in New Hampshire and shipped the pistol to a wholesale distributor in Ohio. See [D.E. 22] 2; [D.E. 22-1] ¶¶ 5–6; [D.E. 63] 2. Sig Sauer does not maintain any offices or facilities in North Carolina and does not directly employee anyone in North Carolina. See [D.E. 22] 11–12; [D.E. 22-1] ¶¶ 7–9.

Sig Sauer has been manufacturing the P320 pistol since 2014 and has sold the pistol in North Carolina since 2014. See [D.E. 64-3] 278, 281; Manually Filed Ex. C-2. Sales in North Carolina comprise an average 3.45 percent of Sig Sauer's gross profits from the P320 pistols across the United States. See Manually Filed Ex. C-2. Specifically, Sig Sauer has sold over 84,000 P320 pistols in North Carolina since 2014, including, 44,664 P320 pistols to commercial customers, 8,180 P320 pistols to law enforcement customers, and 32,015 P320 pistols to military and government customers in North Carolina. See [D.E. 64-3] 215–16, 278, 281; Manually Filed Ex. C-2. As for the government customers, Sig Sauer has a state contract to sell the P320 pistol to law enforcement in

2

North Carolina and provides training in North Carolina on using the pistol. See [D.E. 63] 6, 10–14, 18–19; but see [D.E. 22] 10–12; see also Manually Filed Ex. C-2, C-3, C-5. Sig Sauer touts this relationship with North Carolina law enforcement in its marketing materials. Am. Compl. ¶ 51.

Sig Sauer sells firearms through licensed dealers and commercial distributors. See, e.g., Manually Filed Ex. C at 13–15, 36, 124–25; Manually Filed Ex. C-2. Sig Sauer maintains 51 licensed dealers in North Carolina and sells to 224 commercial distributors in North Carolina. See [D.E. 63] 4–5; [D.E. 64-3] 14–284; [D.E. 64-4, 64-5, 64-6, 64-10, 64-11]; Manually Filed Ex. C at 13–15, 36, 124–25; Manually Filed Ex. C-2. Sig Sauer's licensed dealers fall into two categories: regular dealers and "elite dealers." See Manually Filed Ex. C-1. A regular dealer buys either directly from Sig Sauer or through a "buy-group," which requires a "minimum-advertised-price" for Sig Sauer's products. Manually Filed Ex. C at 28–29, 37. An "elite dealer" maintains a closer, direct relationship with Sig Sauer. Of the 51 licensed dealers in North Carolina, Sig Sauer has two elite dealers. See id. These two elite dealers sell a significant volume of firearms, carry Sig Sauer's complete line of firearms, and have a "store-within-a-store." See Manually Filed Ex. C-8 at 1, 11. This "store-within-a-store" includes Sig Sauer providing flooring and fixtures in an area within the store that Sig Sauer maintains throughout the life of the program, as well as specific marketing of its products with the elite dealers location. See id. at 11; Manually Filed Ex. C at 85; [D.E. 64-3] 15. Under the elite dealer's store-within-a-store agreements, Sig Sauer has final approval of all Sig Sauer marks within the elite dealer's location, provides on-site training to the dealers in North Carolina, and sends personnel on site in North Carolina for at least one scheduled event per year, known as a "SIG Day." See Manually Filed Ex. C at 85; Manually Filed Ex. C-8 at 11; [D.E. 64-3] 15. The P320 pistol is part of the SIG Day promotional events. See Manually Filed Ex. C at 84–85, 87–95; Manually Filed Ex. C-8 at 11, 15; [D.E. 64-3] 15.

Sig Sauer also provides warranty and repair orders in North Carolina. See [D.E. 64-3] 228–29. Sig Sauer prefers to have firearms returned to New Hampshire for any warranty issues or

3

repairs, but a local Sig Sauer armorer can also conduct repair work. See id. 228–29. When repairs are shipped to Sig Sauer, Sig Sauer returns the repaired firearms directly to the individual. See id. at 149. Sig Sauer has directly returned at least 7,315 warranty or repair orders to North Carolina. See id. at 208. Sig Sauer also uses form purchase orders for sales directly to entities in North Carolina and ships the P320 pistols sold directly to North Carolina from New Hampshire. See, e.g., Manually Filed Ex. D at 001128; Manually Filed Ex. F.

Sig Sauer has a registered agent in North Carolina, and its employees visit North Carolina for marketing, sales, advertising, and training. See [D.E. 63] 4–6, 14; [D.E. 64-9] ¶ 4; but see [D.E. 22] 12–15. Sig Sauer provides a link on its website to federally licensed firearms dealers in the United States, which, if searched, provides those dealers located in North Carolina. See [D.E. 63] 4–6, 14; [D.E. 68].

## II.

Sig Sauer moves to dismiss the amended complaint for lack of personal jurisdiction. See [D.E. 22]; Fed. R. Civ. P. 12(b)(2). In this court, personal jurisdiction over a nonresident defendant requires compliance with North Carolina's long-arm statute and the Fourteenth Amendment's Due Process Clause. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). North Carolina's long-arm statute extends personal jurisdiction over nonresident defendants consistent with the Fourteenth Amendment's Due Process Clause. See Christian Sci. Bd. of Dirs. v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Thus, the statutory inquiry merges with the constitutional inquiry. See id.; Atl. Corp. of Wilmington, Inc. v. TBG Tech Co., 565 F. Supp. 3d 748, 759 (E.D.N.C. 2021).

Due process requires a defendant to have "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414 (1984) (cleaned up).[1] The

---

[1] No party has addressed the possibility of personal jurisdiction under the theory discussed in Mallory v. Norfolk Southern Railway Co., No 21-1168, 2023 WL 4187749 (U.S. June 27, 2023).

4

minimum contacts analysis focuses on whether a defendant "purposefully directed his activities at residents of the forum" and whether the causes of action arise out of or relate to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024–25 (2021). The minimum contacts analysis ensures that a defendant is not haled into a jurisdiction's court "solely as a result of random, fortuitous, or attenuated contacts." Burger King, 471 U.S. at 475 (quotations omitted); see Ford, 141 S. Ct. at 1025. The minimum contacts analysis focuses "on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quotation omitted); see Ford, 141 S. Ct. at 1024–26; Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 255, 264 (2017).

The extent of the contacts needed for personal jurisdiction turns on whether the claims asserted against a defendant relate to or arise out of the defendant's contacts with the forum state. See Ford, 141 S. Ct. at 1024–26; Bristol-Myers, 582 U.S. at 262–63; ALS Scan, Inc. v. Dig. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002); Atl. Corp. of Wilmington, Inc., 565 F. Supp. 3d at 760. In determining specific jurisdiction, the court considers: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of or relate to those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. See ALS Scan, 293 F.3d at 712. The "constitutional touchstone" of specific personal jurisdiction "remains whether the defendant purposefully established minimum contacts in the forum State." Burger King Corp., 471 U.S. at 474 (quotation omitted); see Bristol-Myers, 582 U.S. at 263–64; Walden, 571 U.S. at 284–91.[2]

---

Thus, the court does not address the issue.

[2] If a defendant's contacts with the forum state are not the basis of the causes of action, general jurisdiction may "arise from the defendant's general, more persistent, but unrelated contacts with the State." ALS Scan, 293 F.3d at 712. To establish general jurisdiction, a defendant's contacts with the forum state must be both continuous and systematic. The general jurisdiction standard is

5

First, in analyzing the extent to which a defendant purposefully availed itself of the privilege of conducting activities within a State, a court examines "various non-exclusive factors" including:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 352 (4th Cir. 2020) (quotation omitted); see Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009).

Second, the plaintiff's claims must have arisen out of or relate to the activities that the defendant directed at the State. See Ford, 141 S. Ct. at 1026–32; UMG Recordings, 963 F.3d at 354–55.

Third, the court must analyze whether the exercise of personal jurisdiction is constitutionally reasonable. See Ford, 141 S. Ct. at 1030; Bristol-Myers, 582 U.S. at 263; Burger King, 461 U.S. at 476–78; World-Wide Volkswagen, 444 U.S. at 292; Consulting Eng'rs, 561 F.3d at 279. This analysis "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." Consulting Eng'rs, 561 F.3d at 279. Such factors include:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social polices.

---

more demanding than the specific jurisdiction standard. See id.; BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549, 1558–59 (2017); Daimler AG v. Bauman, 571 U.S. 117, 131–33 (2014); Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 926–29 (2011); Helicopteros, 466 U.S. at 414–16; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291–99 (1980). Here, the parties agree that general jurisdiction does not exist. See [D.E. 63] 8.

6

Id.

When the court decides a pretrial motion to dismiss for lack of personal jurisdiction without receiving evidence, a plaintiff need only make a prima facie showing of personal jurisdiction. See Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019); Sneha Media & Ent., LLC v. Associated Broad. Co., 911 F.3d 192, 196–97 (4th Cir. 2018); Mylan Lab'ys, Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). In doing so, the court construes all relevant jurisdictional allegations in the complaint in the light most favorable to the plaintiff and draws the most favorable inferences for the existence of jurisdiction. See Hawkins, 935 F.3d at 226; Mylan Lab'ys, 2 F.3d at 60. In that procedural posture, a plaintiff need not establish the existence of personal jurisdiction by a preponderance of the evidence. See Sneha Media & Ent., 911 F.3d at 196–97. If the court receives evidence concerning personal jurisdiction, plaintiff must demonstrate personal jurisdiction by a preponderance of the evidence. See id. at 197; Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).

Sig Sauer argues that the court does not have jurisdiction under North Carolina's long-arm statute and that Sig Sauer has not purposefully availed itself of the privilege of conducting activities in North Carolina. Sig Sauer argues that Ford is distinguishable because Williams is not a North Carolina resident and Sig Sauer has significantly less contacts with North Carolina than Ford Motor Company had with the forums at issue in Ford. Sig Sauer also argues that any of Sig Sauer's contacts with North Carolina did not cause William's alleged injury in North Carolina; therefore, the alleged injury does not arise out of or relate to Sig Sauer's contacts with North Carolina. Thus, Sig Sauer argues that exercising jurisdiction in North Carolina over Sig Sauer is constitutionally unreasonable.

Williams responds that this court has specific personal jurisdiction over Sig Sauer because Sig Sauer directed activities to North Carolina and purposefully availed itself of the privilege of

7

conducting activities in North Carolina. Williams also argues that the Court in Ford rejected Sig Sauer's causation theory and that exercising personal jurisdiction is constitutionally reasonable.

As for the extent to which Sig Sauer purposefully availed itself of the privilege of conducting activities within North Carolina, this action presents the issue that Justice Gorsuch forecast in his concurring opinion in Ford: the exploration of the "virtually infinite number of 'affiliations'" necessary to establish minimum contacts for personal jurisdiction "between the poles of 'continuous' and 'isolated.'" Ford, 141 S. Ct. at 1035 (Gorsuch, J., concurring). Both parties cite Ford as support for their position in this case. See [D.E. 22] 12–17; [D.E. 63] 10–19; [D.E. 67] 1–9.

The facts of this case fall between the poles of continuous and isolated contacts discussed in Ford, Bristol-Myers, and World-Wide Volkswagen. Here, a nonresident plaintiff, Williams, sued a nonresident defendant, Sig Sauer, for an alleged injury that occurred in North Carolina. See Am. Compl. ¶¶ 13–14. Unlike Ford, Williams is a nonresident of North Carolina and Sig Sauer disputes that it purposefully directed activities at residents of North Carolina. Compare Ford, 141 S. Ct. at 1026 with Am. Compl. ¶ 13 and [D.E. 22] 10–12. Unlike Bristol-Myers, the alleged injury did occur in the forum, North Carolina. Compare Bristol-Myers, 582 U.S. at 266 with Am. Compl. ¶¶ 2–4. And, unlike the New York retail vehicle dealer or the regional vehicle distributor in World-Wide Volkswagen, Sig Sauer does have extensive and continuous contacts with the forum state. Compare World-Wide Volkswagen, 444 U.S. at 288–89, 295–99 with [D.E. 22] 12–15 and [D.E. 63] 3–6.

Sig Sauer's contacts do not rise to the level of those described in Ford (particularly as to national advertising), but Sig Sauer's contacts with North Carolina are extensive and continuous. Moreover, although Sig Sauer owns no property in North Carolina and exercises no control over its independent dealers, see [D.E. 22] 11–12; [D.E. 22-1] ¶¶ 7–9, Sig Sauer's lack of a physical presence in North Carolina "is not essential" to the personal jurisdiction inquiry. Perdue Foods, LLC v. BRF S.A., 814 F.3d 185, 191 (4th Cir. 2016); see Burger King, 471 U.S. at 476. Furthermore, this court has described the extensive and continuous contacts that Sig Sauer has had with North Carolina

8

since 2014 concerning the P320 pistol. Cf. Burger King, 471 U.S. at 473 ("And with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." (quotation omitted)). The contacts Sig Sauer did have with North Carolina were more than sporadic and occasional.

Sig Sauer's extensive and continuous contacts in North Carolina are not "random, fortuitous, or attenuated," or "unilateral." Id. at 475 (quotations omitted). Rather, Sig Sauer created "continuing obligations" between it and North Carolina. Id. at 476. These continuous obligations include multi-year state contracts with law enforcement in North Carolina, establishing store-within-a-store fronts operated by elite dealers but controlled by Sig Sauer in North Carolina, selling a high volume of firearms to North Carolina (including the Sig Sauer P320 semi-automatic pistol), sending Sig Sauer employees to North Carolina to interact with and train dealers and others, and sending warranty and repair orders directly to individuals in North Carolina. See [D.E. 63] 4–6, 14; [D.E. 64-3] 15, 149, 208, 228–29, 78, 281; [D.E. 64-4, 64-5, 64-6, 64-10, 64-11]; [D.E. 64-9] ¶ 4; Manually Filed Ex. C at 84–85, 87–95; Manually Filed Ex. C-2; Manually Filed Ex. C-8 at 11, 15; Manually Filed Ex. D at 001128; Manually Filed Ex. F. The presence of authorized dealers and repair or warranty work contracts reflects Sig Sauer reaching into North Carolina to conduct business and long-term contacts in North Carolina. Cf. Hicks v. Jayco, Inc., No. 1:16CV1236, 2018 WL 1363843, at *5 (D. Md. Mar. 15, 2018) (unpublished); see, e.g., Burger King, 471 U.S. at 472; J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 881–82 (2011). Furthermore, the court finds that the agreements between Sig Sauer and North Carolina law enforcement as well as Sig Sauer and dealers and distributors in North Carolina were sent to and received in North Carolina, and that the negotiations to arrive at the agreement were conducted over the phone or by email with individuals in North Carolina. See [D.E. 11-6]; Walden, 134 S. Ct. at 1122; English & Smith v. Metzger, 901

9

F.2d 36, 38–39 (4th Cir. 1990). Thus, Sig Sauer purposefully availed itself of the privilege of conducting business in North Carolina, and Williams has proven the first factor.

As for whether Williams's claims arise out of or relate to the activities Sig Sauer directed at North Carolina, Sig Sauer argues that Williams's alleged injury did not arise out of or relate to the activities Sig Sauer directed to North Carolina. In Ford, the Court held that two state courts had personal jurisdiction over Ford Motor Company after an allegedly defective Ford Motor Company vehicle in the respective state injured the plaintiff in the state. See Ford, 141 S. Ct. at 1032. Ford Motor Company did not manufacture, design, or sell either defective vehicle in the states where the plaintiffs were injured, but Ford Motor Company did business in both states and purposefully availed itself of the privilege of conducting activities in both states. See id. at 1023–25. Ford Motor Company argued that because the particular vehicle involved in the crash was not first sold in the forum state, nor was it designed or manufactured in the forum state, then the state courts lacked personal jurisdiction over Ford Motor Company. Id. at 1022. Under Ford Motor Company's theory of personal jurisdiction, the defendant's connections to the state had to cause the plaintiff's injury. See id. at 1025.

The Court rejected Ford Motor Company's causation argument. See id. at 1026. Thus, a plaintiff did not have to prove that Ford Motor Company designed, manufacture, or sold the vehicle at issue in the forum state of the accident in order for the state court to exercise personal jurisdiction over Ford Motor Company. See id. at 1023–26. To the extent Sig Sauer parrots Ford Motor Company's causation argument, this court rejects the argument.

Sig Sauer also argues that, under Ford, William's alleged injury does not relate to Sig Sauer's contacts with North Carolina because Sig Sauer has fewer contacts with North Carolina than Ford Motor Company had with each state in Ford. See [D.E. 22] 10–15. In support, Sig Sauer notes that, in Ford, the Court examined the business that Ford Motor Company regularly conducted in each state, its significant distribution network and advertising efforts in each state, the sale of the specific

10

vehicle models at issue in each state, its connection to dealers in each state, vehicle owners in each state, and repair shops in each state, its distribution of replacement auto parts and independent auto shops in each state, and each state's interest in protecting their resident from harm by a foreign corporation. See Ford, 141 S. Ct. at 1028.

Although Sig Sauer has fewer contacts with North Carolina than Ford Motor Company had with each state in Ford (id.), Sig Sauer's contacts with North Carolina are extensive and continuous, and Sig Sauer's contacts relate to Williams's alleged injury. See id. at 1026–28. As discussed, Sig Sauer marketed its P320 pistol to consumers and dealers in North Carolina, retains a contractual agent that travels to North Carolina for the sole purposes of marketing and selling Sig Sauer's products, including the P320, to dealers in North Carolina, has direct employees who market and contract with local law enforcement offices and state agencies, has sold over 84,000 P320 pistols in the State of North Carolina since 2014, grosses an average 3.45 percent profit on P320 pistol sales in North Carolina as compared to P320 pistol sales in the other 49 states, and maintains in North Carolina continuous and ongoing business relationships with 224 commercial entities and 51 dealers, including two dealers that Sig Sauer maintains direct control of physical areas of their stores through the store-within-a-store model. See [D.E. 63] 4–6, 14; [D.E. 64-3] 15, 149, 208, 228–29, 78, 281; [D.E. 64-4, 64-5, 64-6, 64-10, 64-11]; [D.E. 64-9] ¶ 4; Manually Filed Ex. C at 84–85, 87–95; Manually Filed Ex. C-2; Manually Filed Ex. C-8 at 11, 15; Manually Filed Ex. D at 001128; Manually Filed Ex. F. Sig Sauer's contacts with North Carolina indicate that the use of a P320 pistol in North Carolina was foreseeable to Sig Sauer.

As in Ford, Williams's alleged accident in North Carolina involving the pistol relates to Sig Sauer's contacts in North Carolina. See Ford, 141 S. Ct. at 1026–29. Notably, in Ford, the Court held that where a company purposefully avails itself of a forum and targets extensive sales to the forum, an accident relating to a sale, even if not the sale in the forum of the specific item that malfunctioned, is foreseeable and relates to the company's contacts with the forum. See id. at 1027

11

(specific jurisdiction attaches "when a company like Ford serves a market for a product in the forum State and the product malfunctions there"); cf. Wallace v. Yamaha Motors Corp., U.S.A., No. 19-2459, 2022 WL 61430, at *4 (4th Cir. Jan. 6, 2022) (per curiam) (unpublished). As in Ford, Sig Sauer "serves a market [for the P320 pistol in North Carolina,] and the product malfunctioned there." Ford, 141 S. Ct. at 1027; see World-Wide Volkswagen, 444 U.S. at 297.

In opposition, Sig Sauer cites Bristol-Myers and argues that Williams's status as a noncitizen of North Carolina suing a noncitizen defendant dooms his claims of personal jurisdiction in North Carolina. In Bristol-Myers, the Court held that where there was a noncitizen plaintiff and noncitizen defendant, an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum" was necessary. See Bristol-Myers, 582 U.S. at 262 (alteration in original); Goodyear, 564 U.S. at 919.

Although Williams is not a citizen of North Carolina and did not purchase the P320 pistol in North Carolina, the alleged accident involving the P320 pistol occurred in North Carolina, and Sig Sauer has substantial and continuous contacts with North Carolina. See Ford, 141 S. Ct. at 1026–29. Moreover, the Court's central concern in Bristol-Myers was forum shopping. See Bristol-Myers, 582 U.S. at 265–66. Williams, however, is not forum shopping. In fact, Williams originally brought his claim in his home state, Kentucky, and the court dismissed the action for lack of personal jurisdiction. See [D.E. 64-1]. Furthermore, in World-Wide Volkswagen, the plaintiffs were citizens of New York who were injured in Oklahoma when another vehicle struck their Audi in Oklahoma. See World-Wide Volkswagen, 444 U.S. at 288. The plaintiffs sued various defendants in Oklahoma. The Court observed that if a defendant sold numerous vehicles to retail customers in Oklahoma, then such conduct and connection with Oklahoma would mean that such a defendant should reasonably anticipate being haled into court in Oklahoma. See id. at 297–99. Tellingly, the Court's analysis in World-Wide Volkswagen did not turn on the noncitizen status of the plaintiffs. See id. Here, as in Ford, Williams's alleged accident in North Carolina relates to Sig Sauer's contacts with North

12

Carolina. Moreover, this court does not read Ford, Bristol-Myers, or World-Wide Volkswagen to require a plaintiff asserting specific jurisdiction to be a citizen of the state where the injury occurred. On this record, Williams has satisfied the second factor.

As for whether the exercise of personal jurisdiction is constitutionally reasonable, Williams has shown that this litigation is not "so gravely difficult and inconvenient" that Sig Sauer "is at a severe disadvantage in comparison to its opponent." ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 392 (4th Cir. 2012) (quotations and alterations omitted); Burger King, 471 U.S. at 478. Sig Sauer's arguments concern the relative inconvenience of litigating in North Carolina, but Sig Sauer can address such concerns in a motion for change of venue. See Burger King, 471 U.S. at 483-84. Moreover, although Sig Sauer argues that North Carolina has no interest in adjudicating disputes between a noncitizen plaintiff and noncitizen defendant, North Carolina has an interest in adjudicating the claims in this case. See Considine v. West Point Dairy Prods., Inc., 111 N.C. App. 427, 431, 432 S.E.2d 412, 414-15 (1993); Ga. R.R. Bank & Tr. Co. v. Eways, 46 N.C. App. 466, 469, 265 S.E.2d 637, 640 (1980); see also Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1551 (11th Cir. 1993). An allegedly defective firearm discharged in North Carolina and injured Williams. The key witnesses to the alleged accident were in North Carolina when the accident occurred and the initial evidence of alleged injuries manifested at the North Carolina hospital Williams visited after the accident. Furthermore, Williams seeks relief under North Carolina law against a company with significant and continuous contacts with North Carolina, including the sale of a large number of P320 pistols. Here, Williams has satisfied the third factor. Accordingly, the court has personal jurisdiction over Sig Sauer.

13

III.

In sum, the court DENIES Sig Sauer's renewed motion to dismiss [D.E. 21], GRANTS plaintiff's motion to seal [D.E. 65], SEALS the documents at [D.E. 63] and [D.E. 64], GRANTS Sig Sauer's motion to seal [D.E. 69], and SEALS the documents at [D.E. 68].

SO ORDERED. This 27 day of June, 2023.

JAMES C. DEVER III
United States District Judge

14

Case 4:22-cv-00048-D   Document 70   Filed 06/27/23   Page 14 of 14