

EXHIBIT
8

# Investigative Report

## Williams v. SIG SAUER

ESi Matter #: 103850



430 Technology Parkway NW
Peachtree Corners, GA 30092

# Investigative Report

## Williams v. SIG SAUER
ESi Matter #: 103850

**Report Prepared For**

Cranfill Sumner & Hartzong LLP
5420 Wade Park Boulevard, Suite 300
Raleigh, NC  27607

**Submitted by:**

_____

Tony C. Dill, COL (USA Retired)
Senior Managing Consultant
Security & Defense Services Group

June 7, 2024
_____
Date

**Technical Review by:**

_____

Steven Counts
Senior Technologist

June 7, 2024
_____
Date

This report and its contents are the Work Product of Engineering Systems Inc. (ESi).  This report should only be duplicated or distributed in its entirety.  This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESi at the time of this report and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESi © 2024 - All Rights Reserved

**Phone: 678-990-3280** | **Fax: 678-990-3285** | **Toll Free: 866-596-3994**
www.esi-website.com


# Table of Contents

Introduction ........................................................................................................... 3

Basis for this Report ............................................................................................. 3

Materials Reviewed ................................................................................................... 3

Background ............................................................................................................ 4

Complaint .............................................................................................................. 4

Deposition Testimony of Mr. Williams ................................................................. 5

Review and Analysis of Expert Reports .............................................................. 6

Dr. Joshua Harrison's Report ..................................................................................... 6

Mr. Timothy Whealton's Report .................................................................................. 7

Mr. Adam Hall's Report ............................................................................................... 7

Mr. Derek Watkins' Report .......................................................................................... 8

Conclusions .......................................................................................................... 9


# Introduction

ESi was retained by Cranfill Sumner & Hartzong LLP to review the weapon carry procedures during an incident on May 25, 2019, in New Bern, North Carolina, where Mr. Jack Anthony Williams was injured by the uncommanded discharge of his Sig Sauer P320 pistol.[1]   ESi was also asked to review the expert reports related to this matter.

This report details the findings and opinions expressed by Mr. Tony Dill pertaining to the engagement described above. This report summarizes the opinions reached and the basis for those findings. ESi reserves the right to clarify or supplement this report, if warranted, as new information becomes available. Attached hereto as Appendix A is the CV of Mr. Dill which sets forth pertinent qualifications and experience and lists the technical presentations and publications authored. Also appended is a listing of depositions and trials wherein expert testimony has been given over the last four years (Appendix B). ESi currently bills Mr. Dill's time at $325 per hour for research and analysis in this matter. Report figures, photographs, videos, graphical representations of data, excerpts from literature and other materials reviewed may be utilized at the time of trial as demonstrative exhibits.

# Basis for this Report

This report is based on review of the documents in the Materials Reviewed section below, examination of the available evidence, and the analysis outlined herein. The education, training, and experience of the author as listed in the CV found in Appendix A also formed a basis for this report.

## Materials Reviewed

During the course of investigation and analysis in this matter for this report, ESi has reviewed the following materials:

- Plaintiff's Amended Complaint
- Plaintiff Jack Williams' Responses to Wintrode's discovery requests
- Plaintiff Responses to Defendant SIG SAUER First Requests for Production of Documents
- Deposition of Jack Williams
- Expert report of Joshua Harrison
- Expert report of Timothy Whealton
- Expert report of Adam Hall
- Expert report of Derek Watkins
- P320 Voluntary Upgrade Programs
- U.S. Army Contract Award (17 Jan 2017)
- U.S. Department of Defense website clip – Government Contract for the P320

---

[1] Plaintiff First Amended Complaint pg. 1.



# Background

Before explaining my opinions in the case, I will describe my understanding of the facts as presented to me at this time in response to the complaint filed by Mr. Williams against Sig Sauer Inc and Wintrode Enterprises Inc; I will be utilizing the testimony, records, and transcripts provided to date.

# Complaint

On May 25, 2019, Mr. Jack Anthony Williams was sitting on his Harley Davidson motorcycle with the Sig Sauer P320 pistol in a Bull Dog holster in his right rear pocket. When he shifted his position on the seat, the pistol fired, the bullet entered his right leg, passing through his femur and became lodged in his patella. Mr. Williams filed a complaint against the defendants. Based on the products I have reviewed to date I understand that:

- Sig Sauer Inc is the manufacturer of the subject P320 9mm pistol (SN:58A126941).[2]

- Wintrode Enterprises Inc is the manufacturer of the subject Bull Dog Belt Holster.[3]

- Mr. James Boggs sold the Sig Sauer P320 to Mr. Williams.[4]

- The subject P320 was in the Bull Dog holster at the time of the uncommanded discharge.[5]

- The subject Sig Sauer P320 was locked in the saddlebag of the Harley prior to Mr. Williams being transported to the hotel and then hospital.[6]

- The bullet was recovered between the patella and the kneecap[7] and turned over to the police.[8]

- Mr. Williams was admitted to the Carolina East Medical Center on May 25th and discharged on May 27, 2019.[9]

- An April 16, 2024, inspection of the P320 pistol revealed that it is had not been through the Sig Sauer voluntary upgrade program.[10]

---

[2] Harrison Report pg. 4.
[3] Plaintiff Complaint pg. 8.
[4] Plaintiff Responses to Wintrode Discovery Request pg. 6.
[5] Harrison Report pg. 6.
[6] Williams Deo pg. 191.
[7] Williams Depo pg. 190.
[8] Williams Depo pg. 251.
[9] Williams Depo pg. 243.
[10] Harrison Report pg. 9.



# Deposition Testimony of Mr. Williams

Mr. Williams reviewed his experience with firearms during his deposition. He started shooting at the age of seven with his dad, and he first fired a pistol at age fifteen with a .22 target pistol. His father had taught him firearms safety, but he had not gone through formal training.[11] He had owned several pistols in the past and was looking for a Sig Sauer P320 or 1911 pistol. The subject pistol was purchased from Mr. James Boggs[12] with a Sig Sauer case, extra magazine, holster but no owner's manual.[13] After purchasing the P320, he took it to Melbourne, Kentucky to a private range to test fire the pistol.[14]

On the day of the incident, Mr. Williams was wearing an Iron Horseman leather belt, loose jeans, a vest and t-shirt, and was sitting on a Harley Davidson Ultra Classic with hard saddle bags.[15] The pistol was located in his right rear pocket, with holster clip to the outside and muzzle down.[16] The Harley was set on the kickstand with handlebar cocked.[17] He originally started with both legs on the right side of the motorcycle, then moved his left leg to the gas tank and right leg on the handle bars.[18] When he went to scoot back the pistol discharged and the sound was muffled.[19]

Mr. Williams locked the pistol and holster in the saddle bags of the motorcycle,[20] and was transported into the hotel and then later the hospital. Mr. Williams confirmed he did not drop the pistol on the ground and did not have anything in his pockets.[21]

Mr. Williams reviewed the police report during his deposition and relayed several discrepancies; he indicated that he did not tell the police he was with the Iron Horseman, he did not drop the motorcycle, and the gun did not hit the saddle bags.

Mr. Williams reviewed his injuries, medical treatment, and current physical limitations.[22]

---

[11] Williams Depo pg. 62-63.
[12] Williams Depo pg. 129.
[13] Williams Depo pg. 133-134.
[14] Wilaims Depo pg. 130.
[15] Williams Depo pg. 126-127.
[16] Williams Depo pg. 164-166.
[17] Williams Depo pg. 168.
[18] Williams Depo pg. 168-170.
[19] Williams Depo pg. 171-173.
[20] Williams Depo pg. 190.
[21] Williams Depo pg. 195-208.
[22] Williams Depo pg. 267-274.


# Review and Analysis of Expert Reports

## Dr. Joshua Harrison's Report

Dr. Harrison was assisted by Mr. Derek Watkins and his report highlights the inspection of the subject P320 on April 16, 2024. This inspection included a CT scan of the pistol, functions check, and internal inspection. The interior components of the pistol confirmed it had not gone through the Sig Sauer P320 voluntary upgrade program (VUP).[23]

Dr. Harrison inspected the retention strap and noted "The retention strap of the subject holster was observed to permit some motion of the entire subject pistol relative to the holster in a direction parallel to the barrel axis of the subject pistol. However, because the retention strap of the subject pistol is adjustable by a hook and loop attachment, its adjustment might have been affected by a violent event such as the subject pistol discharging within the subject holster."[24]

Dr. Harrison also inspected the holster, indicating "The sides of the heavy-duty nylon holster at the trigger covering location were compliant enough with the subject gun holstered that, by applying sufficient compressive force there with my fingers, I could cause the interior of the holster to contact and bear against both lateral sides of the trigger." [25]

The subject pistol was inspected including a functions check and it was reported that there was no damage, and the components and controls were operating normally. He did note the interior of the pistol included debris. "The interior of the subject gun, upon disassembly was observed to include debris such as carbon and lint that would be expected from occasional use and prolonged concealed carry."[26]

Mr. Harrison inspected the tolerances and appearance of the internal components of the pistol, and the 3D CT-Scan of the pistol with dummy ammunition.[27] He observed Mr. Whealton test the trigger pull indicating the range was between 6.25 and 6.75 lbs. over the series of attempts.[28]

---

[23] Harrison Report pg. 9.
[24] Harrison Report pg. 7.
[25] Harrison Report pg. 7.
[26] Harrison Report pg. 8.
[27] Harrison pg. 13.
[28] Harrison Report pg. 8-9.



## Mr. Timothy Whealton's Report

Mr. Whealton assisted Dr. Harrison during the inspection. Mr. Whealton discusses the Sig Sauer P320 military versions the M17 and M18, and the Army drop testing which led to the Sig Sauer Engineering Change Proposal that was implemented.[29] Mr. Whealton compared the P320 to several other pistol models including the Glock.[30] He evaluated the design of the P320 indicating areas he believes are deficiencies.[31] Finally, he reviews the holster along with the weapon readiness condition with a bullet in the chamber.[32] I concur with his assessment that "It is a common and acceptable practice to carry a semi-automatic handgun with both ammunition in the magazine and with one round in the chamber of the firearm."[33]

## Mr. Adam Hall's Report

Mr. Hall was assisted by Mr. Derek Watkins and observed him test fire an exemplar P320 pistol inserted in exemplar Bull Dog holsters.[34] Mr. Hall did not know the exact size of the subject Bull Dog holster and selected sizes 33, 8, and 15 for his evaluation. Holster size 33 was too dissimilar in appearance to the subject in size and angle, and ultimately not used during the live fire test.[35] Mr. Hall reviewed the results of the various tests in the size 8 and 15 holsters with the pistol fully seated and partially seated positions. Mr. Hall notes that there are 22 sizes of Bull Dog extreme duty holsters and that "At this point, the model of the holster has not been positively identified."[36] I am unable to evaluate the testing until I can confirm the size of the subject holster by model, or by dimensional comparison using a laser scanner or similar tool. I did search the Bull Dog web page and they do list 25 custom fit sizes available of the extreme duty holster.[37]

Mr. Hall notes that Mr. Williams was not carrying the holster on his belt as intended.[38] I am familiar with holsters being placed temporarily in pockets for short movements, this includes the front and back pants pockets, jackets, bags and purses. Belt wear does not protect the holster from incidental contact with seats, vehicles or other people. I am unfamiliar with safety warnings indicating it is unsafe to place a holster in a pocket. I searched the Bull Dog product web site and was unable to locate any such warnings. I located the Bull Dog 'Inside the Pocket' holster, printing and movement seem to be the focus of the design, not increased trigger protection. The specific marketing indicates the "Fused Padding Helps Conceal The Pistol Outline While Protecting The User's Leg From The Sharp Edges Of The Pistol Non-Slip Band Helps Keep The Holster In Place In The Pocket When Pistol Is Drawn."[39]

---

[29] Whealton Report pg. 2.
[30] Whealton Report pg. 9-12.
[31] Whealton Report pg. 13-16.
[32] Whealton Report pg. 16-18.
[33] Wheaton Report pg. 16.
[34] Hall Report pg. 9.
[35] Hall Report pg. 9.
[36] Hall Report pg. 10.
[37] https://bulldogcases.com/collections/holsters/products/extreme-pistol?variant=46750457954585
[38] Hall Report pg. 10.
[39] https://bulldogcases.com/collections/holsters/products/inside-pocket-holster-black?variant=46750464737561



Mr. Hall offers an alternate theory to the incident "that Mr. Williams was manipulating the P320 in the holster with his finger on the trigger and negligently discharged the P320 with his own finger."[40] I saw no information in evidence that Mr. Williams' hands were anywhere near the pistol, nor the holster, at the time of the uncommanded discharge.

## Mr. Derek Watkins' Report

Mr. Watkins reviews the April 16, 2024, inspection of the subject P320 pistol and holster. He notes the function checks of the pistol passed all categories except the slide release.[41] He reports that "All physical testing of the subject pistol failed to produce a discharge absent a trigger pull."[42]

Mr. Watkins notes in his report that various law enforcement and the military agencies have adopted a policy not to carry a round in the chamber[43] and notes the Israeli Carry technique used by the Mossad. Based on my understanding of Israeli Defense Force training from my time in the military, I agree that the IDF do not normally carry a round in the chamber and incorporate a slide cycle into their pistol draw sequence. The IDF does use several pistols including the Glock 17 and Glock 19[44] and several organizations have a qualification time required of this loading and firing sequence. I am unaware of the IDF using the Sig Sauer P320 pistol.

My experience from 31 years with the U.S. military highlights that we used a different technique than the IDF. The U.S. military changes the status of the pistol based on threat conditions. In living areas, the weapon did not normally have a bullet in the chamber, while every time we were out traveling or on patrol it did. When the threat escalated at the base camps, we would increase readiness and carry a round in the chamber at all times. At ISAF Headquarters in Afghanistan, we were issued Force Protection Exemption Cards, to permit our carrying a round in the chamber even when NATO ISAF staff went to a lesser weapon readiness condition. Mr. Watkins reviews that the Israelis are not the first to develop this technique and highlights that W.E. Fairbairn did institutionalize the empty chamber concept. I looked up this reference and Mr. Watkins is correct; Fairbairn advocated the empty chamber while he was with the Shanghai Police in 1910. I would argue threats and tactics have changed in the past 114 years and it is common practice now for Law Enforcement, Military and Civilians to carry a round in the chamber.

---

[40] Hall Report pg. 10.
[41] Watkins Report pg. 2.
[42] Watkins Report pg. 2.
[43] Watkins Report pg. 25.
[44] https://www.idfgearreview.com/guide-to-idf-gear/



# Conclusions

The following conclusions are based on the analysis to date, as well as prior education, training, testing, analysis, and experience. ESi reserves the right to supplement the details and findings if additional material is received.

1. Carrying a bullet in the chamber of a pistol is a common practice for self-defense, including in the U.S. military. It is foreseeable that a pistol would be carried in this ready condition.
2. Pistols carried during long range driving or military patrols are likely not to be cleaned until the travel is over. It is foreseeable that weapons carried during these operations will have lint, dust and possibly other small debris inside and should continue to function correctly under such conditions.
3. I am familiar with holsters being placed temporarily in pockets for short periods of time when belt wear is not desirable; this includes the front and back pants pockets. It is foreseeable that a pistol owner may carry a holstered pistol in this manner, and I have seen no product warnings to the contrary.
4. I am unable to fully analyze the testing conducted by Defendant's experts until I can confirm the size of the subject holster.

ESi reserves the right to supplement or amend these findings and conclusions if additional information becomes available or based upon additional work or analysis in this matter.

✎ **End of Report Text** ✎

## Appendices:

Appendix A: CV of Author

Appendix B: Testimony History of Author



# Appendix A



## TONY C. DILL, COL (USA Retired)
## SENIOR MANAGING CONSULTANT

tcdill@engsys.com

Tony Dill leads ESi's Security and Defense Services Practice Group. He specializes in high-risk training management, complex problem-solving, and has participated in accident investigations within various Airborne and Special Operations units involving parachutes, firearms, transportation, and explosives. During his 31 years of service to the nation, he held numerous roles within the United States military, including Chief of Staff for the John F. Kennedy Special Warfare Center and School, State Inspector General (IG) for the Georgia Department of Defense, and Commander of the prestigious U.S. Army Parachute Team, The Golden Knights.

A retired Green Beret, Mr. Dill's broad experience includes security assessments, implementation of protection protocols, and facilities/personnel management for large-scale initiatives designed to improve operations and security at work sites, oil refineries, and small military cities abroad. Trained as both a Safety Officer and Inspector General, Mr. Dill is skilled at navigating complex regulatory and compliance requirements and has conducted risk assessments and audits of policies and procedures. He has also managed complex supply chain logistics, including fuel farm and pipeline operations, water purification and testing, equipment maintenance, rail movement, and aerial delivery of equipment and personnel. In addition, Mr. Dill has led multiple mission-critical response efforts, including natural disasters, combat search and rescue operations, hostage rescue planning, personal security detachments, site security, and convoy operations.

Mr. Dill also has significant hands-on experience in aviation management and operations. As Battalion Commander, he was responsible for a flight detachment of four medium transport aircraft, and provided direct oversight of aircraft maintenance, budgets, flight operations, parachute operations, training, and risk assessments in accordance with Department of Defense regulations and FAA Parts 119 and 135.

For three years, Mr. Dill worked in the defense industry, consulting with clients on ballistic and blast safety, product development, testing, and evaluation, and ISO-9000 compliance. He also provided training on firearms and other military equipment and was responsible for compliance and export licensing in accordance with the U.S. Department of State's International Traffic in Arms Regulations (ITAR).

With over 34 years of experience in firearms, Mr. Dill is well-versed in virtually every area of firearm safety and performance, including tactical training, maintenance, readiness, evaluation, and risk assessment. His expertise includes handguns, tactical shotguns, submachine guns, military rifles, mortars, and anti-armor rockets. He has also been cross trained in U.S., NATO, and Soviet small arms. Mr. Dill has conducted research, development, and testing for weapon rigging procedures utilized in freefall parachute infiltration.

March 2024



## Areas of Specialization

- Forensic Security
- Firearms, Weapons Safety, Use, Marksmanship and Range Operations
- Active Shooter Deterrence and Response Training
- Safety Inspections
- Mil STD 882E Safety and Risk Assessments
- Parachute Safety, Rigging, Operations
- Global Logistics (Food, Fuel, Ammunition)
- Blast Safety and Mitigation
- Compliance Audits
- Water Quality Testing
- Blood Lead Level Mitigation
- Airdrop Load Inspection
- Extreme Cold Weather Training (ECWT)
- Transportation Operations and Accident Investigations (TWIC)
- Advanced Land Navigation
- Equal Opportunity Standards and Complaint Process
- Sexual Harassment / Assault / Suicide Prevention
- Cyber Security Training and Best Practices

## Education

GAFASTA – 40 Hour Armed and Unarmed Security Guard Training, 2021

Adjunct Faculty for the U.S. Army War College, Special Operations Elective, 2015 - 2019

MSS – Strategic Studies, U.S. Army War College, 2012

NATO Defense College, Rome Italy, 2012

MA – Military Studies - Joint Warfare, American Military University, 2011

BA – Humanities / Communications Arts, University of West Florida, 1988

## Foreign Language

Italian (2/2/2)



Tony C. Dill
*March 2024*

## Certifications

- Inspector General
- Safety Officer
- TSA – Transportation Worker Identification Credentialed (TWIC)
- Airdrop Load Inspector
- Parachute Rigger (Round, ram air, and cargo)
- Military Freefall Jumpmaster
- Tandem Master (Strong, Sigma, and Eclipse system rated)
- Combatives Instructor
- Winter Warfare Instructor
- Taekwondo (3rd Dan)
- Hapkido (1st Dan)
- Glock Advanced Armorer
- Armed Security Guard
- Unarmed Security Guard
- GRUVLOK Installer
- Mycometer® Surface Fungi Sampling & Analysis

## Positions Held

**Engineering Systems Inc., Norcross Georgia**
Regional Office Manager – GA , 2023 - present
Senior Managing Consultant, Security and Defense Systems Group, 2021 - present

**KF Armory Defense LLC, Alpharetta, Georgia**
Senior Vice President – Product Development and Government Solutions, 2017 - 2020

**U.S. Army, 1986 - 2017**
- State Inspector General, Georgia Department of Defense, 2015 - 2017
- Chief of Staff, John F. Kennedy Special Warfare Center and School, 2013 - 2015
- Deputy Commanding Officer, U.S. Army Special Forces Command (Airborne), 2012 - 2013
- Director Village Stability National Coordination Center, Kabul Afghanistan, 2012
- Commander Rear and Deputy Commander, 5th Special Forces Group (Airborne), 2010 - 2011
- Chief of Staff, Combined Joint Special Operations Task Force - Arabian Peninsula, Iraq, 2010
- Commander, U.S. Army Parachute Team, The Golden Knights, 2007 - 2010
- G3 Chief of Training, U.S. Army Special Forces Command (Airborne), 2005 - 2007
- Operations Officer, 3rd Special Forces Group (Airborne), Kabul Afghanistan, 2004 - 2005
- Commander, Advanced Operating Base 370, Kandahar Afghanistan, 2003 to 2004



- Executive Officer, 3rd Battalion, 3rd Special Forces Group (Airborne) Iraq, 2003
- Assistant Operations Officer, Special Mission Unit, 2000 - 2002
- Commanding General's Staff, U.S. Forces Korea, Seoul Korea, 1999
- Chief of Command Information (PAO), U.S. 8th Army Korea, Seoul Korea, 1998
- Assistant Operations Officer, 2nd Battalion, 10th Special Forces Group (Airborne), 1997 - 1998
- Commander, Special Forces Operational Detachment A-064 (MFF), 1996 - 1997
- Commander, Special Forces Operational Detachment A-061, 1994 - 1996
- Executive Officer, Headquarters and Headquarters Company, 82nd Airborne Division, 1992 - 1993
- Executive Officer, C Company, 407th Supply and Transportation Battalion, 82nd Airborne Division, 1991 - 1992
- Platoon Leader, Parachute Pack Platoon, 407th Supply and Transportation Battalion, 82nd
- Airborne Division, 1989 - 1991
- Platoon Leader, 4.2 Inch Mortar Platoon, 3/124th Infantry, Florida National Guard, 1987 - 1988
- M-60 Gunner, Scout Platoon, 3/124th Infantry, Florida National Guard, 1986 - 1987

## Service Schools

- The Inspector General School (TIGS), Fort Belvoir, VA
- US Army War College, Carlisle PA
- NATO Defense College Regional Cooperation Course (NRCC), Rome, Italy
- Joint Professional Military Education, Phase II, Norfolk, VA
- US Army Command and General Staff College, Ft Leavenworth, KS
- Defense Information School (DINFOS), Ft Meade, MD
- Infantry Officer's Advance Course, Ft Benning, GA
- Quartermaster Officer Basic Course, Ft Lee, VA

## Battle Campaigns and Peacekeeping Operations

- Operation JUST CAUSE (Panama)
- Operations DESERT SHIELD / DESERT STORM (Iraq)
- JOINT TASK FORCE ANDREW - HURRICANE RELIEF (Miami, FL)
- Operations DENY FLIGHT / JOINT ENDEAVOR / JOINT GUARD (Bosnia)
- Defense of Korea x 2
- Operation ALLIED FORCE (Kosovo)
- Operation PROVIDE COMFORT (Northern Iraq)
- Operation ENDURING FREEDOM x6 (Afghanistan)
- Operation IRAQI FREEDOM (Iraq) x2
- Operation NEW DAWN (Iraq)



# Appendix B



**TONY C. DILL, COL (USA Retired)**
**SENIOR MANAGING CONSULTANT**
**tcdill@engsys.com**

| CASE | STATE | TYPE |
|------|-------|------|

**2024**

| | | |
|------|-------|------|
| **State of Indiana v. White (Jay)**<br>State of Indiana<br>Circuit Court of Owen County<br>Cause No. 60C01-2109-MR-000549 | **IN** | **Testimony** |
| **State of Indiana v. White (Jay)**<br>State of Indiana<br>Circuit Court of Owen County<br>Cause No. 60C01-2109-MR-000549 | **IN** | **Hearing** |

**2021**

| | | |
|------|-------|------|
| **National Union Fire Insurance Company of Pittsburgh, PA**<br>**v. AlliedBarton Security Services, LLC**<br>No. 02-14-0000-8204<br>American Arbitration Association (AZ) | **GA** | **Deposition** |