## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                  EASTERN DIVISION

 3
   JACK ANTHONY WILLIAMS,        )
 4                               )
           Plaintiff,            )    CASE NO.
 5                               )    4:22-cv-00048-D
      vs.                        )
 6                               )
   SIG SAUER, INC. AND WINTRODE  )
 7    ENTERPRISES, INC.,         )
                                 )
 8           Defendants.         )
   _____)
 9
10
11
12
                DEPOSITION OF
13
                  TONY DILL
14
15
16           July 31, 2024
17            10:08 a.m.
18
        McAngus Goudelock & Courie, LLC
19        270 Peachtree Street Northwest
                 Suite 1800
20            Atlanta, Georgia 30303
21
22
             Quinn Bruno
23          Notary Public
        Commission No. W-00638913
24
25
```

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2
 3  On behalf of the PLAINTIFF:
 4       J. Lawson Hester, Esq.
         CRANFILL SUMNER, LLP
 5       5420 Wade Park Boulevard
         Suite 300
 6       Raleigh, North Carolina 27607
         919-828-5100
 7       lhester@cshlaw.com
         Appeared via In-Person
 8
 9  On behalf of the DEFENDANT WINTRODE ENTERPRISES, INC.:
10       David M. Fothergill, Esq.
         MCANGUS GOUDELOCK & COURIE, LLC
11       1001 Military Cutoff Road
         Suite 310
12       Wilmington, North Carolina 28405
         910-726-1122
13       david.fothergill@mgclaw.com
         Appeared via In-Person
14
15  On behalf of the DEFENDANT SIG SAUER, INC.:
16       Jonathan Woy, Esq.
         LITTLETON JOYCE UGHETTA & KELLY, LLP
17       4 Radnor Corporate Center
         Suite 520
18       Radnor, Pennsylvania 19087
         484-254-6225
19       jonathan.woy@littletonjoyce.com
         Appeared via In-Person
20
21
22
    Also present:
23
         John Parkman, Videographer
24
25
```

## Page 3

```
 1            INDEX TO EXAMINATION
 2
 3  EXAMINATION OF TONY DILL              PAGE
 4  Examination By Mr. Woy                  6
 5  Examination By Mr. Fothergill         136
 6  Examination By Mr. Hester             157
 7  Reporter Disclosure        164
 8  Certificate of Reporter        165
 9  Certificate of CSR        166
10  Deposition Errata Sheet 167
11
12            INDEX OF EXHIBITS
13  DEFENDANT'S       DESCRIPTION          PAGE
14  Exhibit 1        Investigative Report     7
15  Exhibit 2        Purchase Description    126
16  Exhibit 3        Supplemental Expert Report  131
17  Exhibit 4        ESI Document Production Files  157
18
19
20  (Defendant's Exhibits 1 through 4 were attached to the
21  original transcript.)
22
23
24
25
```

## Page 4

1  Deposition of TONY DILL July 31, 2024

2  (Reporter disclosure made pursuant to

3  Article 10.B of the Rules and Regulations of the

4  Board of Court Reporting of the Judicial Council of

5  Georgia.)

6  THE VIDEOGRAPHER:  This begins the

7  video-recorded deposition of Tony Dill in the matter of

8  Jack Anthony Williams versus SIG Sauer, Incorporated,

9  et al.  Today's date is Wednesday, July 31st, 2024.

10  The time on the video monitor is now 10:08 a.m. Eastern

11  Time.

12  Would Counsel present please state your names

13  and affiliations for the record, after which the court

14  reporter will swear in the witness.

15  MR. HESTER:  Yes.  My name is Lawson Hester,

16  and I represent the plaintiff, Jack Anthony Williams.

17  MR. WOY:  Jonathan Woy for the defendant, SIG

18  Sauer, Inc.

19  MR. FOTHERGILL:  And David Fothergill for

20  Wintrode.

21  THE REPORTER:  Okay.  My name is Quinn Bruno,

22  notary public and digital reporter for Esquire

23  Deposition Solutions in the State of Georgia.  I'll be

24  capturing the verbatim record of today's proceeding

25  using electronic audio equipment, a computer, and

Page 5

1 specialized recording software, which is not a form of
2 stenography.
3      The witness has confirmed his identity with a
4 driver's license issued by the state of Georgia.
5 Absent any objection at this time, Counsel and the
6 witness agree to my administration of the oath to this
7 witness, and that the final transcript may be used for
8 all purposes allowed by the local Rules of Civil
9 Procedure -- Federal Procedure.
10      MR. HESTER: Yes. And just for the record, I
11 will state that we have made a production pursuant to
12 the subpoena and Notice of Video Deposition Duces Tecum
13 that has been produced to counsel for SIG Sauer. We
14 feel like it's responsive. To the extent anything is
15 not contained therein, we object via omnibus objection
16 on the basis of privilege or work product.
17      THE REPORTER: Okay. Absent any objection,
18 this shall constitute agreement and stipulation of
19 such. And I will now swear in the witness.
20      Tony Dill, can I have you raise your right
21 hand.
22           TONY DILL,
23 having first been duly sworn, testified as follows:
24      THE REPORTER: Okay. Counsel, you can
25 proceed.

Page 6

1      MR. WOY: Before we get into the deposition,
2 Lawson, will you be producing a privilege log for any
3 documents withheld from the production?
4      MR. HESTER: I certainly can. Yes.
5      MR. WOY: Thank you.
6           EXAMINATION
7 BY MR. WOY:
8      Q.   All right, sir. I introduced myself off the
9 record. My name is Jonathan Woy, and I'm an attorney
10 for SIG Sauer. So I appreciate you being here today.
11 I'll do my best to not take up a ton of your time, and
12 we'll get through this as expeditiously as possible.
13      A.   Yes, sir.
14      Q.   Before we get started, just a few ground
15 rules. I'm sure you've heard them before and have
16 probably spoken with someone recently about them, but
17 for the court reporter's sanity, and our sanity later
18 when we read the -- the deposition transcript, we just
19 have to do our best to keep from talking over each
20 other, because when it gets put into a transcript
21 format later, it'll be a mess if -- if we stumble over
22 each other. I can be difficult to do, but just want
23 to keep that in mind, okay?
24      A.   Yes, sir.
25      Q.   If at any point in time you want to take a

Page 7

1 break for whatever reason, that's perfectly fine. All
1 I ask is that if there's a question pending, give us an
2 answer to the question, and then if you want to use the
3 restroom, use your phone, whatever you need, just want
4 a few minutes, just let me know and -- and happy to
5 take a break, okay?
6
7      A.   Okay.
8      Q.   If you have any questions about the
9 questions I ask you, or you're not quite sure what I'm
10 asking, or you're confused in any way, just ask me to
11 rephrase. I'm happy to do it. I -- I'm -- I'm not
12 trying to trip you up, and I -- I want to make sure
13 we're both on the same page and you understand what I'm
14 asking and there's -- there's nothing getting lost in
15 translation, okay?
16      A.   Yes, sir.
17      Q.   All right. I'm going to give you -- and --
18 and there may be some other issues that come up in the
19 deposition, those are the big ones, and if -- if we
20 have something else, we'll -- we'll address it then.
21      MR. WOY: But I'm going to give you what's
22 been marked as Exhibit 1.
23      (Defendant's Exhibit 1 was marked for
24 identification.)
25 BY MR. WOY:

Page 8

1      Q.   If you could just take a look at that. I
2 understand that to be your expert report in this case,
3 along with Appendix A, which is your CV, and Appendix
4 B, which is your testimony history.
5      A.   Yes, sir. That's correct.
6      Q.   Is that -- okay. Is that the only report
7 that you've issued in connection with this case?
8      A.   Yes, sir.
9      Q.   Does that report contain all the opinions
10 you intend to provide at trial in this case?
11      A.   It does.
12      Q.   Do you have any plans as you sit here to
13 issue a supplemental report?
14      A.   Not at this time. No, sir.
15      Q.   All right. Appended to that report -- or
16 I'm sorry. Appendix A, is your CV. Now, I -- I took a
17 look at that and it -- it looks like it seems to be
18 pretty comprehensive to me, but I -- I wanted to ask
19 you, you know, I -- number 1, is it up to date?
20      A.   It is.
21      Q.   And is there anything as far as significant
22 education experience, work history, or -- or other
23 experience that you feel is relevant to this case
24 that's not included on there?
25      A.   No. Everything should be contained in

Page 9

1  there.
2      Q.    Okay.  Have you published any kind of
3  articles, or studies, or written materials of any kind?
4      A.    Other than investigative reports for the
5  military when I was there.  Do you mean like that, or
6  are you --
7      Q.    Well --
8      A.    -- looking for, like, professional journals?
9      Q.    Right.  More like professional journals.
10  I'm not -- yeah.  Not so much any kind of investigative
11  reports for the military.
12     A.    No.  No.
13     Q.    Okay.  All right.  And then looking at
14  Appendix B of that -- and -- and we'll talk a little
15  bit about your -- your work history and everything in
16  more detail, but looking at Appendix B, that's your --
17  your testimony history list, and I see three items on
18  there.  And it looks like you testified in a deposition
19  in 2021 in National Union Fire Insurance Company of
20  Pittsburgh versus AlliedBarton Security Services.  Does
21  that sound right?
22     A.    Yes, sir.
23     Q.    What did that case involve?
24     A.    Sir, that was a -- it was a case involving
25  the overview of a security contract, about a six-and-a-

Page 10

1  half year contract involving two security companies and
2  the loss of about $10 million worth of product from the
3  facility.  So review of the security procedures and --
4  and accountability, essentially, for those products.
5      Q.    Sounds like that case had nothing to do with
6  firearms handling practices; is that right?
7      A.    No, sir.  It did not.
8      Q.    And the other case, you have two testimony
9  types listed on here.  One is identified as testimony,
10  and one is identified as hearing.  State of Indiana
11  versus White.  And it looks like that was this year.
12  Does that sound right to you?
13     A.    Yes, sir.
14     Q.    What did that case involve?
15     A.    Sir, that was a murder trial on the criminal
16  side.  The -- the last case was civil, this was
17  criminal.  It involved -- I testified as a -- as a
18  firearms expert in the state of Indiana for this murder
19  trial.  So the -- the hearing led up to -- to the
20  trial, so that was preliminary with the --
21  prosecution.  And then I testified again as a firearms
22  expert in that trial.
23     Q.    So where it says "testimony" on this list,
24  that's the trial testimony?
25     A.    The second one is.

Page 11

1      Q.    Yeah.  So I'll just show you.
2      A.    I just want to make sure I'm seeing it.
3      Q.    Yeah.  So I -- you see where it says
4  testimony and then hearing?
5      A.    Right.  So -- so the -- the hearing should
6  have been a bail hearing that was associated with the
7  trial.  They did that instead of a deposition.  And
8  then the testimony in the actual courtroom.
9      Q.    I see.  Okay.  Thank you.  And were you
10  testifying on behalf of the State or the defendant in
11  that case?
12     A.    It was the defendant, sir.
13     Q.    Could you just give me a sense of what the
14  types of opinions you were offering in that case were?
15     A.    It was primarily centered around how a
16  firearm was used, and we had to do testing in a
17  laboratory setting on the different aspects of the
18  firearm movements inside the -- of a vehicle, just --
19  just generally.  So you know, testified on -- on how
20  that weapon was used, then how the recreation, and then
21  a comparison to those two theories of the shooting that
22  occurred.  So we had to do a check down on the two
23  theories and then -- and then kind of gave the result
24  of the two testings that -- in that case.
25     Q.    What type of a firearm was that?

Page 12

1      A.    Sir, it was an AR-15.
2      Q.    Do you know the manufacturer?
3      A.    Yes, sir.  It was a Colt law enforcement
4  version of the AR-15 Harvey.
5      Q.    Was it a law enforcement officer who was
6  accused?
7      A.    It was not.
8      Q.    And did the testimony provided have anything
9  to do with the internal functioning of how the
10  components interacted with each other, or was it more
11  focused on how that defendant used that weapon during
12  what he was accused of doing?
13     A.    Yes, sir.  It -- it was the -- the use, not
14  -- not the function.
15     Q.    So you didn't provide any kind of product
16  design opinions or causation opinions in the case, did
17  you?
18     A.    No, sir.
19     Q.    Did the prosecution file any kind of motions
20  to attempt to limit or exclude your testimony based on
21  your experience or work history?
22     A.    I -- I'm not aware of any motions, sir.
23     Q.    Did the Court limit you in any way in what
24  you could testify to in that case?
25     A.    They did not.  I recall the -- I'm trying to

Page 13

1  think how the judge -- the judge mentioned it.  It was
2  up to the jury to decide on the validity of the
3  testimony based on my experience with the -- that type
4  platform weapon.
5      Q.    Have you ever been excluded from testifying
6  in any case?
7      A.    No, sir.
8      Q.    Have you ever been limited in any way in the
9  scope of the testimony you were permitted to provide in
10  any case?
11      A.    No, sir.
12      Q.    I -- I just take it from your -- your resume
13  history and your -- your progression to ESI, it -- it
14  sounds like you are just kind of getting into the
15  expert witness arena; is that fair to say?
16      A.    In the last few years.  Yes, sir.
17      Q.    Are there any other testimonies that you've
18  given or any other cases where you've given any kind of
19  deposition, trial testimony, testified at a hearing
20  other than what's listed on this Appendix B?
21      A.    No, sir.
22      Q.    All right.  And one other preliminary item I
23  wanted to ask you about is what you're being paid.
24  That's always a fun topic.  I don't -- I don't need you
25  to pull it out of thin air.  On your report on -- on

Page 14

1  Page 3 --
2      A.    Yes, sir.
3      Q.    -- I see that it says Mr. -- ESI currently
4  bills Mr. Dill's time at 325 per hour --
5      A.    Yes, sir.
6      Q.    -- does that sound right?
7      A.    Yes, sir.  That sounds right.
8      Q.    And is that 325 per hour for your time
9  regardless of the function you are performing?
10      A.    That's correct.
11      Q.    Okay.  So your testimony here today is at
12  325 per hour; is that right?
13      A.    Yes, sir.
14      Q.    And is that the same for if you're called to
15  testify at trial?  Will be -- will you be charging 325
16  per hour for that?
17      A.    That's correct.  Yes, sir.  So again, ESI is
18  charging that.  I'm not.
19      Q.    Sure.  Understood.
20      A.    Yeah.
21      Q.    How much time did you spend preparing for
22  this deposition?
23      A.    Several hours over the weekend reviewing my
24  report.  It was probably two hours, give or take, with
25  my mentor about -- he had a lot of deposition

Page 15

1  experience, so this -- this process.  And then meeting
2  for about two hours, meeting with counsel going, again,
3  over procedures, how this is going to work, and so
4  forth.
5      Q.    When you say two hours with your mentor,
6  does that include the time that you spent reviewing
7  your report and anything else he did to refresh your
8  recollection of this case, or is that additional?
9      A.    That was additional to that.
10      Q.    Are you able to estimate for me how much
11  time you spent reviewing the report, any other
12  materials, and anything else like that, in preparation
13  for your deposition?
14      A.    Sir, I -- I'd be guessing.  I -- I turn in a
15  time sheet daily.  I can probably say about 8 to 10
16  hours, maybe.  Somewhere in that neighborhood.
17      Q.    And one of the other instructions that I
18  should have given you, I guess, is we -- we don't want
19  you to guess.  So if you can provide an estimate --
20      A.    Yeah.
21      Q.    -- that's great.  If --
22      A.    Okay.
23      Q.    If you have some sort of general factual
24  basis for what you're saying, that's helpful.  But, you
25  know, just -- we don't need you to guess.

Page 16

1      A.    Yes, sir.  Let's -- let's say 7 to 10 hours,
2  estimate.
3      Q.    Okay.  And you have to your right a binder
4  full of documents.  I understand that that's the
5  physical version of what was provided to me this
6  morning as a USB flash drive, and you gave me that --
7  that passcode to get into that; is that right?
8      A.    Yes, sir.
9      Q.    Is there anything that's in that physical
10  binder that's not on the flash drive that I was
11  provided?
12      A.    No, sir.
13      Q.    Is there -- is that binder and this flash
14  drive, is that a complete copy of your file for this
15  case, or are there any other materials that you either
16  reviewed, relied upon, generated, or you're maintaining
17  in connection with your expert work in this case?
18      A.    The reports from the other experts are --
19  they're not in this binder, but -- but I used those,
20  and they're -- they're cited as the material -- in the
21  material on this.
22      Q.    All right.  So let's -- I -- I guess we'll
23  turn right to that.  You mentioned it on Page 3, the
24  materials reviewed section of your report?
25      A.    Okay.

Page 17

1    Q.   Now, it -- it looks like, you know, just
2  based on my preliminary review of what's on the flash
3  drive, it looks like there's some additional materials
4  in what was provided to me today that aren't listed on
5  here; does that sound right?
6    A.   Can I -- can I look at this real quick?
7  From -- from what I can tell -- so -- so the -- the
8  materials reviewed, were -- were the materials I
9  reviewed when I issued my report.  I -- I believe some
10  -- there were some of the interrogatories in there that
11  I did not -- there was nothing in them that I needed to
12  pull over to the report.
13    Q.   Okay.  And just by way of another example,
14  there was some Bulldog holster printouts, it looked
15  like.  It looks like a website capture showing an
16  inside pocket holster?
17    A.   Right.  And those were all footnoted later
18  in the document.
19    Q.   Were they?  Okay.
20    A.   Yes, sir.
21    Q.   Okay.  Yeah, I -- I -- no.  I'm -- I'm not
22  trying to trip you up.
23    A.   No.
24    Q.   I just want to make sure I have a complete
25  understanding of -- of what -- what you relied on and

Page 18

1  what we have in the file.  Let me ask you this way:
2  Was there anything that was provided to you, after you
3  issued your report that's contained in your case file,
4  that was provided to me?
5    A.   No.  That -- not that I'm aware of.
6    Q.   Okay.
7    A.   No.
8    Q.   All right.  So I'd like to talk a little bit
9  about your background.  So we'll -- we'll move to the
10  CV, which is Appendix A to your report.  And it -- it's
11  going to take a little while because --
12    A.   Sure.
13    Q.   -- you've covered a lot of ground in -- in
14  your -- your work history.  So you know, it's probably
15  easiest to just start with your education and go from
16  there, if that works for you?
17    A.   Yes, sir.
18    Q.   All right.  So it looks like you have a -- a
19  bachelor's degree in humanities and communications arts
20  from the University of West Florida; is that right?
21    A.   Yes, sir.  Yes, sir.  I believe the actual
22  title was humanities interdisciplinary.  But yes, sir.
23    Q.   Okay.  And was that a degree that you earned
24  while you were serving in the military?
25    A.   I was at that time in the National Guard and

Page 19

1  in ROTC.  So I was a simultaneous membership in the --
2  in the National Guard down in Florida.
3    Q.   Were you a full -- full-time student at that
4  time, and then your National Guard and ROTC duties were
5  on top of that?
6    A.   That's correct.
7    Q.   And then it looks like you have a master's
8  degree in military studies from joint warfare, American
9  Military University, 2011, and that's the second page
10  of your CV.  (Indiscernible).  The strategic studies.
11    A.   I'm sorry.  Which one are you asking?
12    Q.   Military studies.  The second one up.  The
13  master's degree in 2011?
14    A.   Right.  Yeah, that -- that's -- yes, sir.
15    Q.   Where is that university located?
16    A.   Sir, that was an online program.  I -- I'm
17  trying to remember.  I -- I think it's out of Virginia,
18  but I can't remember off the top of my head.
19    Q.   And could you just give me a sense, an
20  overview, of what that degree covered?  I mean, I -- I
21  see military studies, that could be quite a few
22  different things.
23    A.   Yes, sir.  So it's -- part of it was
24  military history, a lot -- some of it was strategic
25  development, you know, military planning, strategic

Page 20

1  operations, and kind of leadership at that strategic
2  level.
3    Q.   It sounds like that didn't have anything to
4  do with firearms handling practices in the field?
5    A.   No, sir.  It did not.
6    Q.   And then I see next up from there is NATO
7  Defense College, Rome, Italy, 2012?
8    A.   Yes, sir.
9    Q.   Could you tell me a little bit about what
10  that -- I guess, is that -- is it a degree, or is that
11  just a -- a training, or so -- I guess let me ask you
12  this:  Tell me a little bit about it, and then I'll
13  follow up, because I have no idea what it is.
14    A.   Yes, sir.  So I was selected by the United
15  States Army to be the senior United States Army
16  representative at the NATO Regional Cooperation Course.
17  I think it was Course Number 8.  And it was -- they
18  brought in our Arab allies, and so I -- we went
19  together through a course, again on strategic military
20  planning, NATO operations, some military history, and
21  they tried to use, for example, World War II, you know,
22  history, that time frame.  So we -- we did some
23  battlefield studies in Italy, along with the -- tied to
24  the Italian campaign during World War II.
25    Q.   And I -- I apologize, I'm -- I'm looking

Page 21

1  down as you're testifying. I'm -- I'm taking notes so
2  that I don't have to ask you later, and I remember what
3  it is you said. So I -- I don't mean to be rude.
4      A.  Not -- not at all. I understand.
5      Q.  It sounds like that -- that also did not
6  address firearms handling practices in the field.
7      A.  No. We -- we talked about some offensive
8  military operations, but not specific handling of the
9  firearms.
10     Q.  Okay. Next up is MSS strategic studies,
11 U.S. Army War College, 2012. Could you tell me a
12 little bit about that?
13     A.  Again, it's a same kind of vein where you
14 have, you know, military studies using past operations,
15 strategic planning, doing exercises on -- in different
16 -- you're in different positions within the class,
17 running operations or logistics or so forth in -- in
18 larger scale, military planning operations.
19     Q.  What does MSS stand for?
20     A.  It's master of strategic studies.
21     Q.  Is that -- was that in Carlisle,
22 Pennsylvania?
23     A.  It is.
24     Q.  Actually, I'm from Chambersburg, which is
25 just south of there, so I --

Page 22

1      A.  Okay.
2      Q.  -- I drive past it every time I go down to
3  see my parents still.
4      A.  I grew up in Dillsburg for a while.
5      Q.  Yeah. Okay. That's not far away. And then
6  I see you were an adjunct faculty at the U.S. Army War
7  College in a special operations elective, 2015 to 2019.
8  Could you tell me a little bit about that?
9      A.  So that was a special operations elective
10 for the university -- well, for the War College, and I
11 served as -- assisted the primary instructor, who was
12 not special operations, to -- to conduct the classes.
13 So they were delivered online to the students, and then
14 we met up physically during some of the summers. And
15 again, that was reviewing special operations history,
16 employment techniques and so forth, as -- as the
17 students are trying to get a better understanding of
18 how to work with and what they could do with special
19 operations that were within their, like, joint warfare
20 formations.
21     Q.  Okay. Is that more from a -- a larger
22 strategic perspective as opposed to on the ground, this
23 is what you should do if you encounter this scenario,
24 type training?
25     A.  That -- that's correct. It -- it's more for

Page 23

1  point of considerations. Again, not tactical, you
2  know, specific finding. You're looking at larger scale
3  planning considerations for the use of special
4  operations.
5      Q.  And the last one listed on here is the
6  GAFASTA 40-Hour Armed and Unarmed Security Guard
7  training, 2021. Could you tell me a little bit about
8  that?
9      A.  Yeah. The Georgia Firearms and the Security
10 Training Academy, I believe that's the correct title.
11 So I went through civilian security guard training to
12 augment some of my military security training. Part of
13 that was in support of the project I did for the -- the
14 deposition case that you were describing.
15     Q.  Makes sense.
16     A.  But that did involve firearms training and
17 qualification.
18     Q.  Could you tell me a little bit about the
19 firearms training you went through for that course?
20     A.  You had to certify with the firearm. They
21 gave you some safe-handling techniques. You had to
22 deploy your -- your carry pistol, and they gave you
23 some target and pass qualification paperwork.
24     Q.  What type of a pistol did you use for that
25 training?

Page 24

1      A.  I believe it was a Glock.
2      Q.  Okay. Any other education experience that
3  you think is relevant to this case we haven't talked
4  about?
5      A.  It'd be probably more onto the more tactical
6  schools I went into, like Ranger school, the -- the
7  Green Beret course, you know, special forces officer
8  course, along those lines. Do you want me to -- to
9  highlight what those are, or --
10     Q.  Yeah. If you could just give me a quick
11 sketch of -- of that part of your history, that would
12 be helpful. Yes, sir.
13     A.  So I'm a graduate of the United States Army
14 Ranger School. That involves small unit tactics. You
15 do have some weapons training and handling. The -- the
16 Green Beret course. I'm not sure how familiar you are
17 with -- with Green Beret Special Forces. Our primary
18 mission is to serve as -- as instructors. So for
19 example, you don't just do a raid or attack an enemy
20 like you would in -- from a Ranger formation. You go
21 -- for example, let's use Afghanistan as an example.
22 We went and trained local forces. So instead of me
23 bringing 1,000 Americans with me, we took a few small
24 teams, trained 1,000 locals on how to use firearms, how
25 to do tactics, how to do security operations, and then

Page 25

1 fought alongside of them doing those kind of
2 operations.
3     Q.   Got it.  And then -- well, let me ask you
4 this:  When did you go through the -- the Green Beret
5 course?
6     A.   I went through tryouts and the qualification
7 in 1993, and then served the majority of my 31 years in
8 as a Green Beret officer.  And over time, it changes
9 where in the, you know, as a more junior person, you're
10 more into the training and development, and then as you
11 get more senior, you're providing oversight of those
12 programs.
13     Q.   I take it Ranger School would have been
14 before that?
15     A.   Yes, sir.  That was '89.  1989.
16     Q.   So you -- you served for a -- U.S. Army
17 Ranger for a period of maybe four or so years, and then
18 you went into the Green Beret?
19     A.   So I was a Ranger-qualified paratrooper in
20 the 82nd Airborne Division.  Just trying to be
21 accurate.
22     Q.   Got it.  Okay.
23     A.   So yes, sir.  I spent about -- I spent about
24 five years in the 82nd Airborne Division, four or five
25 years, and then went to -- to Green Beret tryouts from

Page 26

1 there.
2          One of the other assignments you probably
3 want to highlight, you see on there that I was the G3
4 Chief of Training for the U.S. Army Special Forces
5 Command.  Special Forces Command is the headquarters of
6 the Green Berets.  So at that time, it was, I want to
7 say, something around 13,000 personnel.  And as chief
8 of training, I was responsible for, you know,
9 validating training programs.  Some A teams going over
10 into the fight, we would actually go and validate their
11 weapons training.  If they're having issues with their
12 weapons, which a couple teams were, particularly on
13 some of the new fielding that was going on, we were
14 involved in solving those problems.  I got involved in
15 some weapons testing and evaluation, particularly with
16 the SCAR rifle system.  And so again, we provide
17 resources, evaluation, and so forth that has that
18 training.  So the -- the time I spent in that position
19 was -- was focused on that.
20     Q.   Okay.  And maybe it makes some -- some sense
21 to work through.  I -- I'm going to ask you about, I
22 guess, kind of the progression of -- we're -- we're
23 getting into probably the more -- the most relevant
24 stuff.  I appreciate you sharing that.
25     A.   Okay.

Page 27

1     Q.   I just want to get kind of a -- a general
2 sketch, so I understand what's on your -- your resume
3 here.  I'm trying to figure out -- think about how I
4 can do this most efficiently, because I don't want to
5 ask you about every single bullet point.  We'll be here
6 forever.
7     A.   Yeah.  Absolutely.
8     Q.   Frankly, it's probably how we were just
9 doing it, and how we were offering up the information,
10 so --
11     A.   All right.
12     Q.   So you -- you mentioned -- I see on here the
13 G3 chief of training, that was from 2005 to 2007, and
14 --
15     A.   Yes, sir.
16     Q.   Were you ever overseeing all -- all 13,000
17 individuals in the Green Beret and responsible for
18 their training?  Is that what that entailed, or --
19     A.   So we -- we were providing, like, you know,
20 corporate level oversight of their -- you know, they
21 would send up training plans of what they were working
22 on.  We would do spot checking of the training.
23 Anything that was specialty oriented, military free
24 fall, dive operations, we'd be involved in that.  If
25 there was certain certifications that were happening.

Page 28

1 For example, at that time, I recall 20th Special Forces
2 Group, which was one of the National Guard groups, was
3 going into the box into Afghanistan, and so we were
4 very tied in to make sure that they had all the
5 training and resources, which included, you know,
6 observing and watching their training that was going
7 on.
8     Q.   I'm guessing this would have been earlier in
9 your career, but there was a -- was there a time where
10 you were, say, on the ground with other soldiers and
11 actually providing the training directly to them as
12 opposed to the oversight from a more senior level?
13     A.   Yes, sir.  As -- as a -- A team commander,
14 as a Green Beret captain, I led two different A teams
15 with -- at that time it was a 10 Special Forces group,
16 and that was working with counterparts.  And, for
17 example, that would have been Bosnia time frame in
18 Northern Iraq working with the Kurdish Peshmerga.  So
19 we were doing coaching and mentoring for that.  Some
20 pistol systems, some rifle systems, depending on what
21 they had.
22          So if -- some of the training, we -- each of
23 an A team has a weapons sergeant, and so they might set
24 up the training and then you'd have different tasks.
25 And then as commander, you're overall responsible for

Page 29

1  the training that's going on, and then whatever you can
2  do to help assisting, you know, teaching safety.
3  You're serving perhaps as range safety. I've done that
4  several times. Again, where you're -- you're in that
5  kind of a role, or you are giving coaching, mentoring,
6  and watching each of the students, because usually
7  there's a lot more of them than you. And so you're
8  trying to, kind of, fixing problems as they see, you
9  know, looking at the marksmanship, see how they're
10  hitting the targets, trying to make adjustments on the
11  -- the training site picture, making sure that they're
12  getting the job done right. Because eventually, you
13  know, you're going on the operations with these same
14  people, so it's in your best interest that they're
15  well-trained.
16      Q.  Sure. And as part of that, it sounds like
17  you would have some responsibility for making sure not
18  only were they accurate with their marksmanship, but
19  they were handling their weapons safely; is that
20  correct?
21      A.  That's -- that's correct.
22      Q.  And if you saw someone mishandling a weapon
23  or doing, you know, handling the firearm unsafely,
24  would you be responsible for saying something to that
25  person?

Page 30

1      A.  Absolutely.
2      Q.  So I'm looking here on Page 4 of your CV,
3  it's the -- the sixth bullet point down. I see,
4  Commander Special Forces Operational Detachment A, and
5  there are two different A, either 064 or 061; is that
6  -- are those the A teams you're referring to?
7      A.  They are. 064 was a free fall detachment.
8  So we had that additional skill set for infiltration
9  technique that we worked on.
10      Q.  I see. Okay. And that would have been
11  while you were a Green Beret at the time --
12      A.  It is.
13      Q.  -- right? So I -- I -- and -- and part of
14  my ignorance on this, I -- I -- frankly, it's
15  interesting, so I want to ask about it, and also, I --
16  I -- you know, I think it'd be helpful to the case to
17  know, like, if, you know, as a Green Beret, I
18  understand that you had responsibility for training
19  partners in other parts of the world, local forces.
20  But it sounds like you also had -- is it a team of
21  Green Berets, or is it a team of Rangers? Is it a -- a
22  team of -- I mean, who -- who makes up the -- the A
23  teams that are referred to here?
24      A.  So a -- a fully -- a -- a fully manned A
25  team is 12 people. Most of them are running -- at that

Page 31

1  time were running 10 -- 8 to 10 people. So they're --
2  they have two specialists and -- and -- let's see. Two
3  in medical, two in weapons, two in engineering, two
4  communications, you've got an operations sergeant,
5  you've got an intel sergeant. Anyway, so the -- the
6  team is able to split in half and kind of have
7  redundant capabilities, but that's kind of like the
8  nucleus of the A team, and that's -- and they would
9  send us, again, overseas. With 061, I did a lot of
10  NATO training. So we were focused with working with
11  the Belgian commandos, (indiscernible) SAS and so
12  forth. And then with 64, I did a lot more partner
13  operations with like Bosnia and North Iraq.
14      Q.  And so you're -- the role of the A team
15  would be to -- I -- I guess the A team as a whole would
16  work with training your partners and then fighting
17  alongside them? Is that how it would work?
18      A.  Yeah. So you would train with your
19  partners. If there was a war going on, then you would
20  fight beside them. If it was just, you know -- we did
21  do Joint Country -- JCET training. I believe it was
22  Joint Country Exchange Training, where we would train,
23  you know, again beside the NATO partner, but if there's
24  no conflict, then we came back. The -- the larger
25  conflicts, when I was with the 82nd Airborne, you know,

Page 32

1  we had Panama and Desert Shield Storm. And then in --
2  in the Green Berets, then we had, you know, 9/11 kicked
3  off. So we had all the -- we had the Bosnia Kosovo,
4  multiple trips to Afghanistan, multiple trips to Iraq.
5      Q.  I see. Okay. Let's skip ahead a little bit
6  here. I want to ask you about some of your more recent
7  experience still in the U.S. Army, but in the -- I'm
8  interested in the, I guess, the 2013 to 2015 time
9  frame, when you were Chief of Staff at the JFK Special
10  Warfare Center, and then also your time as the State
11  Inspector General from 2015 to '17. So let's start
12  with the -- the Chief of Staff position. Could you
13  tell me a little bit about what that entailed?
14      A.  Yes, sir. So the John -- the U.S. Army
15  John F. Kennedy Special Warfare Center and School is --
16  is the pipeline for Green Berets, civil affairs, and
17  psychological operations for -- that's -- that's the
18  primary branches of -- of special operations. And they
19  -- that's the pipeline schoolhouse. So as Chief of
20  Staff, I had oversight of -- of all the -- the staff
21  within the organization, all the training resources
22  from the training group. You know, we -- we conducted
23  checks of the training that was going on, and we'd be
24  invited out to go see the students conducting
25  operations. So again, more on that kind of strategic

Page 33

1  oversight, resources, providing oversight of any
2  investigations that were going on, if there was
3  injuries or so forth.  And then the -- let's say we got
4  involved with a doctrine review, you know, of how --
5  how we're employing forces again, tactically
6  operational, and strategically.
7      Q.   While you were there, did you have any
8  involvement in identifying a need for the Army to adopt
9  the -- the new modular handgun system?  That, as I
10  understand, that solicitation was put out towards the
11  end of 2015.  So that would kind of over -- coincide
12  with your time then.  Did you have any role in that?
13      A.   I did not.
14      Q.   All right.  And then the next item from 2015
15  to 2017, it says you were the State Inspector General
16  for the Georgia Department of Defense.
17      A.   Yes, sir.
18      Q.   Can you tell me a little bit about that
19  position?
20      A.   Yes, sir.  So the -- do you know what an
21  inspector general is or no?
22      Q.   Start there.
23      A.   Oh, okay.  Okay.  So an -- an IG is kind of
24  a -- a special trusted position within the Army.  You
25  have to go through a -- a special selection and

Page 34

1  screening process for that.  And, you know, based on
2  seniority, each of the states and for -- for -- there
3  are multiple IGs within the Army and -- and other
4  civilian organizations.  I'm sure you've see them on
5  TV.  But the Army for each of the states has an
6  active-duty IG at the National Guard headquarters to --
7  to assist with evaluation of training, compliance.
8  You're the eyes, ears, and conscience of -- of the --
9  the state -- State Attorney General, essentially.  So
10  you're -- you serve as an advisor, but you're doing
11  compliance and so forth.
12      In my role in Georgia here, we had some
13  additional responsibility where the state of Georgia
14  has a partnership program and at that time was with the
15  country of Georgia.  It still exists.  And so I had
16  some responsibilities for training over there that we
17  were participating in.  And then there was some more
18  tactical tasks.  I was asked to help because I was a
19  special operator.  So they had long-range surveillance
20  detachment, so we were working some free-fall
21  operations with them as well.  We did have weapons
22  currency training within the staff.  And at that time,
23  I was also on the active shooter response team for the
24  headquarters.  So we had permission, based on some
25  shooting incidents that happened in -- in the National

Page 35

1  Guard side of the house, to -- to carry weapons in the
2  headquarters, and I did at that time.
3      Q.   It sounds to me, and correct me if I'm
4  wrong, but in that position -- well, let me ask -- let
5  me just ask you --
6      A.   Yeah.
7      Q.   -- and not tell you what it sounds like.
8  Did you have any involvement in the selection or
9  evaluation of the -- what ultimately became the M17 and
10  M18 --
11      A.   No, sir.
12      Q.   -- while you were in that role?
13      A.   No.  I did not.  No, sir.
14      Q.   Okay.  I think we -- we'll move up to, I
15  guess, KF Armory Defense --
16      A.   Yes.
17      Q.   -- is the next item on there.  Could you
18  tell me a little bit about what you did with them?
19      A.   Okay.  So KF Armory Defense is one component
20  of the Kim Law Firm.  The -- the arm I worked into was
21  involved in ballistic testing.  We provided oversight
22  of manufacturing of ballistic defense products.  We
23  actually went to the SIG range to do some
24  demonstrations for them up there.  And we did product
25  demonstrations for law enforcement, mostly in Georgia,

Page 36

1  and were involved in some of the fielding programs like
2  the P320 VTAC that -- that was one of the local
3  departments here picked up.  We -- we were part of that
4  demonstration of fielding.  And then we supported other
5  law enforcement organizations.  One, for example, was
6  called Tacflow where they did shooting inside the
7  stadiums.  And so we were involved with that, with the
8  sniper training, to set up ballistic backstops to catch
9  the bullet inside the stadium.
10      And full -- well, one more thing.  So in
11  addition to KF Army Defense, there was KF Armory.  So
12  that was in the same workspace, the other side of the
13  -- the other side of the offices.  That was a retail
14  Class III armory that -- that held -- sold high-end,
15  again, you know, Class III items:  Suppressors, full
16  automatic, and then the high-end pistols and so forth.
17  And so when they needed assistance, if I wasn't busy on
18  the defense side, then I would assist over there.  And
19  that also involved range training of -- of civilians
20  that whatever they wanted to purchase from the armory,
21  if they wanted to do range training, to be involved in
22  that.
23      Q.   KF Armory, did that -- did that retail side
24  of the business, did they sell SIGs?
25      A.   They did.  They were an LE SIG dealer.

1    Q.    Were you involved in any kind of sales --
2 well, let me ask you this:  Let's start with you
3 mentioned the P320 VTAC.
4    A.    Yeah.
5    Q.    Could you tell me a little bit about your
6 involvement with whether it was demonstration of that
7 pistol, the sale of that platform?  What -- what was
8 your role?
9    A.    I didn't do the sales.  If -- if we put on a
10 range demonstration, that might be one of the products
11 that was put out.  If -- if they had, you know, the law
12 -- the law -- I'm sorry.  The police officers if they
13 wanted to test, you know, test the weapon, fire the
14 weapon, they were allowed to do so, and just provide
15 information.  So I was more on the safety and
16 demonstration, again, for -- for that -- for that type
17 of system.  But that would be, like, one of multiple
18 products.  There might be lasers.  There might be, you
19 know, long guns, just depending on what -- what the
20 department was interested in.  And again, I might also
21 at the same time, have the ballistic safety products in
22 the -- the blocks that we were working with, if it was
23 a modular system.  So that might be part of the range
24 training and demonstration that day.
25    Q.    And you were at KF Armory Defense at the

1 time that SIG's voluntary upgrade program came out.
2 Are you familiar with that program?
3    A.    I am now.  I wasn't overly before.  I mean,
4 I -- I know -- I -- I knew about some of the drop-fire
5 things, and I knew there was a corrective action.  I
6 just didn't know a lot about it.
7    Q.    So it -- is it your understanding as you sit
8 here today that the voluntary upgrade program was
9 intended to address -- address drop-fire concerns?
10    A.    I don't -- I knew that SIG was working on a
11 correction for the drop-fire concerns.  I did not know
12 that it was called the voluntary upgrade program.
13    Q.    Okay.
14    A.    If that makes sense.
15    Q.    Let me ask you this way:  You don't have any
16 reason to believe that the voluntary upgrade program
17 was intended to address anything other than drop-fire
18 concerns, do you?
19    A.    Sir, I -- I didn't know.  Again, I didn't
20 know until -- until this case where I'm reading all the
21 back and forth with the manufacturer, I did not have
22 any -- any understanding before that of -- of the name
23 of that program or what it was trying to address.  I
24 just knew that SIG, there was some -- some issues with
25 some drop-fire testing, and they -- they made some

1 changes to address that.
2    Q.    Okay.  Did the retail side of KF Armory sell
3 Glocks as well?
4    A.    They did.
5    Q.    And it sounds like -- well, let me ask you
6 this:  In your -- in your work in -- in the military,
7 did you carry a Glock at any point in time?
8    A.    Yes.  I was given a Glock 19 for one mission
9 that I recall.
10    Q.    And I think that you mentioned that the
11 Glock -- well, you -- you qualified on a Glock for the
12 security training, right?
13    A.    Yes.  I believe.  Yeah.
14    Q.    And you're familiar with the -- the trigger
15 on a Glock with the tab that protrudes through the face
16 of the trigger, right?
17    A.    Yes, sir.
18    Q.    Do you know what the point of that tab
19 trigger is on a Glock?
20    A.    To prevent the trigger from moving unless
21 it's depressed so that it clears the -- the frame
22 housing.
23    Q.    And is that a -- a component of the Glock,
24 to your understanding, that's there for drop safety
25 protection?

1    A.    No.  That -- my understanding, it's there
2 for trigger pull safety.
3    Q.    Okay.
4    A.    If I'm saying that correctly.
5    Q.    What -- what's that based on?
6    A.    My use and training of the gun.  I mean,
7 that's --
8    Q.    Let me ask you this:  Is that an assumption
9 you made based on your use of the gun; that that's what
10 it's there for?
11    A.    Yes.
12    Q.    Okay.  You mentioned that you had -- had
13 been to SIG at least once.  That was in New Hampshire,
14 right?
15    A.    It is.
16    Q.    And have you been to SIG at any other point
17 in time other than the one you mentioned in connection
18 with KF?
19    A.    No.  And we were at the -- there's a range
20 complex near the road.  That's where we were -- we were
21 focused on.  So we -- we did not go, like, in the
22 factory.  We were at the range, and then there's, like,
23 a retail store that was there on the way out.  So --
24    Q.    Have you ever spoken with anybody employed
25 by SIG about the P320 or the M17 or M18?

Page 41

1    A.    Not that I recall.

2    Q.    Are you aware of any other accidental

3  discharges involving the P320, the M17, or the M18,

4  other than the one involving Mr. Williams?

5    A.    Yes.

6    Q.    What other accidental discharges you -- are

7  you aware of?

8    A.    I was -- I -- after my report, I was told

9  about the videos that are online about some police

10  officers that had the uncommanded discharge, and so I

11  went and observed those.  And then this past weekend,

12  there was an NPR article that came out with some

13  incident reports from the military on the M17 and 18.

14    Q.    Have you ever personally spoken with anybody

15  who was involved with an accidental discharge involving

16  the P320, the M17, or the M18?

17    A.    No, sir.

18    Q.    Have you ever been involved in any kind of

19  an investigation, outside of what you have may done --

20  may have done with respect to Mr. -- let -- let me ask

21  you a clear question because that was going to get

22  wordy.

23        Other than Mr. Williams's discharge, have you

24  involved -- been involved in any investigations of any

25  accidental discharges involving a P320, an M18, or an

Page 42

1  M17?

2    A.    No.

3    Q.    And you mentioned you reviewed some videos

4  of accidental discharges involving -- were they all

5  videos of the P320, to your understanding?

6    A.    Yes.  That -- that's my understanding.  It

7  was the 320.

8    Q.    How many videos did you review?

9    A.    There was a -- there was a couple

10  compilations.  I looked -- some of them looked like it

11  was the same -- some of it that was the same, some of

12  it was different.  But do you mean how many clips of it

13  was inside the video?

14    Q.    I mean, I think we're asking the same --

15  same -- the same thing.  How many different accidental

16  discharges did you see videos of?

17    A.    I'd estimate probably about eight.

18    Q.    And was that -- you mentioned a compilation.

19  Was that a -- a compilation of all those eight, or were

20  they different videos that you found?

21    A.    No.  It -- it was a compilation.  I think it

22  was two different video strings that I saw, and they

23  were showing -- well, I'm trying to remember now.  I --

24  I focused in on two of the law enforcement videos that

25  I saw.  Again, I'm trying to remember what else I --

Page 43

1  that was clicking through a few videos.  I don't want

2  to over-count.  So again, for sure I saw the two -- the

3  two police officer videos.  There's one in a hallway,

4  and there's one in a parking lot.  I recall those.

5  Yeah.  That -- as I'm sitting right here, that's --

6  that's what I'm remembering right now, so --

7    Q.    Do you have any personal knowledge of any

8  information relating to any of those discharges, other

9  than what you saw in those videos?

10    A.    No, sir.  I do not.

11    Q.    Do you have any opinion as to what was

12  causing the discharges you saw in those videos?

13    A.    I do not.

14    Q.    Do you think the P320 can discharge without

15  a trigger pull?

16    A.    I don't know.  I didn't assess the weapon.

17  Dr. Harrison was the one that did that.

18    Q.    So and -- and I -- I think I understand.  I

19  -- you know, I understand.  So just for purposes of the

20  record, though, you're not offering any kind of design

21  defect opinions in this case, are you?

22    A.    No, sir.  My -- my testimony is limited to

23  -- to three components for the use of the firearm.

24    Q.    Okay.  So you -- and -- and along the same

25  lines, you're not offering any opinions as to the

Page 44

1  causation of or what caused Mr. Williams' discharge in

2  this case, are you?

3    A.    No, sir.

4    Q.    And you don't plan to offer any opinions

5  criticizing the design of the P320 in this case, do

6  you?

7    A.    No, sir.  My -- my testimony is limited to

8  the bullet carry in the chamber, the cleaning of the

9  firearm, and then the -- putting holsters in your

10  pocket.  That was the scope of my -- the work that I

11  was asked to do.

12    Q.    Okay.  We've been going at almost an hour.

13  Do you want to take a quick break?

14    A.    Okay.

15        THE VIDEOGRAPHER:  Off the record.

16        THE REPORTER:  We're going off the record.

17  The time is 10:56 a.m.

18        (A recess was taken.)

19        THE REPORTER:  We're back on the record.  The

20  time is now 11:03 a.m.

21  BY MR. WOY:

22    Q.    All right, sir.  Just a few more areas on

23  your resume I want to cover, then we'll move on to

24  something else.  I noticed that you are a Glock

25  Advanced Armor --

Page 45

1    A.   Yes.

2    Q.   -- listed under certifications.  When did

3   you go through that training?

4    A.   When I was at KF Armory, so -- Defense.

5   Probably 2018, I think.

6    Q.   And what -- what was the -- the purpose of

7   taking that training program?

8    A.   Well, at the -- at the -- if the armory

9   needed assistance with some light gunsmithing or

10  accessories being added to the different systems, you

11  know, putting in, like, the -- Zev made the trigger

12  systems, you know, that went into the Glocks, or

13  switching out components that -- just to give me a

14  little bit better comfort level on some of the things I

15  was being asked to do.

16   Q.   I see.  Okay.  As part of that training

17  program, did Glock or whoever was giving the training,

18  did they address the purpose of the tap trigger in any

19  way?

20   A.   They might have.  I -- I don't remember off

21  the top of my head, all of it.  You know, there was a

22  lot of -- of the maintenance aspects and how to look up

23  parts and the, you know, to make sure that they had

24  their proper components and the parts, and then, you

25  know, how to switch out trigger-bar safeties and some

Page 46

1   of the -- some of the components for different trigger

2   pull.

3    Q.   Okay.  All right.  Under the, I guess, the

4   same section as where you have the Glock Armor listed,

5   I see Safety Officer listed as Number 2 --

6    A.   Yes.

7    Q.   -- under the certification list.  What is

8   that?

9    A.   So in the Army, back in -- somewhere around

10  1990-ish, I went through the safety officer course.

11  And then once you were qualified, then you had

12  additional safety duties.  It was collateral duties

13  that you were assigned.  So it might be serving as a

14  safety for certain events, like at the range or the

15  drop zone.  There was some additional training

16  depending on what -- on what task your were asked to do.

17  And then you were also -- could assist with safety

18  investigations.

19   Q.   And would those safety investigations be,

20  generally, some sort of an event happens; you're tasked

21  with investigating it and making -- and seeing what

22  went wrong?  Is that --

23   A.   That's correct.  It's in -- let me try to

24  lump this together because this is -- because it all

25  kind of ties in.  So you've got -- in the military, I

Page 47

1   served as investigator beyond the I -- the IG, which

2   does very high-level, senior-level investigations.  You

3   got the safety officer, which if there's a safety

4   mishap, you have a -- a 15-6 officer, which means

5   something happened a little bit more serious.  There

6   could be -- you could be making recommendations on

7   financial liability.  So again, it's -- it's a

8   different type of investigation.  But once you're

9   trained on that, you go on the roster for those.  You

10  have a report of survey officer because they all kind

11  of tie together.  But report of survey officer is

12  usually damaged equipment or -- and so you're going to

13  assess, you know, the -- the damage, which again could

14  also lead into safety.

15        So there's different kind of investigations.

16  They all have different rules on -- for example,

17  everybody has to cooperate with a safety investigation.

18  They can't plead the Fifth, but the turnaround is, I

19  can't -- I can't prosecute them or fine them or charge

20  them for some kind of issue.  If we find out that there

21  was misconduct that -- that created the safety issue,

22  then we would have to stop the investigation and swap

23  it over to something else.  But again, then you can't

24  use anything from the safety side to something else.

25  So again, different rules, but yeah.

Page 48

1    Q.   Did you serve in that position for a -- an

2   extensive period of time after you went through the

3   training?  Or was it a few years?  Or can you give me a

4   sense of how long you did that?

5    A.   So the -- once you were qualified in these

6   different investigative pieces, you went on a roster.

7   So they would -- the -- the lawyers -- the Staff Judge

8   Advocate would select for the command the next person

9   on the roster to avoid nepotism, you know, to have, you

10  know -- so you would go on it.  And pretty much during

11  my entire career, after I was trained in these

12  different events, so it could be, you know, 10 to 20

13  years serving as an investigating officer and these

14  different roles, the more senior you get, they try to

15  -- either you're providing oversight of those

16  investigations and you're -- you're hacking off on

17  those, you know, for sufficiency with the -- with the

18  legal review.  Or if there's, you know, fines or some

19  kind of punishment that comes along with whatever

20  happened, again, you're -- you're certifying that,

21  depending on what level that you're at.  But if there's

22  a more senior-level person that's accused of or -- or

23  being looked at for whatever happens, then they have to

24  have a -- a -- an investigator that is in -- in a

25  senior grade or at least date of rank one day more

Page 49

1   senior than the person being investigated, essentially.
2       Q.   Did you ever lead or participate in any
3   safety investigations involving the accidental
4   discharge of a firearm?
5       A.   Yes.
6       Q.   Approximately how many times?
7       A.   Personally investigating it, probably half a
8   dozen.  And then again, just getting oversight of other
9   ones that happened the more senior -- you know, the
10  more senior you get, now you bring -- presented that.
11      Q.   Of the ones that you investigated
12  personally, was there any that you determined or
13  thought it was even a remote possibility that the
14  firearm went off without the trigger being pulled?
15      A.   Yes.
16      Q.   How many of them?
17      A.   Just one off the top of my head that I
18  recall.
19      Q.   Could you tell me about that one?
20      A.   Yes, sir.  The -- we were being fielded the
21  new heavy -- the new upper receiver for the -- the M4
22  carbine, and the barrel overheated and cooked off the
23  round.
24      Q.   Any others that you can think of?
25      A.   No, sir.

Page 50

1       Q.   Approximately how many accidental discharge
2   investigations did you oversee beyond those six that
3   you were personally involved in?
4       A.   I -- I'd probably have to estimate about,
5   let's just say, six more.  And -- and that's where
6   somebody's doing the investigation again, and I'm --
7   I'm looking at the results or asking questions.  Then
8   there's other times, again, where you're being briefed
9   that something happened, again, some kind of negligent
10  discharge, and again, and -- and get results about how
11  that happened.
12      Q.   Did any of those investigations involve a
13  pistol of some kind?
14      A.   Yes.
15      Q.   Approximately how many?
16      A.   I'm going to say at least -- at least three
17  or four that I'm thinking of right now.  Specifically
18  on negligent discharges, sometimes, again, you're just
19  being briefed that it happened.  But the ones we were
20  getting, we went to look to see what happened, so --
21      Q.   And of those three or four, would those
22  pistols have been Berettas or something else?
23      A.   I believe they were all M9 Berettas.  Yeah.
24      Q.   And the M9 had an external thumb safety,
25  right?

Page 51

1       A.   Yes, sir.
2       Q.   And of those three or four that involved the
3   M9 Beretta, in all those scenarios, it was your belief
4   or whoever is leading the investigation that the
5   discharge was caused by someone pulling the trigger
6   accidentally?
7       A.   The -- the gun -- the gun went off when it
8   shouldn't have, but there was a trigger pull involved.
9   Most of them were involved with clearing operations
10  where somebody dropped -- sorry.  They -- they charged
11  the slide, then they dropped the magazine and -- and
12  then pulled the trigger and discharged the -- the
13  weapon.  So it was a -- it was a sequence problem.
14      Q.   Got it.  Were you issued an M17 or M18
15  before you left the military?
16      A.   No.
17      Q.   Have you ever personally owned a P320, an
18  M17, or M18?
19      A.   M17.
20      Q.   Do you own one currently?
21      A.   I do.
22      Q.   And I take it that it has the external manual
23  safety on it?
24      A.   It does.
25      Q.   Okay.  Did you -- what was your reason for

Page 52

1   purchasing that?
2       A.   I still volunteer.  Georgia has a state
3   guard.  I volunteer.  And you don't -- they don't issue
4   us weapons.  So for the marksmanship training, you have
5   to bring your own.
6       Q.   You ever had any issues with that pistol?
7       A.   I -- I've only used it once, but I have not
8   had issues with it.  No.
9       Q.   Have you ever been involved in product
10  development, testing, or evaluation of pistols?
11      A.   Not pistols, per se.  But, I mean, we were
12  putting some optics on and stuff like that.
13      Q.   Got it.  Okay.  Was that in connection with
14  KF Armory?
15      A.   Yep.  Right.
16      Q.   And I -- I see on here -- and I'll just read
17  it to you.  It's the -- last line on -- in -- in
18  the narrative of the first page of your CV.  It says,
19  "Mr. Dill has conducted research, development, and
20  testing for weapon rigging procedures utilized in
21  freefall parachute infiltration."
22      A.   Yes.
23      Q.   Is that just how the -- the weapon is
24  attached to the soldier or the parachute in some way?
25      A.   Yes.

1   Q.   Something else?
2   A.   I -- I was one of the more experienced
3   freefall personnel within the command, so I was asked
4   specifically when we were doing the SCAR rifle testing.
5   We had the range training going on, and then I also was
6   given the -- the -- at the request to do the rigging.
7   So we had to figure out how it performed during
8   different opening sequences, and then based on that, we
9   had to change the rigging.  If you're familiar with the
10  SCAR, the way it pops, it pops open --
11       Q.   I'm not.  No.
12       A.   Yes, sir.  So the -- the buttstock, the way
13  it pops open, we rig it like an M4, but when that
14  happens, it would -- it would pop open during the
15  opening sequence for the parachute, because it's a
16  pretty violent stock.  And so it would, like, jab you
17  in the rib cage and cause some issues.  We had to do a
18  reverse rig of that based on my testing.
19       Q.   Okay.  Okay.  I -- I think that's as far as
20  your CV goes.  It's a pretty lengthy one, and I think
21  that's all the questions I have for you on that.  Now,
22  some other stuff may pop up, but I think that's it.
23       So let's move on and talk about -- I want to
24  -- I want to talk a little bit about, and it sounds
25  like this will probably be pretty quick, the M17, M18

1   selection and MHS process.  Were you aware while you
2   were in the military that the military was looking for
3   a new duty-issue pistol?
4   A.   Yes.
5   Q.   What was your -- what did you know about
6   that?  Did you have any involvement and any input,
7   anything like that?
8   A.   My recollection was, you know, the -- the
9   regular army was working on that.  Special operations,
10  we were still in the debate to go to a 1911.  So that
11  was -- that was kind of the focus of the headquarters
12  at the time was, you know, 40 cal versus 45.  And so
13  again, the discussions I was in was more focused on
14  that -- on that vein, not -- not on the -- the 9mm
15  replacement.
16       Q.   Okay.  So you did -- did you have any kind
17  of input on whether the military should include certain
18  specifications in the request for proposal that went
19  out or anything like that?
20       A.   No, sir.  Again, yeah.  My understanding was
21  that was handled at the Army, and -- and it was not --
22  again, it was not something more specialized that we
23  were looking at.
24       Q.   I see.  Okay.  And -- and the -- the issue
25  that you mentioned with the special -- special ops

1   going possibly to the 1911, that was a -- primarily a
2   caliber-driven decision or --
3   A.   That was part of it.  We had -- when Iraqi
4   -- I'm sorry.  It was Iraqi Freedom kicked off.  We
5   didn't have enough pistols for everybody, so we ended
6   up drawing 1911s out of World War II stockage.  And so
7   they had some of them refurbished and reissued to us.
8   So there were some modifications done to those weapons
9   systems, Wilson Combat parts.  They were standard.
10  Most were Colts.  But -- but that was part of that
11  discussion.  And then there are some units within
12  Special Operations that were already using a 1911.
13  So...
14       Q.   Have you ever seen the solicitation that the
15  Army put out for the modular handgun system?
16       A.   No, sir.
17       Q.   Do you have any information one way or the
18  other about whether the initial solicitation required
19  whatever the manufacturers were going to be submitting
20  to include an external manual safety?
21       A.   I -- I don't.  I -- I recall that -- that
22  those, you know, the -- the M17 competing against the
23  19X.  I don't know what else was in the -- in the
24  program.  That -- that's pretty much the limit of my --
25  just some -- some broad overview that I knew that there

1   was some competition going on.
2   Q.   Do you know anything about the testing that
3   the submitted pistols were put through before the SIG
4   submission was selected?
5   A.   No, sir.  Well, again, I -- I don't have any
6   in-depth knowledge.  If -- if I saw a -- if I saw a
7   news report or something about it, I mean, I -- I can't
8   remember off the top of my head right now.  But just in
9   general, I had no inside knowledge on what was going on
10  there.
11       Q.   Do you know anything about the mud and sand
12  testing that the Army puts pistols it's evaluating
13  through?
14       A.   No.  I -- I'm not familiar with -- with the
15  testing they do.  I know the operational use issues on
16  -- on the -- on the far side when you're using it on
17  what you're encountering.
18       Q.   Could you tell me a little bit about that?
19       A.   Well, I've got six deployments to
20  Afghanistan and support to Iraq, very sandy conditions.
21  You're doing the -- back in the early days, we didn't
22  have doors on the Humvees, so made it easy for the RPGs
23  to go right through.  So once -- once you drive for
24  about 20 minutes, the entire inside of the vehicle is
25  -- is caked with, especially Afghanistan, like a fine

Page 57

1  moon powder, like -- like a talcum powder, kind of red.
2  And so it would get into cracks and seams of
3  everything.  So again, that's just some kind of
4  operation conditions.  And at the end of wherever
5  you're driving, you had to be able to be ready to do
6  whatever you need to do.  So --
7      Q.   So you -- you -- in other words, you needed
8  to know that the pistol you were carrying was going to
9  work?
10     A.   Yes, sir.
11     Q.   Even though it's been exposed to those types
12  of elements, right?
13     A.   Yes, sir.
14     Q.   Fair to say that the -- the mud and sand
15  testing that the Army conducts of the pistols it -- it
16  considers, is to make sure that they're going to fire
17  if you pull the trigger in that type of scenario?
18     A.   I mean, I -- I don't have any in-depth
19  knowledge onto all the tasks that they do, but, again,
20  I just generally say, that that would -- should be the
21  goal of that, to do environmental testing.
22     Q.   All right.  We'll move on from that.  You
23  were obviously retained through ESI in this case,
24  right?
25     A.   Yes, sir.

Page 58

1      Q.   Did you personally prepare the report that
2  we have marked as Exhibit 1?
3      A.   I did.
4      Q.   Did you have any assistance in preparing
5  that report?
6      A.   I mean, that -- some editing from my
7  administrative assistant or project coordinator, and --
8  and I had a peer review.
9      Q.   When you say a "peer review," what does that
10  mean?
11     A.   The -- the majority of -- of let's see, ESI
12  requires that -- that somebody that has some general
13  understanding of what you're working on, reviews it
14  just for -- to make sure that it reads correctly, that
15  they understand what you -- what, you know, what points
16  you're trying to make.  So they don't have to be in the
17  exact same field, but again, just -- just generally.
18  So again, trying to have some -- a counterpart, just
19  look at it and say, you know, what -- what does this
20  mean or again, can you please clarify this, if they
21  don't understand, so --
22     Q.   Are there any words, phrases, or sentences
23  in your report that were supplied or prepared by anyone
24  outside of ESI?
25     A.   No.

Page 59

1      Q.   Is the peer -- so I -- I see on -- if you
2  turn it over to the -- I don't know if you consider
3  this the first page or -- or not, but there -- there
4  are a couple signatures on there and I see technical
5  review by Steven Calis.
6      A.   Yes.
7      Q.   Is that the peer reviewer you are referring
8  to?
9      A.   It is.
10     Q.   And who is -- who is he?
11     A.   So Steven is former military.  He's in my
12  office and he is the laboratory director for the entire
13  company.
14     Q.   Did he provide any kind of suggested
15  substantive changes to your report?
16     A.   No, sir.
17     Q.   Did you interview Mr. Williams in connection
18  with this report?
19     A.   No, sir.
20     Q.   You've never spoken to him?
21     A.   No, sir.  Just the written reports and the
22  deposition that was provided.
23     Q.   And it's my understanding that you -- you
24  never personally inspected Mr. Williams' pistol at any
25  point in time, have you?

Page 60

1      A.   No, sir.
2      Q.   So you don't have any firsthand knowledge,
3  other than maybe photographs you've seen about what
4  type or the extent of the debris that may have been
5  inside of it at the time of the discharge?
6      A.   Yes, sir.  Just whatever I read in the
7  reports.
8      Q.   Did you perform or rely on any kind of
9  testing or studies of any kind, in preparing your
10  opinions in this case?
11     A.   I -- I'm sorry, can -- can you ask that me
12  again?  I just want to make sure I answer it correctly.
13     Q.   Yeah.  Let -- let me ask you this.  I'll --
14  I'll ask one that's a little more specific.
15     A.   Yeah.
16     Q.   Have you performed any kind of testing or
17  studies to assess the amount of lint, dirt, debris, or
18  anything else that might accumulate inside of a pistol
19  that was carried under the conditions described by Mr.
20  Williams?
21     A.   Not specific to this.  I was relying on my
22  experience using firearms while riding motorcycles,
23  while riding vehicles and so forth and -- and, you
24  know, wearing them for long periods of time.
25     Q.   That gets me to something else I wanted to

1  ask you.  Are -- are you a motorcycle rider?
2      A.   I used to be.
3      Q.   How long has it been?
4      A.   I mean, I have dirt bikes right now, but I
5  had some street bikes.  Probably 2015 is when I stopped
6  riding.
7      Q.   Okay.  And did you ever carry a pistol while
8  you were riding your motorcycles?
9      A.   Yes.
10     Q.   How often did you do that?
11     A.   Pretty much all the time.
12     Q.   How did you secure your pistol while you
13  were on your motorcycle?
14     A.   Either inside the waistband or inside --
15  inside a pocket.
16     Q.   Okay.  If it was inside your waistband, did
17  you have it in and inside the waistband holster?
18     A.   Yes.  I believe it was.  Yeah.
19     Q.   Did you ever -- let me ask you this:  Did
20  you ever carry your pistol while you were riding your
21  motorcycle without a holster, just shoved in your
22  waistband?
23     A.   By itself?
24     Q.   Yeah.
25     A.   No.

1      Q.   And then you said that you -- you've carried
2  your pistol inside a pocket while you -- you rode a
3  motorcycle, before.  Approximately how many times have
4  you done that?
5      A.   15, 20.
6      Q.   What type of pistol?
7      A.   I think back then it probably would've been
8  a KelTec.
9      Q.   And did you use a holster for the pistol
10  that you put inside of your pocket?
11     A.   That had a -- it had like a little carry
12  case that came with it.
13     Q.   Was that some sort of a Kydex holster, a --
14  a plastic, like, a hard case or was it a soft case?
15     A.   That was a soft case.  Yeah.  And -- and I'm
16  -- and I'm thinking back to, you know, again, riding
17  Harley's on the street, you know.  I do it a little
18  differently on dirt bikes, so --
19     Q.   Did that KelTec that you mentioned, did it
20  have an external safety?
21     A.   No.
22     Q.   Do you know what the model was of the
23  KelTec?
24     A.   I don't off the top of my head.  It was a --
25  a 32 caliber.

1      Q.   Was it a semi-automatic pistol?
2      A.   It was.
3      Q.   Do you know if it was striker fired or
4  something else?
5      A.   I believe -- I believe it's striker fired.
6  I haven't used it in a few years, so --
7      Q.   Did you ever carry any other pistols, other
8  than the KelTec, inside the pocket of your pants while
9  on a motorcycle?
10     A.   Again, now I'm switching back to dirt bikes.
11  Again, because I switched over for carry to a SIG 365.
12     Q.   And I take it that would have an external
13  safety on it?
14     A.   No.  It does not.
15     Q.   No.  Okay.
16     A.   They do come that way, but mine does not.
17     Q.   Got you.  How do you secure your 365 when
18  you're riding dirt bikes?
19     A.   Again, it's either inside the waistband
20  holster that I've got or the -- the holster is really
21  small.  I've got one from SIG and then there's another
22  manufacturer, I can't remember the -- the brand, but
23  again, they're very small, so I can just stick the
24  whole thing in.  It's a Kydex.  Both are Kydex-style
25  plastic holsters.

1      Q.   Have you ever carried that 365 -- well, let
2  me ask you this:  Have you ever carried any pistol
3  inside your pocket when you were riding a dirt bike?
4      A.   Yes.  I mean, I've -- I've stuck the 365 in
5  there.
6      Q.   Okay.  And which pocket would that go in?
7      A.   The front right.
8      Q.   Ever the back pocket?
9      A.   Not that I can think of.  No.
10     Q.   Why do you use the front-right pocket?
11     A.   It's just more comfortable when I'm sitting
12  down on the motorcycle.
13     Q.   Are you able to get the pistol the whole way
14  into your pocket?
15     A.   Yes.  It's not very big.  My recollection is
16  that it's all in there.  Again, I -- I'm trying to
17  think of any piece of it that's sticking out.
18     Q.   Yeah.  How often do you carry your 365 while
19  you ride your dirt bike?
20     A.   It -- it depends.  I live up in North
21  Georgia, so there's a lot of critters out there.  So
22  I'm -- I'm always carrying something.  Is it, you know,
23  am I wearing open carry on the outside, again, where
24  I'm on private property or, you know, somewhere where
25  somebody might see me, and then I'll carry concealed,

1 and I'll use the 365.
2    Q.   If you're not carrying, do -- do you carry
3 something other than a 365, sometimes on your dirt
4 bike?
5    A.   Yes.
6    Q.   What else do you carry?
7    A.   19X Glock.  Outside the waistband.
8    Q.   Got it.  So that's -- that's a little bit
9 larger.  That's why you use that for the outside the
10 waistband and the -- the --
11   A.   365.
12   Q.   Yeah.  Okay.
13   A.   It's not a concealed carry.
14   Q.   Yeah.  All right.  So let's -- let's get
15 back to your -- we'll talk about -- we may come back to
16 the dirt bike issue, but obviously Mr. Williams was not
17 on a dirt bike.  So I'm going to ask you a little bit
18 more about the Harley.  Did you carry that KelTec in
19 the front-right pocket as well, when you rode your
20 Harley?
21   A.   Yes.
22   Q.   Did you ever carry it in your back pocket
23 while you rode your Harley?
24   A.   Not that I can recall.
25   Q.   Why not?

1    A.   Just seemed more comfortable.  It's a little
2 bit easier to get to.  Personal preference.
3    Q.   You mentioned you -- you did that probably
4 15 or 20 times or so.  And of any of those 15 to 20
5 times, were they lengthy trips?  Were they kind of just
6 around town?  Are we talking -- what -- what are we
7 talking here?
8    A.   Probably -- probably most of them were
9 around town.  There were a couple out, like, probably
10 say, two out to Myrtle Beach.  I -- I'm sorry.  I -- I
11 was up in Fort Bragg, in Fayetteville, North Carolina
12 at the time.  So -- so, what's that, about a three-hour
13 drive, something like that.
14   Q.   After each time you rode your motorcycle and
15 carried your -- your pistol, and we're talking about
16 the Harley again, not the dirt bikes, would you clean
17 the pistol when you got to your destination?
18   A.   No.
19   Q.   Would you clean it at some point in time
20 shortly after?
21   A.   Again, if it was the KelTec, it was in -- in
22 the little bag, so it didn't get dirty.  So that would
23 be like a monthly cleaning cycle, essentially.
24   Q.   What do you mean, "it was in the little
25 bag?"

1    A.   That -- that's what I'm talking about.  It
2 had like this, the -- the -- what's it called?  The
3 case that came with it.  I mean, that's, you know, it's
4 -- it's small -- small enough that it fits in there
5 comfortably and it keeps your finger off the trigger.
6    Q.   Is that similar to -- but is it, are you
7 talking about a soft-sided holster, is that what you're
8 talking about?
9    A.   No.  It -- it -- there's, like, a
10 rectangular bag that comes with it, like, a little
11 zipper pouch so you can put it in there.
12   Q.   Oh, interesting.  Okay.  Does it -- so did
13 you zip the entire pistol inside of that little bag?
14   A.   I did.
15   Q.   And that came from KelTec?
16   A.   It did.
17   Q.   Okay.  So because of that, did -- there was
18 no concerns about getting dust or lint or other debris
19 into that pistol while you were riding your bike,
20 right?
21   A.   No.
22   Q.   Okay.  Did you ever ride your Harley and
23 carry a pistol, other than that KelTec, in the bag, in
24 any way?
25   A.   Some military dirt bikes.  Again, not -- not

1 the Harley, that I can recall.
2    Q.   Yeah.  I'm -- I'm more focused on -- on the
3 road riding --
4    A.   Okay.
5    Q.   -- you know, given that Mr. Williams was on
6 the road.  So it sounds like there's -- there's not
7 another time, other -- that other than the KelTec, you
8 never carried a pistol while you were on your
9 motorcycle on the road?
10   A.   I -- I don't think so.
11   Q.   All right.  I guess I'll ask you something
12 similar about the dirt bike.  So when you're -- when
13 you're dirt biking, do you have some sort of a similar
14 bag that you put the 365 in, when you put it into the
15 -- into your pocket, or are you using a -- a Kydex
16 holster for that?
17   A.   Yeah.  Just either the factory holster that
18 the factory sells.  You know, again, it's very small,
19 that two layer in there, but the rest of the pistol is
20 exposed.  Or again, or I'm doing open carry with, like,
21 the -- the Glock, again, where if I'm on private
22 property with it.
23   Q.   So after riding your dirt bike with either
24 the open carry or the pistol in your pocket, do you
25 typically clean them when you're done?

Page 69

1    A.   I -- I would say it depends.  If I, you
2  know, got a lot of debris on it based on where I'm
3  riding, then -- then yes.  If not, then no.
4    Q.   Have you ever opened up the pistol to clean
5  it after riding your dirt bike and found that there was
6  a significant amount of dirt and debris inside of it?
7    A.   A -- a -- probably a little bit.  I -- I'd
8  say the more debris, like, if I'm doing chain -- if I'm
9  doing some chainsaw work on the farm, you know, with my
10 exposed, like Glock, I would see a lot more debris
11 then.
12   Q.   And is that inside of the pistol?
13   A.   Yes.
14   Q.   You ever see that issue with the 365?
15   A.   I -- I don't think I've used it the same
16 way.  I've seen -- I've seen some -- some lint and, you
17 know, from -- for prolonged carry, lint and I would
18 say, dust or something inside the firearm.
19   Q.   Has that ever caused a problem with how the
20 firearm functioned for you?
21   A.   No.
22   Q.   Have you ever found that you cleaned your
23 365 or your Glock after riding on your dirt bike with
24 it and found a -- a concerning amount of dirt, debris,
25 or lint or anything like that inside of it?

Page 70

1    A.   No.
2    Q.   So other than the carrying of the 365 and
3  that Glock while on your dirt bike, do you have any
4  other personal experience with the amount of dirt,
5  debris, lint, or anything else that can get inside of a
6  pistol that's being carried by someone on a motorcycle?
7    A.   Not that I can think of at this time.
8  Again, most of my other experience is involved in
9  vehicles, aircraft, you know, and so forth.
10   Q.   You didn't personally inspect the clothing
11 that Mr. Williams was wearing, either on his trip from
12 his home to New Bern, North Carolina, or at the time of
13 the discharge, did you?
14   A.   No, sir.
15   Q.   Have you seen any photographs of that
16 clothing?
17   A.   I don't think so.  I -- I've only seen the
18 mock-ups and the -- the reports.
19   Q.   Do you know what he was wearing -- at --
20 well, let me ask because that's -- let me be a little
21 clearer.  Do you know what he wore on his way from his,
22 I guess, beginning point to New Bern, North Carolina?
23   A.   I'm trying to remember what I read.  I
24 believe there was some discussion about a vest, some
25 kind of motorcycle vest that was worn and then I paid

Page 71

1  more attention to the day of the incident.
2    Q.   Do you know what the motorcycle vest was
3  made of, the material?
4    A.   I -- I don't.  I -- I might have read it.  I
5  just can't remember at this time.
6    Q.   Do you know how he carried or secured his --
7  his pistol when he was traveling to New Bern?
8    A.   My recollection was in the report, said that
9  he put the -- the holster in some kind of vest pocket,
10 some kind of pocket on the -- the vest.
11   Q.   Do you think it's important for the purposes
12 of your opinions in this case, whether that pocket was
13 on the inside or the outside of the vest?
14       MR. HESTER:  I'm going to object to the form.
15 Would you clarify the time frame that you're talking
16 about for that question?
17       MR. WOY:  Sure.  Yeah, happy to do it.
18 BY MR. WOY:
19   Q.   Do you think it's important for the purposes
20 of your opinions in this case, whether the pocket where
21 Mr. Williams carried the pistol on his way to New Bern
22 before the discharge, whether the pocket was on the
23 inside or the outside of the vest?
24   A.   Sir, I -- I would say I think it depends.
25 If it's -- if it's on -- on the outside, you're subject

Page 72

1  to more elements.  If it's on the inside, you're
2  subject to more lint and -- off the clothing and so
3  forth, the T-shirt, the -- the vest.  So again, you --
4  you would see different -- different levels.
5    Q.   Okay.  And -- well, let me ask you this:  Do
6  you know where the pocket was where he carried the
7  pistol when he was traveling to New Bern?
8    A.   I recall reading that it was on the vest
9  somewhere, but -- but again, I -- I think it was on the
10 front, but I, you know, I'm not specific.  Again, I'd
11 have to go back and read the report.
12   Q.   Okay.  So you can't say whether the pocket
13 was on the inside or the outside of the vest?
14   A.   Not off the top of my head.  No.
15   Q.   Do you know if the pocket where he carried
16 the pistol when he traveled to New Bern had any kind of
17 a zipper or a flap over it to close it?
18   A.   I don't.
19   Q.   Do you think that information is important
20 to your opinion in this case?
21   A.   My -- my opinion wasn't trying to determine
22 exactly where the -- where the lint came from, or there
23 -- there was a mention in one of the reports that there
24 was a few pieces of lint.  So was it before that, was
25 it during the travel, was it after that?  That was --

1  it's there. That -- that was my focus, not exactly --
2  I wasn't asked to investigate how it got there, if that
3  makes sense.
4      Q.  So are -- are you offering an opinion that
5  the lint, dirt, or debris, whatever it is that was
6  inside of the pistol, got there while he was traveling
7  or are -- are you just saying, I -- I understand it was
8  there, but I don't know where it came from?
9      A.  Sir, my -- my testimony is revolved around
10  the fact that -- that I expect a weapon to function
11  with lint in it or with -- with some minimal amount of
12  debris. And again, the weapons I used down range, had
13  significant debris in it and functioned correctly.
14  That -- that's kind of the -- the crux of -- of the --
15  the opinion.
16      Q.  All right. Let's go off the video real
17  quick, please.
18      THE REPORTER:  We're going -- we're going off
19  the record. The time is 11:40 a.m.
20      (A recess was taken.)
21      THE REPORTER:  We're back on the record. The
22  time is now 11:41 a.m.
23  BY MR. WOY:
24      Q.  So are you -- let me try that again.
25      A.  Yes, sir.

1      Q.  Are you offering an opinion that the lint,
2  dirt, debris, whatever it was inside the pistol at the
3  time of the inspection, got there as a result of either
4  being inside the pocket or the travel on the
5  motorcycle, or is that not part of your opinion in this
6  case?
7      A.  Sir, that's -- that's not part of my
8  opinion. But my -- my -- again, I'm -- I'm trying to
9  focus on, like, the cleaning aspects and, you know, the
10  -- I tried to focus on what the -- what was found
11  during the inspection for the amount of debris. And I
12  don't know how it got there. That -- that wasn't what
13  I was asked to do. I was asked, based on my experience
14  with firearms in -- in some adverse conditions, you
15  know, when, you know, would I expect that amount of --
16  of debris to interfere with the -- the function of the
17  weapon. The actual function of the weapon, again, was
18  tested by Dr. Harrison.
19      Q.  Okay. So is -- is your opinion then focused
20  on whether the amount of lint that was in the pistol
21  should have caused it to malfunction?
22      A.  As far as the -- the cleaning aspects of it,
23  yes. As far as the actual physical performance, again,
24  that was Dr. Harrison, where again, he -- he was
25  testing for that. So -- so, you know, how common it is

1  to see that level, again, with very minimal debris
2  inside the pistol.
3      Q.  So is -- would your opinion be the same,
4  regardless of whether -- how it was stored as he
5  traveled? Are you just look -- or in other words, let
6  me -- let me start this over.
7      Does the way in which Mr. Williams carried
8  the pistol and secured it while he traveled to New Bern
9  make any difference to the -- to your opinions in this
10  case?
11      A.  Again, I -- I was asked to look at, you
12  know, the debris in the pistol, not to investigate how
13  it got there. So again, whether it happened at some
14  other time, a different way he was carrying it during
15  the travel, that's less important to me as, you know,
16  that -- that it was minimal and -- and that amount
17  should not have, based on my experience using pistols
18  in -- in very adverse conditions, that amount that I
19  saw, should not affect the performance. Again, that
20  kind of drives to the cleaning regimen and so forth.
21  That was kind of more of my focus.
22      Q.  Okay. Okay. That's -- that's helpful.
23  Okay. I -- I think I understand it a little better.
24  So -- so your opinion is, regardless of how it got into
25  this gun, the lint that was inside of it should not

1  have affected the performance of it?
2      A.  Yes, sir. But again, to be clear, I didn't
3  test the performance of the gun with that amount of
4  lint in it. That was Dr. Harrison.
5      Q.  Got it. Okay. Got it.
6      A.  I -- I'm more onto the -- the use side of it
7  and what -- what I would expect to happen.
8      Q.  Makes sense.
9      A.  Yes, sir.
10      Q.  Okay. You never personally saw the lint, or
11  dirt, or dust, or debris that was in this pistol, did
12  you?
13      A.  No, sir. I did not. I didn't inspect it.
14      Q.  So you don't know where the lint, dust, or
15  -- or debris was at the time of the discharge, do you?
16      A.  I do not. Other than again, what was in the
17  report.
18      Q.  And what report are you referring to?
19      A.  Well, those -- those -- I'm trying to
20  remember which one talked about the -- I'm sorry. I
21  don't have that in front of me. So there's four expert
22  reports that were -- were provided: Dr. Harrison's,
23  Mr. Wheaton Wilton's, Mr. Adams and Mr. Watkins. I'm
24  trying to remember which one specifically talked about
25  the debris. One second. Okay. Dr. Harrison's report

Page 77

1  -- let's see. After the functions check, it was
2  reported there was no damage, so forth. He did note
3  that there was -- interior pistol did include some
4  debris. So, Dr. Harrison's report.
5      Q.  Okay. Do you know what he meant by "some
6  debris?"
7      A.  I believe there was a photo. Again, it --
8  it's been a little -- I -- I'd have to go back -- go
9  back and read that section again. Again, I -- it is my
10  understanding, again, that there was some kind of
11  debris or sand or something inside -- inside the
12  pistol.
13      Q.  Do you know what type of debris it was?
14      A.  Oh, I -- I keep thinking it was sand, but
15  again, I -- that -- I'm not 100 percent sure sitting
16  right here. I'd have to, again -- involved in a few
17  things, so I'm trying to remember -- trying to remember
18  this specific inspection.
19      Q.  Okay. So a -- as you sit here today, you --
20  you think it was sand, but you're not quite sure; is
21  that fair to say?
22      A.  Yeah.
23      Q.  Are you able to quantify the amount of sand
24  that was in there?
25      A.  No. Again, I didn't physically --

Page 78

1      Q.  Do you know where inside the pistol the sand
2  was located?
3      A.  I read it in a report, but again, I -- I
4  don't remember off the top of my head exactly where it
5  was at. I don't want to guess.
6      Q.  So as -- as you sit here today, you can't
7  tell me where on the pistol the sand that was found was
8  located?
9      A.  I mean, it was when they took it apart, is
10  my understanding. So it was in, I want to say it was
11  near the fire control unit, but again, I -- I can't --
12  I can't remember if it was up or down.
13      Q.  Is the only information that you have about
14  where the sand was located inside the pistol coming
15  from Dr. Harrison's report?
16      A.  Yes. Unless somebody else mentioned it in
17  their report and I didn't capture it in my summary. I
18  just again, I -- I can't -- I can't remember who else
19  talked about it, but Harrison is what, kind of, queued
20  me in on that.
21      Q.  Okay. Did you see any photographs of the
22  sand?
23      A.  I recall seeing the -- the photographs of
24  the inspection. I believe one showed that, but again,
25  I -- I can't remember all the photos that I saw right

Page 79

1  now. I don't know if I have them with me or not. Hold
2  on one second.
3      Q.  Sure. Take your time.
4      A.  Oh, there we go. It doesn't have a -- it
5  doesn't have a figure number, but it's on Page 8 of his
6  report and it's got the photo of the fire control unit.
7  Oh, here you go. And it was carbon and lint. Yeah.
8      Q.  Okay. Were there any other photographs that
9  you reviewed and relied on, other than that one on Page
10  8 of Dr. Harrison's report?
11      A.  For the -- for the lint and carbon? No.
12      Q.  Okay. That was the only one?
13      A.  That's the only one I recall. I pulled it
14  out for you.
15      Q.  So the only information you have about the
16  debris that was inside the pistol is coming from Dr.
17  Harrison's report generally, and the only specific
18  photo that shows that, that you relied on, was on Page
19  8 of his report; is that fair to say?
20      A.  I -- I pulled that -- that specific photo.
21  I -- I can't remember, as I said right now, anywhere
22  else in the other expert reports, if there was also a
23  photo of that, but I -- but that's the one that I
24  queued in on from the report.
25      Q.  Okay. And was the photo that you just were

Page 80

1  looking at, that -- was that in your report or was that
2  directly in Dr. Harrison's report?
3      A.  It's Dr. Harrison's report but is attached
4  to mine as a footnote. Footnote 26.
5      Q.  I see. Okay.
6      A.  Yeah. And you don't have all the footnotes
7  in it.
8      Q.  Yeah. So in other words, if we look at Dr.
9  Harrison's report, go to Page 8, there's only one photo
10  on that page; is that right?
11      A.  I believe this is the complete page that was
12  in there. Yes.
13      Q.  Okay. Other than that photo on Page 8 and
14  the narrative in Dr. Harrison's report, do you have any
15  other information about where or what kind of or the
16  amount of debris that was found inside the pistol?
17      A.  No, sir. Again, I -- that's what I queued
18  in on my report. I did not see his response and -- and
19  I -- and again, I did not inspect the -- the pistol
20  itself.
21      Q.  Okay. So in -- in other words, that --
22  that's the only information, the -- the photograph on
23  Page 8 of Dr. Harrison's report and the description
24  that Dr. Harrison provides in his report, that's the
25  only information you have about the debris that was

Page 81

1 found inside of the pistol; is that right?
2        MR. HESTER: Objection to form of the
3 question. I think you mischaracterized his -- his
4 answer previously.
5        THE WITNESS: Again, I read all four reports.
6 His report is what I -- I queued in for mine. I -- I'm
7 trying to remember the other four reports that were
8 rather lengthy. Again, if I -- I can't remember if I
9 also read the other reports about that. I did not see
10 any statements about some excessive debris that
11 would've drawn my attention to a different report, if
12 that makes sense.
13 BY MR. WOY:
14    Q.   So what I'm -- I'm trying to figure out is,
15 because -- because you didn't participate in the
16 inspection, you didn't have the opportunity to actually
17 see it yourself, I -- I'm trying to figure out where
18 the information about the type of debris and the amount
19 of debris is coming from.
20    A.   Yes.
21    Q.   And it -- it sounds to me like you're saying
22 that the -- that information is coming from Dr.
23 Harrison's report and the photo on Page 8. Is there
24 anywhere else?
25        MR. HESTER: Objection to form. Asked and

Page 82

1 answered.
2 BY MR. WOY:
3    Q.   You can answer, sir.
4        MR. HESTER: You can answer.
5        THE WITNESS: Oh, okay. Yes. I mean, again,
6 that's -- that's what I focused on. I just -- it -- as
7 I'm sitting here, I -- I just don't want to
8 mischaracterize and -- and -- and somehow I've missed
9 one line in somebody else's report where they also
10 mentioned the same thing. But again, I relied on -- on
11 his inspection to talk about that. Again, my focus was
12 that I didn't see anything excessive in there, which --
13 which as an operator would have made me question my
14 pistol being able to operate.
15 BY MR. WOY:
16    Q.   How would you characterize the amount of
17 debris that was in the pistol?
18    A.   Again, I -- I'm seeing some light carbon on
19 the inside. So it looked like it's been fired. It's
20 either test fired or fired at some point in -- in the
21 recent past or -- again, I -- and there's not enough
22 lint for me to, kind of, draw my attention to it.
23 There's some light spots which could be it. But,
24 again, I didn't physically inspect it.
25    Q.   All right. Let's move on to, kind of, a

Page 83

1 different area.
2    A.   Yeah.
3    Q.   Still about the same general topic. But
4 what's your understanding of what Plaintiff was doing
5 on the day of the discharge?
6    A.   He -- he was sitting on the motorcycle. He
7 -- the pistol was in a holster in his back right
8 pocket. And he kicked up his -- his feet and then the
9 pistol discharged.
10    Q.   Do you know where he was located at the time
11 of the discharge?
12    A.   In the parking lot of -- between the front
13 of the hotel near the -- facing the Outback Steakhouse
14 -- I believe it was Outback Steakhouse.
15    Q.   Do you know why he was at that hotel?
16    A.   He was on a motorcycle ride with the members
17 of his club.
18    Q.   All right. Do you know what his club was?
19    A.   I saw the name. The -- the Iron Horsemen, I
20 believe.
21    Q.   Are you familiar with the Iron Horsemen
22 Motorcycle Club?
23    A.   I am not.
24    Q.   Had you ever heard of them before this case?
25    A.   No.

Page 84

1    Q.   Are you aware that the FBI classifies them
2 as an outlaw motorcycle gang?
3    A.   I am not. When I was at Fort Bragg, we
4 received updates from the FBI and other agencies on
5 outlaw motorcycle gangs, and that's not one that I've
6 -- I've seen before.
7    Q.   What was the purpose of those updates being
8 transmitted to you?
9    A.   Due to gang violence -- clubs operating in
10 the area some would -- would -- were targeting military
11 personnel for recruitment.
12    Q.   Do you know what Plaintiff's role within the
13 Iron Horsemen was?
14    A.   Just what I read in the report, sir.
15    Q.   Are you aware that he was the enforcer for
16 the Iron Horsemen?
17    A.   Again, I -- I saw that in the report.
18    Q.   What's your understanding of what he would
19 be doing as an enforcement -- enforcer for an outlaw
20 motorcycle gang?
21        MR. HESTER: Object to the form of the
22 question.
23        THE WITNESS: Again, I'm not an expert on
24 outlaw motorcycle gangs. But from what I read, it
25 sounds like he was pulling security. He was, you know,

Page 85

1  serving in some kind of (inaudible) role to make sure
2  that -- that whoever was -- was present was behaving
3  themselves, I guess.
4  BY MR. WOY:
5     Q.   All right. You're aware that -- that Mr.
6  Williams never served in the military, right?
7     A.   I don't recall reading anything about
8  military service, no.
9     Q.   And you'd agree with -- with me that he was
10  not on a military patrol at the time of the discharge?
11    A.   That's correct.
12    Q.   You mentioned that he had the pistol in a
13  holster in the back pocket of his pants at the time of
14  the discharge, right?
15    A.   Yes.
16    Q.   And that information comes from primarily
17  his deposition testimony; is that where that comes
18  from?
19    A.   Right. There was -- I can't remember if it
20  was also mentioned in the complaint. But -- but,
21  again, it was the -- primarily discussed I saw in his
22  -- in his deposition. And I believe it's also
23  referenced in some of the expert reports.
24    Q.   And are you aware that he testified that he
25  scooched on the pistol and that's when the discharge

Page 86

1  happened?
2     A.   I believe I read he scooched on the seat.
3     Q.   And the pistol was in the back pocket of his
4  pants at the time, right? As he was sitting down on
5  the seat?
6     A.   Yes. That's my understanding. The back
7  right pocket.
8     Q.   Are you aware that he was actually sitting
9  on the pistol at the time of the discharge?
10       MR. HESTER:  Object to the form.
11       THE WITNESS:  So I know he was sitting on the
12  seat, and I know the pistol was in his back pocket. I
13  can't -- again, I -- I haven't tried to recreate that
14  to figure out, you know, with -- with the -- with the
15  bike being on a kickstand, and him being this way, and
16  how much, if any, of the pistol would have been between
17  him and the seat. I don't know.
18  BY MR. WOY:
19    Q.   So just as you sit here today, you're not
20  sure one way or the other whether or not he was
21  actually sitting on the pistol itself at the time of
22  the discharge?
23    A.   Again, I know he was sitting on the seat. I
24  know that the -- the pistol was in the -- the upper
25  part of his back right pocket. I have not seen a photo

Page 87

1  of his jeans. I've just seen some reenactment from, I
2  believe, it's Mr. Hall's report where -- where he has a
3  volunteer wearing (indiscernible). So again, that's my
4  only knowledge of that. I have not inspected the bike,
5  and I have not tried to sit on the bike in that manner.
6  So I -- there may have been some contact with the
7  barrel. But, again, because it's closer to the seat.
8  But -- but, you know, I just don't know unless I, you
9  know, again, physically try to do that.
10    Q.   And when you say you "just don't know,"
11  you're saying you just don't know whether the pistol
12  was between his -- him -- his body and the seat or
13  whether his body was in direct contact with the seat;
14  is that accurate?
15    A.   I'm trying to make sure my statement is
16  right. Again, I -- I know there was the seat, and I
17  know he's sitting on it, and the pistol was there. I
18  just don't know, you know, again, because the bike is
19  -- the bike and the seat are at an angle, and he's at
20  an angle going the other way, how much of that -- that
21  right back pocket, how much pressure on that is, you
22  know, is -- is he on top of the -- the pistol? Again,
23  it's toward the back. Again, I don't know the exact
24  angles he would be in, in this configuration. Is he --
25  is he putting pressure on the front end of the pistol?

Page 88

1  Probably more than likely. The whole pistol? I don't
2  know.
3     Q.   You're aware that obviously he had a round
4  in the chamber at the time, right?
5     A.   Yes, sir.
6     Q.   And that the pistol was cocked?
7        MR. HESTER:  Object to the form. Could you
8  explain what you mean by cocked?
9        MR. WOY:  Sure.
10  BY MR. WOY:
11    Q.   So a -- it's a striker-fired pistol, right?
12    A.   Yes.
13    Q.   And at the time of the discharge, the
14  striker would have been -- let me -- let me take it a
15  step back.
16       So you're -- are you familiar with the P320
17  model pistol?
18    A.   Yes, sir.
19    Q.   Have you ever fired one?
20    A.   Yes.
21    Q.   In order to cock the action of the pistol,
22  what do you have to do?
23    A.   Cycle the slide.
24    Q.   If you don't cycle the slide, and you pull
25  the trigger, even if you had -- have a round in the

Page 89

1 chamber somehow, does anything happen?
2    A.  I -- I don't know how you'd get a round in
3 the chamber without cocking the striker.
4    Q.  Okay.
5    A.  So, but -- but if there was nothing in it
6 then, I mean, it's -- it's -- nothing would happen.
7    Q.  So in other words, if -- to get a round in
8 the chamber you have to pull the slide back, right?
9    A.  Yes.
10    Q.  And open up the -- so you can get the -- the
11 round in there, right?
12    A.  Yes, sir.
13    Q.  And the pulling the slide back cocks the
14 action of that pistol, right?
15    A.  Yeah.  That's my understanding.
16    Q.  So because he had a round chambered at the
17 time of the discharge, the pistol necessarily also was
18 cocked; is that right?
19    A.  It was ready to fire.  Yes.
20    Q.  All right.  So he had -- he has -- and his
21 P320 didn't have an external safety, right?
22    A.  That's correct.
23    Q.  So he had a pistol with no external safety
24 that was loaded with a round in the chamber and cocked
25 at the time of the discharge, right?

Page 90

1    A.  That's my understanding.  Yes.
2    Q.  Is it important to your opinions in this
3 case, one way or the other, whether Mr. Williams was
4 actually sitting on the pistol at the time of the
5 discharge?
6    A.  Again, I -- I didn't -- I didn't analyze the
7 pistol and how it fired in this configuration.  So
8 again, that was not part of my assessment.  And I have
9 carried pistols on -- in aircraft in seats where it's
10 the -- the weapon is between me and something.  Could
11 be an aircraft frame, could be a seat, the small of the
12 back, off of the hip, leg holster.  So where I'm
13 putting pressure on a loaded pistol against the seat.
14 So I mean, I've -- I have done that.  I'm sorry.  What
15 -- what -- can you repeat your question just to make
16 sure I answer the right part?
17    Q.  Sure.  Sure.  Right.  So we know that the
18 pistol was no external safety --
19    A.  Uh-huh.
20    Q.  -- locked, cocked --
21    A.  In a holster.
22    Q.  -- in a holster.
23    A.  Uh-huh.
24    Q.  Is it important to you, for the purposes of
25 your opinions in this case, to know whether Mr.

Page 91

1 Williams was sitting on that locked, loaded pistol --
2 cocked and loaded pistol at the time of the discharge?
3    A.  Because it's in a holster, the holster
4 should protect the trigger group.  So -- so, again, I
5 -- I don't anticipate that the pressure -- the pressure
6 -- the weight of the person against the firearm should
7 have caused it to discharge.  So that would -- does
8 that answer the question?  I'm sorry -- almost --
9    Q.  Yeah.  My question is, is it important if
10 it's not, you know, I -- what I want to know is, do you
11 think it's important for you to know -- because what
12 I'm hearing is I don't -- I'm hearing that you can't
13 tell me whether he was sitting on the pistol or not; is
14 that right?
15    A.  Again, I know he was sitting on -- it sounds
16 like he was sitting on part of the pistol.  Again, you
17 know, is it -- is it the barrel part?  Is it, you know,
18 I just don't know exactly how he was seated and leaned
19 up onto the bike, and -- and everything else that's
20 going on.  Is he physically -- it sounds like you're
21 asking me is he physically making contact with the
22 trigger group?
23    Q.  Yeah.  Right?
24    A.  Okay.  So -- so, again, that I don't know.
25 Again, it's in a holster.  And I'm looking at carrying

Page 92

1 a bullet in the chamber of the gun if -- there's
2 different ways you can secure it.  But, again, if it's
3 in the holster protecting the trigger group, that
4 should protect it from putting weight up against it.
5    Q.  Okay.  Would you agree with me that you
6 can't have an accidental discharge if you don't put a
7 round into the chamber of any firearm?
8       MR. HESTER:  Object to the form.
9       THE WITNESS:  I'm just trying to make sure --
10 I've seen some weird things.  I'm just trying to
11 (crosstalk) --
12 BY MR. WOY:
13    Q.  Okay.  We can -- we can take a step back.
14 Let's say -- would you agree with me that it is
15 extraordinarily unlikely that if you -- that you'll
16 have an accidental discharge if you don't put a round
17 into the chamber of a pistol?
18       MR. HESTER:  Object to the form.  You can
19 answer.
20       THE WITNESS:  Yeah.  Yes, sir.  If there's no
21 bullet in the chamber it's -- it's unlikely that it
22 will discharge.
23 BY MR. WOY:
24    Q.  Would you also agree with me that, if you do
25 put a bullet into the chamber and cock the pistol,

Page 93

1  you're increasing the likelihood of having an
2  accidental discharge relative to not having a round in
3  the chamber.
4      MR. HESTER:  Object to the form.
5      THE WITNESS:  Well, I would say it depends.
6  But yes.
7  BY MR. WOY:
8      Q.  And that's true regardless of whether the --
9  the pistol, or whatever the firearm is, has an external
10  safety or not; isn't that right?  Because you can
11  forget to turn the safety on?  It could go, you know,
12  it can be turned off accidentally, and if you have a
13  round in the chamber, necessarily the risk of an
14  accidental discharge is higher than if you didn't have
15  a round in the chamber?
16      MR. HESTER:  Object to the form.  You can
17  answer.
18      THE WITNESS:  Again, it depends.  But yes.
19  BY MR. WOY:
20      Q.  Would you agree with me that carrying a
21  pistol with a round in the chamber requires the user to
22  handle that pistol with an increased level of care
23  relative to carrying an unloaded firearm?
24      MR. HESTER:  Object to the form.  You can
25  answer.

Page 94

1      THE WITNESS:  Generally, yes.
2  BY MR. WOY:
3      Q.  You mentioned that you have carried a loaded
4  weapon, I think you mentioned in an aircraft where
5  there was pressure up against that pistol, right?
6      A.  Uh-huh.
7      Q.  Whenever you've done that, was it a firearm
8  with an external safety on it?
9      A.  I want to say most -- most of the times,
10  yes.  Probably most of the times it would be, like, a
11  Beretta M9.  We did carry a 226 SIG, but I can't
12  remember if it had an external safety or not.  Again,
13  it's been a while since we did that.  And the Glocks
14  did not.
15      Q.  And the times that you did that would have
16  been for some sort of military purpose; is that right?
17      A.  Sometimes.  You know, I -- I have a tractor
18  and -- and I routinely, you know, have either, you
19  know, depending on how I'm wearing the weapon, if it's
20  just catching -- caught up on the instrumentation, I
21  might put it in the small of my back.  And, again,
22  where you're pressing up against the back with the
23  outside of the waistband holster.
24      Q.  What type of a pistol would that be?
25      A.  Glock.

Page 95

1      Q.  Are there scenarios in the U.S. military
2  where you would be expected to carry your pistol
3  without a round in the chamber?
4      A.  Well, the -- the U.S. military will change
5  the weapons carry status based on threat conditions.
6  So even down range when you were inside, like, a house
7  or something if -- if they didn't think there was a
8  threat, then they would ask you to remove the round.
9  But by doing so, they usually increased the amount of
10  negligent discharges into the shooting barrel outside
11  of the facility.  It got so bad in Afghanistan at the
12  dining facility that they -- NATO finally ruled to just
13  load your guns and leave them that way.
14      Q.  Are there different -- well, are there names
15  for the different threat classifications that the
16  military uses to determine whether you should be
17  carrying a round in the chamber?
18      A.  Did you say names?
19      Q.  Yeah.  Like, how do you designate the
20  different threat levels?
21      A.  Well, I would say it's a little different
22  depending on where you're at and -- and who you're
23  working for.  Again, the -- the -- NATO, on my
24  recollection, there was a color code, like, threat
25  condition amber.  If there was no threat to the

Page 96

1  facility, like, if we were in downtown Kabul, for
2  example, if -- if the security staff didn't think there
3  was a threat, then they would ask people to put the
4  magazine in your pocket or you would have the magazine
5  in, no round in the chamber, or round in the chamber.
6  Because we were Special Operations, and we were
7  exempted from that, and we carried hot all the time.
8  And -- and some of this goes to the training of the
9  people that are being given these directives, if that
10  makes sense.
11      Q.  So I take it that because part of the reason
12  that you as Special Operations were permitted to carry
13  hot all the time, was because you've had an extensive
14  amount of firearms handling training, right?
15      A.  Sometimes.  And sometimes just that we would
16  have to depart very quickly, or we might be part of a
17  reaction team, or we might -- again, there was multiple
18  reasons why we carried differently.  But the --
19  everybody else, again, it would change up and down
20  based on what the threat might be.
21      Q.  Could you give me some examples of a
22  scenario or scenarios where the military, the U.S.
23  Military, would expect a soldier to carry a round in
24  their chamber?
25      A.  Any time they're driving between bases.  In

Page 97

1  Afghanistan, for example, the -- the threat went up
2  inside the bases to people being stabbed or shot or
3  whatever, so -- so, again, that would -- they would
4  want you to be able to quickly engage a target, so that
5  would go up.
6     Q.   When you saying, "driving between bases,"
7  are we talking bases overseas in -- in war zones or are
8  we talking here in, you know, stateside in the U.S?
9     A.   So it depends.  I mean, my -- my reference
10  was -- was overseas.  But in -- in the states you also
11  have that requirement.  If you have something that they
12  want you to protect in the vehicle that you're --
13  you're transiting with, then they will require you to
14  have a round in the chamber.  Maybe you're escorting
15  other weapons.  Maybe you're -- again, I'm trying to
16  think of what scenarios.  But -- but there have been
17  times when I've been asked to do that.
18     Q.   What's the reason for the military making a
19  distinction based on threat level, whether you should
20  or should not have a round in the chamber?
21     A.   I think it's just some risk management
22  decisions on the military side.  So you know, just they
23  -- they're willing to take more risk when there's a --
24  there's a greater threat that's going on or, again,
25  there's a requirement.

Page 98

1     Q.   So in other words, the military recognizes
2  that putting a round in the chamber increases the risk
3  of there being some sort of safety issue, primarily
4  an accidental discharge, and, therefore, there has to
5  be a good reason to have a round in the chamber; is
6  that right?
7        MR. HESTER:  Object to the form.  You can
8  answer.
9        THE WITNESS:  I would say it depends.  I
10  think -- I think sometimes it's -- again, it's tied to
11  if they want to be able to react more quickly.  You --
12  you know, if you're doing a training evolution where
13  you're at the range, again, and you're replicating a
14  combat scenario, again, you're going to -- to be
15  carrying hot all the time.  Again, just for the
16  reaction times and your evaluation of your training.
17  So -- but, you know, or -- or are you doing something,
18  and operating at the range, and you may not have access
19  to, you know, to -- to both hands.  You know, for
20  example if you're operating something where you've got
21  to drive, as a driver for example.  You know, there
22  might be some situations like that where, again, you
23  might change the status because you can't -- you can't
24  load it.  Or more difficult to load it then.
25  BY MR. WOY:

Page 99

1     Q.   You're familiar with the Israeli carry
2  technique?
3     A.   Right.
4     Q.   What's your understanding of that technique?
5     A.   So we did some training with IDF soldiers
6  during my time in the military.  Some exchange training
7  here, and then some we supported people overseas.  The
8  -- a couple -- some of the -- I don't know if it's all
9  the Israeli units, but some integrate a draw and fire.
10  My understanding was it was tied to the Glock pistol
11  because it didn't have a safety on it.  And so they
12  draw and fire as part of their -- their engagement
13  technique.  They -- they train that way.  And then they
14  also have some timing requirements to meet as part of
15  the qualification.
16     Q.   So the -- the -- you've referenced the M9 a
17  couple times, right?  That's a -- was a Beretta?
18     A.   Yeah.
19     Q.   And the M9 had an external thumb safety on
20  it, right?
21     A.   Yes.
22     Q.   The Glock used by the IDF does not have an
23  external thumb safety on it; is that right?
24     A.   Again, I haven't physically seen them.  I'm
25  just -- but, again, I was told that that's what it was,

Page 100

1  sir.  I don't know if they have some edition of it but,
2  again, I -- I haven't messed with a Glock with a manual
3  safety on it before.
4     Q.   Have you ever seen a Glock with a manual
5  safety on it?
6     A.   I have not.
7     Q.   Did you know if Glock makes and sells Glocks
8  with manual safeties?
9     A.   I'm not sure.  I know the solicitation for
10  the Army combat pistol involved that, so I'm assuming
11  that if they went into that, they had some kind of
12  version, but I haven't seen it.
13     Q.   Do you think that one of the reasons that
14  the IDF has adopted the Israeli carry technique of not
15  carrying a round in the chamber, is the fact that the
16  pistol they issue does not have an external safety?
17     A.   Again, I'm not in the IDF and so I can't
18  guess to everything.  I would probably just -- as a
19  leader looking at it, I would say that they're probably
20  -- they're intermingled with the civilian population of
21  their -- their own civilians doing internal defense
22  operations.  So again, I think, and this is my opinion,
23  that, you know, I'm not -- again, I'm not in the IDF.
24  But, again, they have, you know, our soldiers are
25  usually on the frontier.  They don't do -- other than

Page 101

1 the National Guard doing domestic operations, like for
2 a riot or something, they are not intermingled with the
3 civilian population. So if we were patrolling downtown
4 Atlanta our weapons carry status would probably be
5 different than it was in Afghanistan because, you know,
6 potential collateral damage and injury to civilians.
7    Q.   And by your weapons -- by saying your
8 "weapons carry status would probably be different for
9 patrolling downtown Atlanta," what do you mean by that?
10    A.   Again, it just depends on what your risk is.
11 By "weapons carry status," you know, is -- is your
12 magazine in the gun? Is your -- is the bullet in the
13 chamber? It's, you know, just however you're -- you're
14 looking to do it. And -- and normally the on-the-scene
15 commander can upgrade if there's, again, the threat.
16 You know, you don't usually have to go back and ask for
17 permission. If there's something going on that you
18 have a reason to escalate, then you can change the
19 status.
20    Q.   If you were overseeing troops that were for
21 some reason patrolling downtown Atlanta, and you had no
22 particular information saying there is a significant
23 threat to these soldiers --
24    A.   Uh-huh.
25    Q.   -- would you expect them to carry with a

Page 102

1 round in the chamber or without a round in the chamber?
2       MR. HESTER: Object to the form. You can
3 answer.
4       THE WITNESS: So if you think of when the
5 National Guard recently has been deployed to Atlanta,
6 it's been for some very violent reasons. I mean, we
7 normally don't use the military to police American
8 civilians. So if you're being deployed, I would
9 anticipate that it's -- it's that high risk that you're
10 bringing in the military, that there's more than likely
11 a reason to have a bullet in the chamber, again, or --
12 or why is the military there?
13 BY MR. WOY:
14    Q.   If you had a soldier that you were
15 overseeing that was for some reason in a scenario
16 similar to that of Mr. Williams on the day of the
17 discharge, would you expect that soldier to have a
18 round in the chamber or not in the chamber, based on
19 your understanding of what potential threats were --
20       MR. HESTER: Object to --
21 BY MR. WOY:
22    Q.   -- likely to be encountered?
23       MR. HESTER: Object to the form of the
24 question. You may answer.
25       THE WITNESS: So most military people that I

Page 103

1 know that -- that carry -- carry a weapon for personal
2 defense will carry with the round in the chamber. I'm
3 not aware of anybody who doesn't. You know, some of
4 the difference here is when you're overseas you're --
5 again, other than some Special Ops teams and some very
6 small groups you're by yourself, usually you're in a
7 large group of people, so you have people to back you
8 up. So if you need an extra second to load your
9 magazine, you've got somebody that's covering you. If
10 you're by yourself, your time and your reaction time is
11 a little different. So again, you're -- you don't have
12 anybody backing you up, so you may want to increase
13 your status. So --
14 BY MR. WOY:
15    Q.   Are you aware of any organizations that
16 promulgate safe carry standards or recommendations for
17 the general public who might want to carry a pistol in
18 a concealed or open-carry format?
19    A.   Again, I've heard of the Concealed Carry,
20 what's it, association or organization, but the CCW.
21 Anyway, I --
22    Q.   Do you know if that organization offers a
23 recommendation as to whether people should -- who are
24 civilians carrying for purposes of self-defense whether
25 or not they should carry with a round in the chamber?

Page 104

1    A.   I don't.
2    Q.   You've mentioned a few times that you
3 personally carry for self-defense often.
4    A.   Yes.
5    Q.   Is that right?
6    A.   Yes.
7    Q.   Are there ever scenarios where you carry a
8 pistol for self-defense without a round in the chamber?
9    A.   I can't think of any. If -- again, as I sit
10 here -- again, if -- if there's a reason that I'm
11 bringing a weapon around with me then there's probably
12 a reason to have it ready.
13    Q.   Have you ever personally been involved in an
14 accidental discharge?
15    A.   No.
16    Q.   When you were in the military you were a
17 small --
18    A.   Oh --
19    Q.   Go ahead.
20    A.   I'm sorry. Yeah. I didn't personally do
21 one. Is that what you're asking me or are you asking
22 me was I around when one happened?
23    Q.   I was asking whether you personally --
24    A.   Oh, okay. All right.
25    Q.   One of your -- a firearm that you were

Page 105

1 responsible for.
2    A.   No. No.
3    Q.   But now I'm going to ask you. It sounds
4 like you were present when an accidental discharge
5 happened before?
6    A.   With a .50 cal. Yeah.
7    Q.   Okay. And that would have been a rifle of
8 some kind or a -- what --
9    A.   An M2 machine gun.
10    Q.   Yeah. All right. Okay.
11    A.   That wasn't fun either, so --
12    Q.   Yeah, I can imagine. When you were in the
13 military, you were personally responsible for keeping
14 your firearms clean, right?
15    A.   Yes.
16    Q.   Was there specific training that included
17 guidelines on cleanliness standards or how often you
18 should clean your firearms?
19    A.   Normally the guidelines revolved around
20 turning it back into an arms room once you were
21 finished. So if -- if you had it for prolonged periods
22 of time that was on you to -- to maintain that. If you
23 -- if we had younger people working with us, you know,
24 we might periodically spot check their equipment and
25 make sure it was good to go. But the more senior

Page 106

1 people, again, it was up to you to maintain your
2 equipment.
3    Q.   If you spot checked someone's pistol while
4 you were in the military and found it in the condition
5 of Mr. Williams', as you understand it, would you ask
6 them or instruct them to clean their pistol?
7        MR. HESTER: Object to the form. You can
8 answer.
9        THE WITNESS: Again, I, you know, we're
10 talking back at like you're in a safe area and not like
11 in the middle of doing something, and then like, hey,
12 everybody, timeout. Again, I -- I wouldn't have a
13 particular issue with that. Again, depending on what's
14 going on. Usually we build in, like, on the calendar
15 somewhere where, hey, we're going to do weapons
16 cleaning on -- on this day of the week or this day of
17 the month, you know, to try to, kind of, bring in all
18 the supplies you need, you know, have some spare parts
19 around if something is wrong. And that's a good time
20 to switch out ammunition. You know, because we're
21 carrying ammunition for prolonged periods of time for
22 spring compression. So and, again, that all might be
23 tied into a range training day. So, you know, instead
24 of unloading your magazine, just go do your training
25 and then go put new bullets in it, and then the

Page 107

1 cleaning is part of that training cycle. So there's,
2 again, multiple ways this could be handled.
3    Q.   If you opened up your pistol, and --
4        THE VIDEOGRAPHER: Excuse me. Excuse me.
5 Could we go off the record for one second?
6        MR. WOY: Sure.
7        THE REPORTER: We're going off the record.
8 The time is 12:22 p.m.
9        (A recess was taken.)
10        THE REPORTER: We're back on the record. The
11 time is 12:23 p.m.
12 BY MR. WOY:
13    Q.   If you open up your personal pistol and saw
14 it in the condition of Mr. Williams', would you clean
15 it at that time or would you be satisfied that it's
16 clean enough to continue carrying?
17        MR. HESTER: Object to the form. You may
18 answer.
19        THE WITNESS: I -- it would not alarm me. I
20 would continue to operate until I, you know, until I
21 had a chance to -- to clean it.
22 BY MR. WOY:
23    Q.   Would you agree with me that it's the
24 responsibility of the user to make sure that their
25 pistol is in a clean and fully operational condition?

Page 108

1    A.   It depends, but normally, yes.
2    Q.   So for example, for you the -- the personal
3 pistols that you own, it's your job to make sure
4 they're -- they're clean?
5    A.   Yes, sir.
6    Q.   How often do you typically clean yours, your
7 pistols?
8    A.   Under -- usually under conditions. So if --
9 if I'm doing, like, a heavy range day. If I'm doing
10 just a test fire, I won't. If I'm doing heavy range
11 training, I will. And that could be 100, couple
12 hundred rounds. And if -- if I haven't used it, like
13 I'm just wearing it around the farm, then, again, that
14 might be a monthly or little bit lighter.
15    Q.   Would you have expected Mr. Williams to
16 begin this trip that he took from -- to New Bern with a
17 pistol that had been cleaned?
18        MR. HESTER: Object to the form. You can
19 answer.
20        THE WITNESS: Again, I -- I don't know what
21 he was thinking. Again, he was obviously comfortable
22 with whatever condition it was in when he started the
23 trip. And, again, at the time of the inspection I'm
24 not overly concerned about the carbon that I saw.
25 BY MR. WOY:

Page 109

1    Q.   Got it.  I know I -- I know I -- you said
2  the 365 that you have does not have an external safety,
3  right?
4    A.   That's correct.
5    Q.   Okay.  And when you carry that in -- in your
6  pocket when you you're on your motorcycle, do you have
7  a round in the chamber?
8    A.   Yes.
9    Q.   Have you ever personally seen anybody carry
10  a pistol in their back pocket?
11    A.   Only for probably like walking around, like
12  they're moving equipment from one side to another, you
13  know, or they're bringing things out to vehicles.  Not
14  -- not for a prolonged period of time.
15    Q.   If you saw someone -- when you were back in
16  the military and had supervisor responsibility for
17  certain soldiers, and if you saw one of the soldiers
18  you were responsible for carrying their pistol in their
19  back pocket and sitting down, possibly sitting on it,
20  would you reprimand that soldier?
21    MR. HESTER:  Object to the form.  You may
22  answer.
23    THE WITNESS:  Sir, I think it depends.  I
24  mean, it depends what I'm sitting at, you know, what --
25  what I'm seeing.  You know, I'd probably be interested.

Page 110

1  You know, again, we're usually carrying it a little
2  differently.  Again, so I might -- I might go ask to
3  see what's going on beforehand.  And, again, if -- then
4  if there was something I didn't like then at that point
5  there would -- there would be some corrective action
6  taken, either with him or with his supervisor.  You
7  know, hey, what's going on here, you know?
8  BY MR. WOY:
9    Q.   Would you want to know whether that person
10  had a good reason for carrying the pistol in that way?
11    A.   Yeah.  I -- I mean, I definitely would want
12  to find out what's going on.  Again, the military back
13  pocket is a little bit different than the jean pocket.
14  So again, it's, you know, you've also got equipment.
15  So --
16    Q.   If you came across someone in the military
17  who was carrying their pistol in their back pocket with
18  no other equipment in there, and you asked you them,
19  and they said, it was just easier for me, would that be
20  an acceptable reason to carry their pistol in that way?
21    MR. HESTER:  Object to the form of the
22  question.  You may answer.  If you understand.
23    THE WITNESS:  Sir, it depends.  Again, I -- I
24  would need a little bit more information, but just to
25  clarify that I -- I don't recall seeing any holsters

Page 111

1  like this in the military that clipped on that way.
2  You know, most of ours are, you know, going through
3  webbing or leg straps, or something like that.  So
4  again, it's -- I'm trying to put the scenario together
5  again, which that -- that's -- just because I didn't
6  see it, you know?  But if somebody took a, you know,
7  Safariland holster and jammed in their pocket, I
8  probably would worry about them -- it falling out of
9  their pocket and losing it would be my -- my bigger
10  concern above anything.
11  BY MR. WOY:
12    Q.   Yeah.  If I were properly trained and
13  licensed to do so, which -- which I'm not, I'll be
14  candid with you on that.  Now, let me start that
15  question over because now I'm going to have my
16  commentary in my transcript.
17    So if I were properly trained and licensed to
18  do so, would it make you uncomfortable if I had a
19  holstered pistol on my belt as we sat here in this
20  deposition?
21    A.   Well, I guess that's something -- it depends
22  on your demeanor and some other things.  If -- if we
23  were having a nice conversation and you just happen to
24  have a -- a weapon on you, again, I've been around
25  weapons enough.  Now, all of a sudden, things started

Page 112

1  to escalate, then I may be a little uncomfortable.
2    Q.   Yeah.  Makes sense.  Yeah.  If -- if, you
3  know, assuming my demeanor was non-threatening --
4    A.   Yes, sir.
5    Q.   -- would it make you uncomfortable if I had
6  a soft-sided holster, like the one used by Mr.
7  Williams, and I decided -- and that's what I was
8  storing my pistol in, I decided I wanted to -- to put
9  it in my back pocket as I sat here, and sit here during
10  the deposition, as I have been, moving around a little
11  bit in my chair and scooching.  And you knew there was
12  a round in the chamber, and it was cocked and there was
13  no safety on that pistol, would that make you
14  uncomfortable?
15    MR. HESTER:  Object to the form of question.
16  You may answer.
17    THE WITNESS:  So before this case, I wouldn't
18  have thought about it.  You know, it's -- it's in the
19  holster, I'm not thinking that -- I -- I'm not thinking
20  that that's going to discharge.  So after this case, my
21  comfort level is changing, if that makes sense.  Again,
22  just honestly, I -- that -- that -- a holstered weapon,
23  usually the trigger's protected.  And so you know,
24  however Dr. Harrison and the team figures -- figured
25  this out.  Again, my comfort level is based on -- on my

1  experience up to that point. After seeing this, again,
2  my -- my comfort level would be different, if that
3  makes sense.
4  BY MR. WOY:
5    Q.   So what I'm taking from what you just said
6  is that you would be uncomfortable if I was sitting
7  here with a loaded, cocked pistol with no external
8  safety in my back pocket as I'm sitting here taking
9  your deposition, is that accurate?
10       MR. HESTER: Object to the form of the
11  question. That's a mischaracterization.
12       THE WITNESS: Sir, again, before I knew that
13  there was a possibility of a pistol going off in a
14  holster, which again, before this case, I had not seen
15  before. Again, I would not have had an issue with me
16  moving around in your seat with a weapon up against it
17  in -- in a holster, in whatever configuration you had.
18  Now that I've seen, again, and I -- I don't know,
19  again, Dr. Harrison, and them were working on why this
20  happened. You know, that's -- that's their thing. You
21  know, now that -- now that I know that there's a
22  possibility, from either something going on with the
23  firearm, that again, was not in my knowledge base
24  before then, today, I'd probably be a little
25  uncomfortable.

1  BY MR. WOY:
2    Q.   Knowing what you know today, would it make
3  you uncomfortable if you were to go home and get your
4  Glock out, put it in a soft-sided holster and put it in
5  the back seat -- or back pocket of your pants, and --
6  and sit on it, and ride your motorcycle, and scooch
7  around on it, like Mr. Williams said he was doing?
8        MR. HESTER: Object to the form. You may
9  answer.
10       THE WITNESS: I'm very comfortable with my
11  Glock and, you know, again, I -- as you notice, I've
12  got some SIG products as well. You know, the -- the --
13  my -- my experience with my Glock has never had an
14  issue with the -- the accidental discharge in whatever
15  configuration. So I would -- with that pistol, I would
16  not have a problem carrying that way.
17  BY MR. WOY:
18   Q.   Okay.
19   A.   Again, that's not normally how I carry
20  things, but I --
21   Q.   Yeah. So just -- just to be clear, you --
22  you've never carried your Glock in a soft-sided holster
23  in your back pocket while you rode your motorcycle,
24  have you?
25   A.   No. I have ridden a motorcycle with soft-

1  sided leg drop holster. And I have had, again, a Glock
2  in Kydex holster on my back, up against like a tractor
3  seat, vehicle seats, and stuff like that. Again,
4  where, you know, I -- I can't -- as I'm sitting here
5  right now I can't think of a soft-sided holster out --
6  that I was wearing outside the waistband, again, being
7  pressed up against anything.
8    Q.   Do you think it would be safe for you, as
9  you sit here in your deposition, to have a loaded,
10  cocked pistol with no external safety in your back
11  pocket, sitting on it?
12       MR. HESTER: Object to the form of the
13  question. Based on his prior answer, I think some of
14  that's been asked and answered.
15  BY MR. WOY:
16   Q.   You can answer.
17   A.   Again, I'm trying to think of the scenario
18  when I would do this. If you're -- if you're asking me
19  if I would be comfortable sitting at -- on a Glock that
20  way, again, I'm not overly bothered. Again, I use the
21  -- it just seems uncomfortable to me, you know. That's
22  probably more of my concern. I'm not worried about my
23  Glock going off. If you're asking me if I would be
24  comfortable doing that with my M-17, based on the stuff
25  I heard this weekend, I'm not.

1    Q.   Do you think there are safer ways to handle
2  a pistol than to load it, cock it, and put it in your
3  back pocket and sit on it?
4        MR. HESTER: Object to the form. You may
5  answer.
6        THE WITNESS: Sir, there are multiple ways
7  that you can -- you can carry firearms. I mean, you
8  could make them really safe and unload and put them in
9  the safe, but -- but at some point, you know, if you
10  are -- you have it around you -- you know, you --
11  you're trying to attach it -- it's got a clip and
12  you're trying to attach -- attach it in such a way that
13  you can use it, to where you can get it. Again, if
14  you're carrying it for a reason, you know, how -- how
15  can you access it? Where does it need to be? Again,
16  there's multiple reasons that -- that somebody chooses
17  on how they carry it. Again, I can't outline all of
18  them that Mr. Williams went through to -- to get to
19  that spot. But again, I -- you know, it -- it's a
20  firearm, you know, it's --
21  BY MR. WOY:
22   Q.   From a -- a safe gun-handling practices
23  perspective, would you agree with me that it would've
24  been safer for Mr. Williams to clip his holster to his
25  belt as opposed to shoving it in his back pocket and

1 sitting on it?
2          MR. HESTER:  Object to the form of the
3 question.  You may answer.
4          THE WITNESS:  So I -- I think it depends,
5 again.  If -- if, you know -- if it was in an exact
6 spot on the hip where it's not in contact with
7 anything, it's possible.  If it's in the small of his
8 back and he's leaning on the bike this way, or it's on
9 his left hip and he's leaning that way, now we're --
10 we're -- we're getting into some eaches and ands.  I
11 mean, you know, were the exact -- you know -- and I
12 think it's going to be very difficult for -- for a gun
13 purchaser if -- if you outline, like, Hey, if you buy
14 my gun, you can only possibly use it this way or it's
15 not going to work, right?  So it's -- there's some
16 general -- you know, you have some flexibility on how
17 you can load and carry it and stuff, what works best
18 for you.
19 BY MR. WOY:
20     Q.    Is it -- is it important, in your opinion,
21 to have the retention mechanism on your holster engaged
22 if you were carrying your pistol anywhere, I guess?
23     A.    Are you talking about the --
24     Q.    So let's --
25     A.    -- strap that keeps it in the holster?

1     Q.    Yeah.
2     A.    Is that what you're talking about?
3     Q.    Let -- let me ask you this:  So you're aware
4 that the -- the holster that Mr. Williams was using at
5 the time of the discharge had a strap that goes over
6 the back of the holster, right?
7     A.    Yes, sir.  Yes.
8     Q.    Do you think it's important to keep that
9 strap buckled to keep the holster in the pistol?
10     A.    I -- I mean, yes.  You need to control the
11 pistol and -- and yes.  The strap should be there.  But
12 my understanding, again, I -- I -- it's not clear for
13 me from what I read, that it -- that it wasn't strapped
14 over and that it didn't possibly move during the
15 firearm sequence.  So I'm not quite sure about that.
16     Q.    Would you agree with me that it -- it's
17 important, or would've been important for Mr. Williams
18 to have that strap buckled to prevent the pistol from
19 coming up and out of the holster?
20     A.    I'm just pausing for a second to think of --
21 of what scenarios I had with -- if -- if I had where I
22 wasn't using the -- the retention device on the pistol
23 -- I'm sorry.  On the holster.  I would agree it makes
24 it -- it keeps it from moving around, which generally
25 should make it so it doesn't fall out of the holster as

1 well, so that it should be generally safer.  Again, but
2 I don't know the whole rationale for how it was, and
3 it's not clear to me that it wasn't done correctly.  I
4 don't think he recalled all -- making all the snaps,
5 but --
6     Q.    So one of the things that can happen if you
7 have -- if -- if you don't strap the strap on a holster
8 like this, the pistol can come up out of the holster a
9 bit, right?
10     A.    For this type of holster?
11     Q.    Right.
12     A.    I -- I believe it's possible.
13     Q.    And -- and when that happens, if it comes up
14 far enough, the trigger can be exposed, right?
15     A.    Again, I -- I didn't examine the specific
16 holster, so I don't know how far it would have to come
17 out to expose the trigger group.  I know it sinks in
18 there pretty deeply so it's, again, probably be some
19 extended -- extended reach, but it -- but it sounded
20 like there was a discussion on the hook pile tape
21 possibly moving during the firing sequence, which tells
22 me that the strap was on, if -- if that's -- that was
23 the conditions.  So I'm not --
24     Q.    As a gun owner yourself, I take it you're
25 aware that certain states have concealed carry

1 requirements that prohibit people without the proper
2 license from carrying concealed pistols, right?
3     A.    Yes, sir.  Some -- some of them are changing
4 right now, but --
5     Q.    Are you familiar with North Carolina's
6 concealed carry laws at all?
7     A.    I used to be.  I know a whole -- several
8 states have just changed, like Georgia is now you don't
9 have to have a permit to carry concealed.  You can
10 carry open or concealed.
11     Q.    Would you agree with me that as a
12 responsible gun user, you -- if you're in a state that
13 you have to be licensed to carry a concealed firearm,
14 and you don't have the right license, you should not
15 carry your pistol in a concealed manner?
16          MR. HESTER:  Object to the form of the
17 question.  Calls for a legal conclusion, but you may
18 answer.
19          THE WITNESS:  I -- I'd say it's important to
20 follow the rules of the state that you're in.  Again,
21 it's not clear to me that this weapon was being carried
22 concealed, if that's what you're alluding to.  So I
23 just want to make sure I clarify that.  Again, that
24 wasn't within the scope of my work, I just want to make
25 sure that -- but if the state has a, you know,

Page 121

1  concealed carry permit requirement, then -- then that
2  is -- you need to get that or have a reciprocal state
3  agreement in place. So again, it -- there -- there's a
4  lot that depends here on -- on -- and I don't know all
5  the -- all the rules for North Carolina right now.
6  BY MR. WOY:
7      Q.  So just assuming that North Carolina
8  requires you to have a concealed carry permit, if you
9  want to carry a concealed, would you agree with me that
10  it would not be acceptable for you to travel to North
11  Carolina, and let's say you're wearing a suit jacket
12  today, to put your pistol inside of the suit jacket,
13  where if I'm sitting here looking at you, I can't see
14  it?
15      MR. HESTER: Object to the form. You can
16  answer.
17      THE WITNESS: Again, if -- if you're -- if
18  you're carrying concealed in the state that requires a
19  permit, you need to get a permit. This is a very large
20  gun. You know, this is -- the 320 is -- is not --
21  again, I would go with SIG's 365 if I was carrying
22  concealed because you can hide that. This is a very
23  large gun. I -- I can't imagine it being hidden in
24  such a way where you couldn't see it.
25      MR. WOY: We've been going another hour and a

Page 122

1  half or so. Do you want to take another quick break?
2  I don't have a ton left, but I think it -- it makes
3  sense to take a quick break, if that works for you.
4      MR. HESTER: We can take five minutes.
5      THE WITNESS: Okay. Yes, sir.
6      MR. WOY: Okay.
7      THE VIDEOGRAPHER: We're going off the
8  record. The time is now 12:41 p.m.
9      (A recess was taken.)
10      THE VIDEOGRAPHER: We're back on the record,
11  the time is now 12:49 p.m.
12  BY MR. WOY:
13      Q.  All right, sir. Are you offering opinion
14  that Mr. Williams was reasonable in how he was carrying
15  and securing his pistol at the time of the discharge?
16      A.  Sir, the -- the three opinions I'm offering
17  are that -- that it's foreseeable that somebody is
18  going to carry a chamber of a round in their pistol.
19  Let me back up a second. That -- that pistols, you
20  know, used during some kind of long -- long term use,
21  you know, and Sir, and all these are on -- on the last
22  page of my report, and I hate to make you --
23      Q.  Yeah. Right. No, I --
24      A.  These -- these are the three pages I'm going
25  to offer.

Page 123

1      Q.  Right.
2      A.  Again, I --
3      Q.  So can you just describe -- so I -- I'm
4  trying to figure out, like, where the lines are drawn
5  on some of these.
6      A.  Yes.
7      Q.  And -- and where you're drawing them. So I
8  -- I'm not necessarily -- I -- I'm just trying to make
9  sure I understand, and we're reading -- and when I read
10  this, I understand what you were, like, exactly what
11  you're going to testify to.
12      A.  Okay.
13      Q.  If that makes sense.
14      A.  Yes, sir. Okay. So as far as the -- the --
15  I'm sorry. I'll let you ask that again.
16      Q.  Yeah. Okay.
17      A.  Just so I -- just -- just so I don't go
18  sideways on you.
19      Q.  Okay. So -- and -- and I have I -- I've
20  taken a close look at your conclusions, your opinions
21  in the report. And I just want to make sure I'm clear
22  and understand what you're going to testify to at
23  trial. And -- and I am -- I'm a bit unclear, and
24  that's why -- why I'm asking.
25      A.  Yes, sir.

Page 124

1      Q.  So are you -- do you intend to offer an
2  opinion one way or the other regarding the
3  reasonableness of how Mr. Williams was carrying and
4  securing his pistol at the time of the discharge, or is
5  that beyond the scope of your opinions in this case?
6      A.  I'm trying to be careful not to create new
7  opinions.
8      Q.  Yeah.
9      A.  So -- so my -- my opinion as regards to the
10  carry revolves around the bullet in the chamber. And
11  it's foreseeable that somebody will carry a pistol like
12  the 320 with a bullet in the chamber. If you're asking
13  me about the way he was carrying the gun, again, it was
14  -- yes, it was loaded, but it was inside of a holster
15  so the trigger grip should have been protected. So
16  again, I -- I think that he had a reasonable care with
17  -- with how that occurred.
18      Q.  Okay. During your time in the military,
19  were you ever responsible for preparing, reviewing, or
20  administering solicitations or requests for proposals
21  for equipment that the military wanted to purchase?
22      A.  No. I wasn't a contracting officer. We --
23  we might put in a request, like, We need an antenna
24  that does something, you know. We -- we might generate
25  a requirement, but after that, the contracting officers



Page 125

1 would be involved.
2    Q.   Okay.  So -- so you have -- okay.  Once you
3 handed it off to the contracting officers, did they
4 ever return whatever they prepared to you and say, Does
5 this fairly and accurately encapsulate what you're
6 asking for?
7    A.   I -- I don't remember anything specifically.
8 I -- I'm sure there might have been some, you know,
9 confirmation of what our requirement was.  I'm just
10 trying to think at what point, you know, I -- I was
11 involved in several process where we were filling
12 equipment, you know, upgrade -- Special Operations
13 upgrade kits for various pieces of equipment.  I -- I
14 -- you know, I don't specifically remember writing the
15 solicitation piece of it.
16    Q.   Yeah.
17    A.   Again, I was probably back on the -- on the
18 user-reception end of it, you know, trying to make
19 adjustments as to what the capability was or, you know,
20 the fielding and the -- new -- new equipment fielding,
21 essentially.
22    Q.   Okay.  Okay.  I -- I'm going to ask you
23 about this.  It should be super quick.  So I'm not
24 going to -- it's a -- it's a lengthy document, but
25 we're not going to go through most of it.  I have a

Page 126

1 copy of the solicitation that the Army put out on
2 December 17th of 2015 for what ultimately became the
3 M17 and M18.
4    A.   Okay.
5    Q.   Have you seen this document before?
6    A.   I do not require (sic) seeing this one.
7    Q.   Okay.  So I'm going to direct you to a
8 specific page when I find my copy of that document,
9 that has it highlighted.  So just bear with me one
10 second.
11    A.   I want to make sure we didn't take your
12 copy.
13       THE REPORTER:  Do you want this marked?
14       MR. WOY:  Yeah.  We'll mark it as Exhibit 2,
15 please.  Thank you.
16       (Defendant's Exhibit 2 was marked for
17 identification.)
18 BY MR. WOY:
19    Q.   Okay.  So it's Page 6.  It'll be Section
20 3.4.4.
21    A.   Okay.
22    Q.   Actually, I'm -- I'm sorry.  But keep your
23 finger on that page.  But if you -- can you flip back
24 to the first page real quick, the top right-hand
25 corner?

Page 127

1    A.   Yes.
2    Q.   Do you see the date on there at the top
3 where it says 17 December 2015?
4    A.   Yes.
5    Q.   Is it your understanding, based on your
6 familiarity with military solicitations, that that's
7 the date that the solicitation was issued?
8    A.   Sir, I honestly don't know.  The -- I know
9 -- I know sometimes they change dates based on updates
10 and things like that.  So I -- I know this is the date
11 it appears that this was issued, I just don't know what
12 came before or after it.
13    Q.   Got you.  Okay.  All right.  Fair enough.
14 So let's go to Page 6, and then Section 3.4.4.  Do you
15 see that heading, Safety Mechanisms?
16    A.   Yes.
17    Q.   And then if we look at C, underneath of
18 that, it says, The MH, which the modular handgun, shall
19 have an external safety -- or let me -- let me start
20 over.
21       "The MH shall have an external manually
22 operated safety control (switch/button/lever) which can
23 be operated with the firing hand."  Do you see that?
24    A.   I do.  I just want to clarify, MH is
25 military handgun, is that what we're saying?  I was

Page 128

1 trying to see -- just to make sure.
2    Q.   I think it's modular handgun.
3    A.   Oh, modular.  Okay.
4    Q.   It should be defined in here.  I would
5 think, but --
6    A.   That's all right.
7    Q.   Oh, here it is.
8    A.   Okay.
9    Q.   Page 2, 1.1 where it says Scope.
10    A.   Okay.
11    Q.   It says, modular handgun, hereinafter --
12 hereinafter referred to as MH.
13    A.   Just wanted to make sure.
14    Q.   Sure.  All right.  So you see Section C
15 there, and then E is similar.  It reads, "The external
16 manual safety shall be capable of being located on
17 either side of the frame for operation with either
18 hand.  The external manual safety shall be ambidextrous
19 or capable of being configured to be ambidextrous."
20 Based on your familiarity with contracting language
21 from your role in the military, and also you're
22 familiar with firearms, does it sound like what they're
23 describing there is an external manual thumb safety of
24 some kind?
25       MR. HESTER:  Object to the form.  You can

Page 129

1 answer.
2         THE WITNESS:  Again, I -- I'm not a
3 contracting officer, but as a -- as an Army -- former
4 Army officer reading this, that's what it appears to be
5 asking.  Yeah.
6 BY MR. WOY:
7     Q.   Okay.
8     A.   External manual safety operating.  Yep.
9 Ambidextrous safety.  Okay.  Yes.
10     Q.   So let -- let me ask the question a
11 different way.  So based on your experience in the
12 military, looking at this document, I know you haven't
13 seen it before, but your interpretation of 3.4.4 C and
14 E is that it's referring to an external thumb safety of
15 some kind; is that accurate?
16     A.   Yes -- or yes.  Some kind of manual safety.
17 I hate to say thumb, but -- but some kind of manual
18 safety that can be taken off.  Yes.
19     Q.   Okay.
20     A.   Ambidextrous.
21     Q.   Got you.  Okay.  That's -- that's all I
22 really wanted to ask you about for that document.  So
23 --
24     A.   But this wasn't an M17, right?
25     Q.   This was for the -- this was the

Page 130

1 solicitation for --
2     A.   For the modular handgun?
3     Q.   Yeah.
4     A.   No.  I meant, but -- but Mr. Williams gun
5 was not an M17.
6     Q.   Right.  No.
7     A.   Okay.
8     Q.   It's a -- no.
9     A.   Okay.
10     Q.   You're right.  You're right.
11     A.   Okay.
12     Q.   His -- his was a P 320.
13     A.   Yes, sir.
14     Q.   Okay.  All right.  So we're going to mark
15 this as Exhibit 2, so I'll just snag that back from you
16 now.
17     A.   Okay.
18     Q.   Thanks.  Okay.  We'll keep these together
19 we're done with that.
20     A.   Yes, sir.
21     Q.   But -- all right, the last document -- I
22 have one more document I want to ask you about.  I -- I
23 know from your report and the file that we were given,
24 that you -- you reviewed the report from Derek Watkins
25 in this case, right?  He was SIG's expert?

Page 131

1     A.   Yes.  Mr. Hall and Mr. Watkins.  Yes.
2     Q.   Have you seen the -- the supplemental report
3 that Mr. Watkins issued on June 28th of '24?
4     A.   Let me check the paperwork.  I was given one
5 report.  I -- I don't recall seeing a supplemental.
6 When did that come out?
7         MR. WOY:  The report's dated June 28th of
8 '24.  We'll mark this as Exhibit 3, please.
9         (Defendant's Exhibit 3 was marked for
10 identification.)
11         THE WITNESS:  Yeah.  I don't have a
12 supplemental report listed on the documents.  I don't
13 think I've seen it.
14         MR. WOY:  Thanks.
15         MR. HESTER:  Your report was issued before
16 this came out.
17         THE WITNESS:  Yeah.
18 BY MR. WOY:
19     Q.   So here's a copy of that supplemental
20 report.  And again, long document, very few questions
21 for you, though, hopefully.
22     A.   Okay.
23     Q.   So I'm going to ask you to turn to Page 26,
24 if you could, please.
25     A.   Yes.

Page 132

1     Q.   And this is the section of the report where
2 Mr. Watkins offers some -- some comments and his
3 opinions regarding the report that you issued.
4     A.   Yes.
5     Q.   You want to take a -- a minute or two to
6 look through that before I start asking you questions?
7     A.   Sure.  One second here.
8         MR. HESTER:  Actually begins on page 25.
9 BY MR. WOY:
10     Q.   Yeah.  Oh, okay.  Yeah.  It begins on 25.
11 My questions are with regard to what's on Page 26.
12     A.   Okay.
13     Q.   All right.  So pretty simple questions, I
14 think, that I have to ask you.  We're going to -- I
15 want to ask you with regard, you know, questions about,
16 on Page 26, it's Paragraph, I guess, or Section 6.1.2,
17 6.1.3, and 6.1.4.
18         Looking first at 6.1.2, do you agree with Mr.
19 Watkins that you do not say that it's acceptable to sit
20 and scooch around on a fully loaded and cocked pistol in
21 your report?
22     A.   Okay.  So first off, just -- just to address
23 the title of six -- Paragraph 6 and Subsection 6.1, he
24 indicates that I made false statements.  I take
25 exception to that.  I did not make a false statement.

1 What he's addressing here is a difference of opinion.
2 So I'd like to address that. That's --
3    Q. Understood.
4    A. We call this unprofessional. But anyway.
5 Okay, so -- I'm sorry. We are -- the -- the testing on
6 -- on the --
7    Q. Yeah. So 6.1.2.
8    A. Right.
9    Q. Go ahead and read that.
10    A. Yeah.
11    Q. Do you agree with his statement in that
12 section?
13    A. My report does -- he is correct that my
14 report does not say that it is acceptable to sit and
15 scooch around on -- that my report does not address
16 this -- that issue.
17    Q. Okay. Do you think it's acceptable for
18 someone like Mr. Williams to -- to sit and scooch
19 around on a fully loaded and cocked pistol?
20    MR. HESTER: Object to the form. You may
21 certainly answer.
22    THE WITNESS: So sir, we -- we kind of went
23 over it in our, you know, earlier on. I mean, the
24 weapon is in a holster. So I would expect it to be
25 protected, regardless of what it's pressed up against.

1 And I don't know specifically how he was interacting
2 with the seat, based on the bike being at an angle, his
3 butt cheek being at an angle. Again, I don't -- I
4 don't see that much pressure, again, based on how I'm
5 envisioning this happening. But again, I did not test
6 that.
7 BY MR. WOY:
8    Q. Okay.
9    A. Does that make sense?
10    Q. Yep. All right. So 6.1.3, I'm going to ask
11 you a similar question. So just take a second to
12 familiarize yourself with that.
13    A. Okay. I see it.
14    Q. Okay. Do you agree with what he states
15 there?
16    A. He's -- he's correct that I did not cite any
17 test data on the seat scooching, nor -- nor did he cite
18 any test data saying not to.
19    Q. Okay. 6.1.4, same question. Take a look at
20 that and -- and let me know if you agree or disagree
21 with these -- what he states there.
22    A. Based on my understanding of this case, I am
23 -- I don't understand. It's not clear to me that there
24 is a shirt concealing the pistol. It's also not clear
25 to me, based on the size of the pistol and the holster,

1 that it was concealed. Again, I -- I understand that
2 he was wearing a motorcycle vest. My -- from riding
3 motorcycles at Fort Bragg, where there was people from
4 motorcycle clubs of all kinds around Fort Bragg, riding
5 around, they usually stopped at the -- at the belt
6 line, so I -- that's my familiarity with those types of
7 devices. And again, so I don't see -- again, so I --
8 I'm not sure that his statement is accurate as far as
9 how this was -- occurred. I do agree that if you carry
10 concealed in the state that requires a permit, you need
11 a permit. Again -- but again, it's not clear to me
12 that he's carrying concealed.
13    Q. Understood. Okay.
14    A. And he did not get cited by the police for
15 carrying a concealed weapon, right?
16    Q. All right. The last -- I do want to ask you
17 about -- back to your report, the -- in the conclusion
18 section.
19    A. Yes, sir.
20    Q. I think it's Number 4. Yeah. Number 4.
21    MR. HESTER: You're back to his report?
22    MR. WOY: His -- yeah. Back to the witness's
23 report.
24    THE WITNESS: Okay. Yes, sir.
25 BY MR. WOY:

1    Q. So Number 4, you -- you wrote in there, "I
2 am a unable to fully analyze the testing conducted by
3 Defendant's experts until I can confirm the size of the
4 subject holster." Have you been able to confirm the
5 size?
6    A. No.
7    Q. Have you asked either Counsel for plaintiff
8 or Plaintiff what the size of the holster was?
9    A. I'm told that nobody knows because of the
10 tag being removed, for sure.
11    MR. WOY: All right, sir. Those are all the
12 questions I have for you. Thank you very much for your
13 time and for your service to the country. I know
14 you've had a -- a long and distinguished career, and I
15 -- I truly appreciate that.
16    THE WITNESS: Thank you, sir.
17    MR. HESTER: So Wintrode Enterprise's
18 attorney gets to ask you questions now. David, do you
19 have anything?
20    MR. FOTHERGILL: Yeah. Hold on. Colonel
21 Dill, can you hear me okay?
22    THE WITNESS: Yes, sir.
23    EXAMINATION
24 BY MR. FOTHERGILL:
25    Q. All right. Great. I'm going to try to be

1  as quick as I possibly can, but I do have some
2  questions. I'm also going to try not to scream my
3  questions at you, but the function of Zoom at times
4  makes me feel like I am screaming questions at people.
5  So if I start doing that, tell me.
6     A.   No -- no problem, sir. Understood.
7     Q.   So I just want to go back to some of the
8  questions you were initially asked by SIG Sauer's
9  lawyer, and I wrote down some of your answers. You
10 were asked within the first 20 minutes of questions
11 about opinions related to any defects. Do you recall
12 that testimony that you gave?
13    A.   Yes, sir.
14    Q.   All right. Is it fair for me to say that
15 you are not offering any opinions in this case related
16 to the holster being defective in any way?
17    A.   No, sir.
18    Q.   Okay. No, sir, you're not, or no, sir, I'm
19 not correct? Sorry, poorly phrased question.
20    A.   No, sir. I'm not offering any opinions on
21 defects on the holster.
22    Q.   All right. Whether it's design,
23 manufacturer, or warning defects, fair?
24    A.   That's correct, sir. I -- I did not
25 evaluate the -- the holster.

1     Q.   All right. And I also wrote down that you
2  are not offering any opinions as to what caused or
3  contributed to the uncommanded discharge in this case;
4  is that fair?
5     A.   That's correct, sir. Dr. Harrison will
6  handle the discussions on the -- the firearm.
7     Q.   All right. And does -- does that subject
8  matter about causation related to the uncommanded
9  discharge, that applies both to the subject pistol in
10 this case, as well as the subject Wintrode holsters; is
11 that fair?
12    A.   Yes, sir. That's correct.
13    Q.   All right. The materials that you reviewed
14 in this case in connection with your opinions as it
15 pertains to the holster was what, if anything?
16    A.   Sir, the complaint and then the -- the four
17 expert reports and the deposition from Mr. Williams.
18    Q.   Okay. Were you at all provided with the
19 document entitled, and bear with me and let me make
20 sure I get the proper title for you. A document
21 entitled "Bulldog Cases and Vaults." The first page
22 has the Bulldog logo on it. In the bottom left corner,
23 it's Volume 12. If you've got it as part of the
24 initial disclosures, in the bottom, right-hand corner,
25 it should say Wintrode Initial Disclosures Number 1.

1     A.   We -- we're double checking, sir.
2     Q.   Sure.
3     A.   And -- and -- but just to clarify --
4          MR. HESTER: I'll let you look.
5          THE WITNESS: Yeah. There's -- I -- I did go
6  to the Bulldog website so I could see, you know, how
7  many sizes the holsters were in, a few things like
8  that.
9  BY MR. FOTHERGILL:
10    Q.   Okay.
11    A.   And then it was a --
12    Q.   And what -- I'm sorry. Go ahead.
13         MR. HESTER: He -- yeah. He hadn't finished
14 there.
15         THE WITNESS: Oh, I'm sorry. The -- so -- so
16 yeah. There was a -- the belt holster loop and clip
17 page, and -- and we have copies of this on the drive
18 for you. There's the -- the section -- the -- the web
19 page on the pocket holster. Again, I'm familiar with
20 these from seeing them before. And then the -- the
21 Bulldog case holster information sheet.
22 BY MR. FOTHERGILL:
23    Q.   All right. The materials on the flash drive
24 or drive that you just referenced, it is printed out
25 copies or -- or PDF copies of what you accessed on the

1  website?
2     A.   There should be. There should be. I
3  believe it's PDF. My -- my assistant did it. I don't
4  know the actual format, but I believe it's PDF. But we
5  do have your -- have your --
6     Q.   (Crosstalk).
7     A.   -- we do have your production folder. It
8  says, Documents 1 to 94.
9     Q.   When did you access the Wintrode or Bulldog
10 website to get this information?
11    A.   Sir, it was probably right before the report
12 was issued, probably within a few days of that. I
13 don't -- I don't know if I've got the actual date. Let
14 me see. Probably the last week of May, the first week
15 of June, somewhere in that time period.
16    Q.   All right. And did you tell me -- did I
17 hear you correctly, that one of the things that you
18 reviewed, whether it was in PDF form or on the website,
19 was whatever materials were available with respect to
20 this belt loop and metal clip holster?
21    A.   Yes, sir. On the website, there was some
22 information. I was -- I -- again, I was mostly focused
23 in on the sizes and -- and how -- and trying to
24 understand how many sizes were available for the
25 pistol.

Page 141

1    Q.    All right.  And based on your role as an
2    expert in this case, what is your understanding as --
3    as to how this specific holster that Mr. Williams had
4    on him that day was designed to be worn or used?
5    A.    It -- it had a belt clip.  I'm trying to
6    think.  I -- I don't recall if I saw if it was just
7    inside the waistband or outside the waistband.  I --
8    I'd have to go back and look again.
9    Q.    Okay.
10    A.    But -- but it did have the -- the belt -- it
11    did have the belt loop -- or I'm sorry, the belt clip.
12    Q.    Is it fair for me to say that, based on your
13    research into this specific holster, that you would
14    agree with me that it was designed to be worn or used
15    externally on a belt loop or a belt?
16    MR. HESTER:  Object to the form of the
17    question.  You can answer it.
18    THE WITNESS:  Sir -- sir, the -- the focus --
19    the focus of my -- of my conclusions was on the -- on a
20    holster, whatever kind that it might be, could be --
21    could be put into -- into pockets periodically, again,
22    during transport.  Again, that was the -- the crux of
23    -- of Conclusion number 3.  I -- I read, again, the
24    different ways that they could use this specific
25    holster, but not anything that I saw limiting how it

Page 142

1    was used.  Does that make sense?
2    BY MR. FOTHERGILL:
3    Q.    Yes.  And so thank you.  But my question is,
4    based on what you've looked at and what you've
5    reviewed, would you not agree with me that this holster
6    was designed to be used as an external holster clipped
7    to the outside of somebody's pants, either by a belt
8    loop or a belt itself?
9    MR. HESTER:  Object to the form.  Asked and
10    answered.  You can answer again.
11    MR. FOTHERGILL:  Well, he didn't answer, but
12    that's fair.
13    THE WITNESS:  So again, I -- I -- my focus
14    was on how it was used, not so much in the design.  So
15    I want to -- I want to be careful I don't overstate
16    this.  So it comes with a loop -- belt loop right in
17    the clip, and so I would anticipate that it could be
18    worn on the -- on the outside of the belt with the loop
19    or on the inside of the -- of the pants -- inside --
20    inside the pants with the clip.
21    BY MR. FOTHERGILL:
22    Q.    Have you seen anything that has been
23    published or represented by Wintrode where there is
24    representations made with respect to this specific type
25    and kind of holster that it was intended to be used as

Page 143

1    a carry inside somebody's pants?
2    A.    I -- I don't recall specifically seeing
3    that, sir.  And again, I -- and I don't recall seeing a
4    prohibition from doing it.
5    Q.    Okay.  Are you aware as you sit here today,
6    that Wintrode makes several different types and kinds
7    of holsters?
8    A.    Yes, sir.
9    Q.    Including holsters that could be used in the
10    manner that Mr. Williams was using it on the day of his
11    incident, correct?
12    A.    No.  I -- again, I -- I would say that the
13    -- the inside the pocket holster is -- my recollection,
14    having seen those before, was that they -- they're
15    designed based on the cut for your front pocket.
16    Q.    Okay.
17    A.    So again, I -- I don't -- I don't think that
18    that would've worked in the back pocket if that's what
19    you're asking.  I'm sorry.  I just want to make sure
20    I'm answering the right question.
21    Q.    You're fine.  Have you seen any photographs
22    or any promotional materials whereby there were any
23    photographic or video representations of this holster
24    being used inside pants pockets or inside the back
25    pocket of an individual?

Page 144

1    A.    No, sir.  I have not.
2    Q.    All right.  Are you aware as to whether or
3    not Mr. Williams made the decision to carry his firearm
4    the way he did on the date of this incident based on
5    any representations made by Wintrode?
6    A.    No, sir.  I'm not aware of any -- any
7    information from -- from Wintrode that would've
8    informed what he did that day.
9    Q.    Okay.  And what is your understanding as to
10    how this holster came into Mr. Williams' possession?
11    A.    It was purchased -- it -- with the firearm
12    from a third party.
13    Q.    Okay.  So it was -- is it fair for me to
14    classify it sort of as a secondhand purchase for the
15    holster?
16    A.    That's my understanding.  Yes.
17    Q.    All right.  Do you know as to whether -- or
18    do you know whether or not any of the packaging or any
19    warning materials that would accompany the holster if
20    purchased new, made it to Mr. Williams through this
21    secondhand purchase?
22    A.    My understanding is that it did not.
23    Q.    Okay.  And as we sit here today, have you
24    seen any warnings, or instructions, or packaging that
25    would've accompanied this type and kind of holster if

Page 145

1  it was, in fact, bought new at some point before this
2  incident?
3      A.  In regards to this case, or are you asking
4  me if I -- if I've seen Bulldog instructions before?
5      Q.  Let's go with this case.
6      A.  Okay.  No.  No, sir.
7      Q.  All right.  Have you seen Bulldog
8  instructions before generally?
9      A.  Yes.
10      Q.  All right.  In what context?
11      A.  When I was with KF Armory Defense, our --
12  the armory side of the house carried Bulldog products.
13      Q.  All right.  Were any of those promotional --
14  or excuse me, were any of those instructional or
15  warning materials or packaging materials related to
16  this type and kind of specific holster?
17      A.  I don't think so.  I -- I don't recall --
18      Q.  Do you have --
19      A.  -- the specific holster.  It was carry
20  cases, the pocket holsters, and I believe there was
21  some long gun cases.
22      Q.  Okay.  Do you know how many times Mr.
23  Williams had carried his P320 in the way he was
24  carrying it that day before that day?
25      A.  I -- I do not have a number for that.  No.

Page 146

1      Q.  Okay.  Did you read Mr. Williams'
2  deposition?
3      A.  I -- I did.  So I -- I did, sir.  I -- I did
4  not memorize it.  So I -- I can go back and check if
5  there's some information you wanted me to -- to glean
6  out of that.
7      Q.  Okay.  Did you take any notes of any of the
8  depositions you read or discovery you reviewed?
9      A.  Sir, my notes were -- I -- it was my -- my
10  thoughts as I went through, the -- the information was
11  put into my report as I went, essentially.
12      Q.  So once I get that flash drive or share file
13  link or whatever you guys have exchanged there, as far
14  as memorialization of your opinions, even as you went
15  along, the only thing is going to be that report that's
16  been marked as Exhibit 1; is that right?
17      A.  Yes, sir.
18      Q.  Okay.  Do you know what was first on the
19  market for retail sale, this type and kind of holster
20  or the P320?
21      A.  Sir, I -- I don't know that answer.
22      Q.  All right.  Would you agree with me that
23  this holster -- this type and kind of holster was not
24  specifically designed for the P320?
25      MR. HESTER:  Object to the form.

Page 147

1      THE WITNESS:  Yes, sir.  It's my
2  understanding that you have 25 sizes of the holster,
3  depending on what type of firearm that you're using.
4  BY MR. FOTHERGILL:
5      Q.  All right.  And so that would be the same
6  thing -- I know I asked about design, but if I put the
7  word "manufacturer" or "advertised for sale" in there,
8  I assume your answer is the same, meaning you would
9  agree with me that this holster was not specifically
10  manufactured for the P320 or advertised for sale as a
11  case or holster specifically for that firearm, fair?
12      MR. HESTER:  Object to the form.  You may
13  answer.
14      THE WITNESS:  As I sit here right now, I -- I
15  don't know how the sizing is described.  I -- I'm
16  trying -- I'm trying to think back to what I've seen.
17  I -- I know it wasn't designed for it, but I don't know
18  if it -- if there's a -- the -- if the information
19  sheet says, if you have a 320, you need size X, Y, Z.
20  So again, I -- that I don't know.
21  BY MR. FOTHERGILL:
22      Q.  Do you have that information sheet in front
23  of you or available?
24      A.  I do not.
25      Q.  Okay.  And sitting here today, you just

Page 148

1  don't recall what that information sheet said as to
2  whether or not you -- a -- somebody who had access to
3  that sheet could go up and down the sheet and figure
4  out if -- if the word SIG or P320 is referenced with a
5  specific size of a holster?
6      A.  Yes, sir.  I -- I don't know.  I -- I
7  haven't seen that.  And again, I -- I would agree that
8  this holster was not made specifically for the SIG
9  P320.
10      Q.  Okay.  The size of the barrel of Mr.
11  Williams' gun, what was it, if you know.
12      A.  Sir, I -- I don't know off the top of my
13  head.
14      Q.  Okay.
15      A.  I don't -- I don't want to just guess.
16      Q.  And in order to not guess, what information
17  would you need?  Would you need to have actual access
18  to the gun to measure it, or would there be some other
19  information whereby you could learn to satisfy yourself
20  that -- as to the size the barrel of the subject gun?
21      A.  I -- I could go back to the manufacturer's
22  website with the model and try to pull the -- pull the
23  length that way.  But again, I -- I did not inspect the
24  -- the subject firearm.
25      Q.  Okay.  If the subject holster was not

1  compatible with the subject firearm, would you agree
2  with me that would be something that Mr. Williams would
3  have had knowledge of?
4      MR. HESTER:  Object to the form of the
5  question.
6      THE WITNESS:  Sir, if he had multiple
7  holsters where he could fit them to see what the best
8  -- best fit was, again, that might have informed what
9  he was working on.  But it came with the firearm, so I
10 don't -- I don't know how he would know if it was a
11 perfect fit or not, other than that the gun was being
12 carried in it securely to his -- to his liking.
13 BY MR. FOTHERGILL:
14     Q.   Okay.  And what information or knowledge do
15 you have that the gun was being carried securely to his
16 liking, prior to this incident?
17     A.   Well, he was carrying it.  I mean, if he --
18 if he was uncomfortable with the way the firearm was
19 inside the holster, I would anticipate him to get a
20 different holster, but he used the one that was
21 provided.
22     Q.   And again, you can't tell us how he was
23 carrying it, he, being Mr. Williams, at any point prior
24 to this incident, right?
25     MR. HESTER:  Object to the form.

1      THE WITNESS:  Other than, again, he was -- it
2  was discussed that he was driving it, and it was in a
3  different pocket during the ride to North Carolina.
4  That's the only information I have on how he was
5  carrying it, and his previous experience with pistols.
6  BY MR. FOTHERGILL:
7      Q.   Okay.  Do you know if the person who sold
8  the holster to Mr. Williams, in connection with selling
9  him the subject P320, actually purchased that holster
10 new or bought the holster secondhand themselves?
11     A.   Sir, I'd have to go back and check.  Again,
12 that wasn't the focus of -- of the scope of work that I
13 was working on.  But I can go -- I can go look that up
14 if -- if you needed me to.  I -- I know the acquisition
15 was discussed in the deposition from Mr. Williams, but
16 again, that was outside the scope I was --
17     Q.   Would you agree with me that on the date of
18 this incident, at the time of the discharge, that Mr.
19 Williams did not have this holster supported by a belt
20 and worn externally?
21     MR. HESTER:  Object to the form of the
22 question.
23     THE WITNESS:  I agree that -- yes.  That the
24 -- the holster was not being worn on a belt.  That's
25 correct.

1  BY MR. FOTHERGILL:
2      Q.   Okay.  And not being worn externally,
3  correct?
4      MR. HESTER:  Object to the form.
5      THE WITNESS:  It was external to his pants,
6  but it was on the inside of a pocket.
7  BY MR. FOTHERGILL:
8      Q.   Okay.  Do you believe, or is it outside the
9  scope of your expertise, and tell me if it is, that the
10 way that Mr. Williams was carrying the P320 at the time
11 of the discharge was a concealed carry?
12     A.   Sir, I -- I have not examined all the
13 clothing that he was wearing.  So I -- I know that it's
14 a large pistol with a holster, and I would imagine that
15 I would be seeing it, so it would not be concealed.
16 Again, but I have not seen the vest that was in
17 question that he -- he was wearing also at the time.
18     Q.   All right.  What, in your opinion, would
19 make it, if you know, a -- an actual, true concealed
20 carry?  Is it such that nobody can see it or -- or --
21 you said that you thought you could see it.  I mean, I
22 -- that's what I'm trying to figure out.  What would,
23 in your opinion, make this a concealed carry?
24     A.   Well, as I mentioned earlier, my familiarity
25 with motorcycle vests, the -- the ones, you know, with

1  the rockers and stuff, again, they end around the
2  waistline.  So again, that -- that's my familiarity.
3  So if he's sitting there and the -- and the gun is
4  below his waistline, sticking out, again, a very large
5  pistol, he's sitting in some kind of an angle, I would
6  anticipate that the gun is sticking out and visible.
7  My understanding of concealed carry -- you know, the
8  classes I've gone to have not really gone into too much
9  detail other than the gun is supposed to be concealed.
10 So I take that to mean that you can't see any of it;
11 it's not -- it's not largely printing so that you can
12 see that it's for sure a gun.  So -- so that -- that is
13 my understanding of what that is, and that's not what's
14 happening here.
15     Q.   You didn't -- and you have just not done any
16 assessment one way or the other to determine the scope
17 of visibility that Mr. Williams' gun would have been in
18 the moments prior to this uncommanded discharge?
19     A.   I -- I was not asked to do that.  No, sir.
20     Q.   All right.  And I think I heard you testify
21 earlier, you've never personally inspected the subject
22 holster, correct?
23     A.   That's correct, sir.  I did not inspect it.
24     Q.   All right.  Have you inspected any exemplar
25 holsters of a similar type and kind to the subject

Page 153

1 holster?
2    A.   No, sir.  Dr. Harrison is doing all the --
3 the testing on the -- the equipment.
4    Q.   Okay.  I just want to talk to you really
5 quick about the four conclusions that you reached, and
6 I'm -- I'm going to be honest, I probably only have
7 questions about 3 and maybe if -- one or two about 4,
8 and then I -- I think I'm done.
9       Number 3 says, "I am familiar with holsters
10 being placed temporarily in pockets for short periods
11 of time when a belt wear is not desirable."  I just
12 want to stop right there.  Tell me everything that
13 supports that sentence before the semicolon, from "I am
14 familiar" to "not desirable."
15    A.   So I probably can't cover everything, but
16 what comes to mind at this moment was just, you know,
17 personally, as I'm having to enter -- go out to
18 vehicles and come back in, I'm with other security
19 personnel, doing security tasks, might have to transfer
20 stuff.  So they'll put their -- they may -- they may
21 want to stick the -- the holster in one pocket or
22 another, again, as they're moving back and forth.  So I
23 have seen this happen.  Again, not with this specific
24 type of holster, but I have seen people that will take
25 the firearm in the holster and put it somewhere while

Page 154

1 they are transporting it for whatever reason that they
2 have.
3    Q.   Okay.  And do you know how long before the
4 uncommanded discharge that Mr. Williams had the P320 in
5 the location on his person that it was when you
6 understand the gun went off?
7    A.   My understanding, he was -- he was walking
8 around for some period of time, but I don't have an
9 exact timeframe for how long he had it in the back
10 pocket or how long he'd been sitting on the motorcycle
11 when it occurred.
12    Q.   So when it says, "Holsters being placed
13 temporarily in pockets for short periods of time," that
14 has nothing to do with this case, fair?
15       MR. HESTER:  Object to the form.  It's part
16 of his opinion.
17       THE WITNESS:  I -- I'm saying that I'm
18 familiar with people carrying it that way for short
19 periods of time, and they did not discharge.
20 BY MR. FOTHERGILL:
21    Q.   Sure.  So that -- that testimony that you
22 gave is part of the basis for that first sentence there
23 before the semicolon; is that right?  That you're
24 familiar with other people carrying --
25    A.   Yes.

Page 155

1    Q.   -- guns and holsters in pockets that have
2 not gone off?
3    A.   That's correct.
4    Q.   Okay, so the last sort of sentence there,
5 after the semicolon, I think it's -- actually, the rest
6 of -- just for sake of completeness, the rest after the
7 semicolon says, "This includes the front and back pants
8 pockets."  The next sentence says, "It is foreseeable
9 that a pistol owner may carry a holster pistol in this
10 manner, and I have seen no product warnings to the
11 contrary."  The product warnings you're referring to
12 there are what?
13    A.   I haven't seen any warnings in -- with the
14 firearms, and I haven't seen any warnings posted
15 somewhere, again, on my experience on the retail side
16 with KF Armory or -- or operating equipment where I --
17 where I have seen anywhere where there was a warning
18 saying, Hey, do not put this in your back pocket.
19    Q.   And the "this" in that sentence is the -- is
20 the pistol.  In this case, it would be the P320, right?
21    A.   Yes.
22    Q.   Okay.  Do you know, as you sit here, whether
23 or not Mr. Williams did any investigation, after the
24 purchase of the gun and holster, into the holster and
25 how to use it?

Page 156

1    A.   I don't recall seeing anything of that
2 nature.  No.
3    Q.   All right.  Do you know if he did any
4 research into the holster itself prior to the purchase?
5    A.   I believe his focus that -- brought up in
6 deposition, was that he was focused on the firearms
7 purchase, and the holster just came with it.
8    Q.   Okay.  And just to make sure I heard you
9 correctly, you had some questions about the strap to
10 the holster.  Do you -- do you recall those questions
11 from SIG's lawyer?
12    A.   Yes, sir.
13    Q.   All right.  I wrote down that you've not
14 done any testing to -- to determine or assess if the
15 strap was or was not affixed at the time of the
16 uncommanded discharge.  Did I hear you correctly?
17    A.   Yes.  I haven't done any testing on the
18 hardware.  That's Dr. Harrison.
19    Q.   Okay.  So other than these four opinions,
20 which are on Page 9 of 9 of your report, you do not
21 hold any other opinions in this case; is that fair?
22    A.   At this time, that's correct.  Yes, sir.
23    Q.   All right.  Is there any materials with
24 respect to the holster that you've asked for that you
25 have not been given?

Page 157

1    A.    No, sir.
2    Q.    All right.  Do you have any -- as you sit
3  here today, do you have any intention to do any further
4  expert work and/or render additional expert opinions as
5  it pertains to the holster itself?
6    A.    No.  No, sir.  Again, all -- all the
7  hardware work was being done by Dr. Harrison.
8        MR. FOTHERGILL:  All right.  Colonel Dill,
9  those are all my questions.  Thank you very much for
10  your time.
11        THE WITNESS:  Yes, sir.  Thank you.
12              EXAMINATION
13  BY MR. HESTER:
14    Q.    I have just a handful of follow-up questions
15  just to clarify a few points.  First, just so we have
16  this, you have a reference or a list of reference
17  materials that you brought with you today, correct?
18    A.    Yes, sir.
19        MR. HESTER:  All right, What are we on, 3?
20        THE REPORTER:  4.
21        MR. HESTER:  4?  Let me mark this as Exhibit
22  4?
23        (Defendant's Exhibit 4 was marked for
24  identification.)
25        THE REPORTER:  I think he's got a couple.

Page 158

1  BY MR. HESTER:
2    Q.    Okay.  Colonel Dill, handing you what's been
3  marked as Exhibit 4.  Could you tell us what that is?
4    A.    Yes, sir.  Yes, sir.  This is the list of
5  documents that ESI received as -- as part of this
6  matter, and I was able to review those as -- as part of
7  my assessment on the -- to reach my conclusions.
8    Q.    Okay.  And as I said, we'll mark that as
9  Exhibit 4 to your deposition.  You were shown a copy of
10  Exhibit 2, correct?
11    A.    Yes.  The --
12    Q.    Which is the --
13    A.    The handgun -- modular handgun solicitation?
14    Q.    The purchase description, "Modular handgun,
15  2015"?
16    A.    Yes.
17    Q.    All right.  And you were asked to refer to
18  Page 6 regarding safety mechanisms.  I'd refer you to
19  Paragraph 3.4.4.
20    A.    Okay.  Yes, sir.
21    Q.    And I know you haven't seen this prior to
22  today, but could you take a look at Section 3.4.4B, and
23  could you read that out loud into the record, please?
24    A.    Yes, sir.  "The MH, or modular handgun,
25  shall have an internal safety mechanism that

Page 159

1  mechanically prevents the firing pin/striker from
2  contacting the cartridge primer unless the trigger is
3  purposefully pulled."
4    Q.    In your service in the military, have you
5  heard of the phrase, or did you use the phrase,
6  "purposefully pulling the trigger"?
7    A.    No, sir.
8    Q.    Okay.  Do you know what is specifically
9  meant by 3.4.4B's use of the term quote, "purposefully
10  pulled"?
11    A.    Sir, based on my experience, I would say
12  that means a -- a full trigger pull --
13    Q.    All right.
14    A.    -- of the firearm.
15    Q.    All right.  And with regard to a statement
16  you made earlier today, in response to SIG Sauer's
17  Counsel's question, you said that before this case, you
18  had a comfort level with regard to the firearm at
19  issue, but that is now changed based on your work in
20  this case; is that correct?
21        MR. WOY:  Object to form.
22        THE WITNESS:  I'm sorry?
23  BY MR. HESTER:
24    Q.    You -- you were asked a question about the
25  manner of carry --

Page 160

1    A.    Yes, sir.
2    Q.    -- and how you would view opposing counsel
3  sitting with a firearm in his right rear pocket before
4  this case?
5    A.    Yes, sir.
6    Q.    All right.  Am I correct or incorrect that
7  your focus in this case has dealt with an injury
8  resulting from the P320 SIG Sauer manufactured weapon?
9  In other words --
10    A.    Yeah.
11    Q.    -- the focus of your inquiry here --
12    A.    Yes.
13    Q.    -- has been about a factual circumstance --
14    A.    Yes.
15    Q.    -- involving one handgun, which was the SIG
16  Sauer P320, correct?
17    A.    Yes, sir.
18    Q.    All right.  And you said that after your
19  work in this case, your comfort level has changed; do
20  you recall?
21    A.    Yes, sir.  With the -- the gun being placed
22  in the -- being pressed up against something.  Yes,
23  sir.
24    Q.    All right, sir.  And can you explain that in
25  terms of how your comfort level has changed as to

Page 161

1  whether or not that applies to the SIG Sauer P320,
2  based on your work in this case?
3     A.   Well -- well, as I -- as I mentioned
4  earlier, the case -- again, I -- I didn't know that
5  this was an issue, or an alleged issue, again, prior to
6  this case.  Again, I'd heard some of the drop testing.
7  So this was kind of the -- the first inkling of -- of
8  uncommanded discharge.  Then when I saw the police
9  videos of the -- the firearm discharging when it's
10  clearly in a holster and not being touched, that kind
11  of concerned me.  And again, as I mentioned that this
12  weekend with the NPR report with the -- what appeared
13  to be military incident reports, again, of the M-17,
14  when one, at least, is indicating -- again, I have not
15  investigated those, but one indicates that the manual
16  safety was on.  So again, that -- those items does
17  change my comfort level because -- because you -- you
18  want to know what's going on.
19     Q.   Sure.  And I -- I just wanted to clarify
20  that one --
21     A.   Yes, sir.
22     Q.   -- one answer that you gave.
23     A.   Yes, sir.
24        MR. HESTER:  And that's all I have.
25        THE WITNESS:  Okay.

Page 162

1        MR. HESTER:  Thank you.
2        THE REPORTER:  Okay.  Anything else?
3        MR. WOY:  Nothing further from me.
4        THE VIDEOGRAPHER:  Oh, David, anything else?
5        MR. FOTHERGILL:  Oh, I'm good.
6        THE VIDEOGRAPHER:  Sorry.  Go ahead.
7        THE REPORTER:  While we're on the record, can
8  I have each of you state your name on the record and
9  whether you'll be ordering a transcript or not?
10        MR. HESTER:  Yes.  Lawson Hester.  Yes.  I'd
11  like an electronic version.
12        THE REPORTER:  Electronic?  Okay.
13        MR. HESTER:  With the --
14        THE VIDEOGRAPHER:  Could you also include if
15  you'd like a video copy as well?
16        MR. HESTER:  With exhibits, and I would like
17  the video copy.  Yes.
18        MR. WOY:  Jonathan Woy.  We'd like an
19  electronic copy as well and, also, a video, please.
20        THE REPORTER:  And David?
21        MR. FOTHERGILL:  Yeah.  I will -- I will take
22  an electronic copy.  I don't need a video.  And I'll be
23  honest, I probably don't even need the exhibits, but my
24  guess is they come with the electronic copies.
25        THE REPORTER:  They do.

Page 163

1        MR. FOTHERGILL:  I figured they did.
2        THE REPORTER:  All right.  Just a moment,
3  please.  We're going off the record.  The time is now
4  1:39 p.m.  This concludes today's deposition.
5        (Deposition concluded at 1:39 p.m.)

Page 164

1        REPORTER DISCLOSURE
2     Pursuant to Article 10.B of the Rules and Regulations
3  of the Board of Court Reporting of the Judicial Council of
4  Georgia, I make the following disclosure:
5     I am a Georgia Certified Court Reporter.  I am here as
6  a representative of Esquire Deposition Solutions.  I am not
7  disqualified for a relationship of interest under the
8  provisions of O.C.G.A. 9-11-28(c).
9     I was sent by the offices of Esquire Deposition
10  Solutions to provide court reporting services for these
11  proceedings.  I will not be taking this hearing under any
12  contract that is prohibited by O.C.G.A. 15-14-37 (a) or
13  (b).
14     Esquire has no exclusive contract to provide
15  reporting services with any party to the case, any counsel
16  in the case, or any reporter or reporting agency from whom
17  a referral might have been made to cover this proceeding.
18     Esquire will charge its usual and customary rates to
19  all parties in the case, and a financial discount will not
20  be given to any party to this litigation.
21     Dated this 7th of August, 2024.
22
23
24     QUINN BRUNO
25     Certified Court Reporter

## Page 165

CERTIFICATE OF REPORTER

I, QUINN BRUNO, a Digital Reporter, Notary Public, and Certified Court Reporter in and for the State of Georgia, do hereby certify:

That the foregoing witness was duly sworn; that the proceeding took place before me at the time and place herein set forth; that the testimony and proceedings were accurately captured with annotations by me during the proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am not interested in the outcome of this matter, financial or otherwise.

IN WITNESS THEREOF, I have hereunto set my hand this 7th day of August, 2024.

_____

QUINN BRUNO Notary Commission

Georgia/W-00638913

Commission Expires: January 18, 2028

## Page 166

CERTIFICATE OF TRANSCRIPTIONIST

I, Kelly M. Walters, Certified Verbatim Reporter, do hereby certify: That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 7th day of August, 2024.

*Kelly Walters*
_____

Kelly M. Walters, CVR

## Page 167

DEPOSITION ERRATA SHEET

Esquire Job No. J11504620

Case Caption: JACK ANTHONY WILLIAMS v. SIG SAUER, INC. AND WINTRODE ENTERPRISES, INC.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2024.

_____

TONY DILL

## Page 168

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

TONY DILL

Page 169

```
 1   DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            TONY DILL
```