| | | |
|---|---|---|
| JACK ANTHONY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SIG SAUER, INC., and | ) | |
| WINTRODE ENTERPRISES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

On July 22, 2022, Jack Anthony Williams ("Williams" or "plaintiff") filed an amended complaint against Sig Sauer, Inc. ("Sig Sauer" or "defendant") and Wintrode Enterprises, Inc. ("Wintrode").[1] See Am. Compl. [D.E. 16]. Williams's claims arise out of the discharge of a Sig Sauer P320 pistol ("P320") on May 25, 2019, in New Bern, North Carolina. See id. at ¶¶ 1–6.

On October 17, 2024, Sig Sauer filed motions to exclude Williams's proposed experts Timothy Whealton ("Whealton") [D.E. 124] and Joshua Harrison, Ph.D. ("Harrison") [D.E. 128]. Sig Sauer filed memoranda in support of both motions [D.E. 125, 129]. Also on that date, Sig Sauer moved for summary judgment [D.E. 130]. On October 18, 2024, Sig Sauer filed a memorandum in support [D.E. 131], a statement of material facts [D.E. 132], and an appendix [D.E. 133].

On December 23, 2024, Williams responded in opposition to Sig Sauer's motions to exclude [D.E. 142, 145]. On that date, Williams also responded in opposition to Sig Sauer's

---

[1] On August 13, 2025, the court granted Wintrode's motion for summary judgment and dismissed with prejudice Williams's claims against Wintrode [D.E. 158].

motion for summary judgment [D.E. 147] and filed an opposing statement in response to Sig Sauer's statement of material facts [D.E. 144].

On January 21, 2025, Sig Sauer replied to Williams's opposition to the motions to exclude [D.E. 152, 153]. Also on that date, Sig Sauer replied to Williams's response in opposition to summary judgment [D.E. 154], and filed a reply statement of additional material facts [D.E. 155] and an appendix [D.E. 156].

As explained below, the court grants Sig Sauer's motion to exclude Whealton's report and testimony, grants Sig Sauer's motion to exclude Harrison's report and testimony, and grants Sig Sauer's motion for summary judgment.

## I.

The P320 is a striker-fired pistol. A projectile is fired when the P320's internal components mobilize the striker, which strikes the projectile loaded into the pistol's chamber. Compare Def.'s Statement of Material Facts ("DSMF") [D.E. 132] ¶ 17, with Pl.'s Statement of Material Facts ("PSMF") [D.E. 144] ¶ 17. The P320's internal components work as follows. When the trigger of the P320 is depressed, the trigger moves the trigger bar forward. Compare DSMF ¶ 17, with PSMF ¶ 17. The trigger bar pushes the safety lever upwards, which pushes the striker safety lock upwards. Compare DSMF ¶ 17, with PSMF ¶ 17. The striker safety lock immobilizes the striker and prevents the P320 from firing until it is moved upwards. Compare DSMF ¶ 17, with PSMF ¶ 17. As the trigger moves the trigger bar, the trigger contacts the sear. Compare DSMF ¶ 18, with PSMF ¶ 18. The sear consists of a ledge which prevents the striker from contacting the projectile in the chamber. Compare DSMF ¶ 18, with PSMF ¶ 18. The trigger bar moves the sear, which causes the striker to move forward and contact the projectile, which causes it to fire out of the P320's chamber. Compare DSMF ¶ 18, with PSMF ¶ 18.

2

In 2017, Sig Sauer created a "Voluntary Upgrade Program" ("VUP") for the P320 to enhance the P320's drop safety. See Def.'s Reply Statement of Additional Undisputed Material Facts ("DRSMF") [D.E. 155] ¶ 1. The VUP permitted those who purchased the P320 to upgrade their pistols to enhance the P320's drop safety. DRSMF ¶ 3. Williams's P320 contained a "trigger mud flap" that prevented debris from entering into the internal components of the P320. See DRSMF ¶¶ 32–33. Separately, Sig Sauer included an external thumb safety on the military variant of the P320 at the request of the United States' military. See DRSMF ¶ 8.

Between 2018 and 2019, Williams purchased a P320 at a private sale. See DSMF ¶ 20; PSMF ¶ 20. Williams consulted Sig Sauer's website and other online sources to research the P320 before purchasing it. See DSMF ¶ 21; Williams Dep. [D.E. 133-1] 113–17. Williams did not read or review the P320's operator's manual. See DSMF ¶ 22; Williams Dep. 331. Williams has never read an owner's manual for a gun he has owned. See DSMF ¶ 23; PSMF ¶ 23.

On May 25, 2019, Williams traveled to New Bern, North Carolina, for a reunion of the Iron Horsemen motorcycle club. See DSMF ¶ 2; PSMF ¶ 2. Williams served as an "enforcer" for the Iron Horsemen. DSMF ¶ 7; Williams Dep. 163. As an enforcer, Williams "protect[ed]" and "monitor[ed]" the members of the club. See DSMF ¶¶ 7–8; Williams Dep. 163.

Later on May 25, 2019, Williams made his "rounds" by walking around the parking lot of the hotel where the Iron Horsemen were staying for the reunion. See PSMF ¶ 8; DSMF ¶ 8; Williams Dep. 162–63. Williams carried the holstered P320 in the right rear pocket of his pants. See DSMF ¶ 4; PSMF ¶ 4; Williams Dep. 165–66. Williams did not have a concealed carry permit as required by North Carolina law. See PSMF ¶ 6; DSMF ¶ 6.

After his rounds, Williams took a break and sat on his motorcycle. Compare DSMF ¶ 10, with PSMF ¶ 10. See Williams Dep. 171. While seated on his motorcycle, Williams "fold[ed]"

3

his left leg "on top of the gas tank" and "pull[ed]" his right leg and "kick[ed] it up on the handlebars." Williams Dep. 172; see DSMF ¶¶ 10–11; PSMF ¶ 11. When Williams attempted to adjust his position on the motorcycle, the P320 discharged. See DSMF ¶ 11; PSMF ¶ 11; Williams Dep. 173. The bullet ripped through the holster that carried it, entered Williams's right femur, and lodged in Williams's patella. See DSMF ¶ 11; PSMF ¶ 11.

After the discharge, officers of the New Bern Police Department spoke to Williams at the hospital. See DSMF ¶¶ 13–14; PSMF ¶¶ 13–14. A New Bern police officer wrote in his report that Williams stated the P320 may have "caught itself on the saddlebags of his motorcycle." See [D.E. 133-3] 2. The parties dispute whether Williams made the statement. Compare DSMF ¶ 14, with PSMF ¶ 14.

Williams asserts claims against Sig Sauer for defective design in violation of N.C. Gen. Stat. §§ 99B-6 and 99B-11 (count one); defective warning in violation of N.C. Gen. Stat. § 99B-5 (count three); negligence and gross negligence (count five); express and implied breach of warranty (count six); a violation of the Magnuson-Moss Warranty Act–Federal Trade Commission Improvement Act ("MMWA"), 15 U.S.C. §§ 2301, et seq. (count seven); fraud (count eight); negligent misrepresentation (count nine); Unfair and Deceptive Trade Practice under N.C. Gen. Stat. § 75-1.1 (count eleven); intentional infliction of emotional distress (count thirteen); negligent infliction of emotional distress (count fourteen); and punitive damages (count fifteen). See Am. Compl. ¶¶ 120–281.

## II.

Sig Sauer moves to exclude the report and testimony of Williams's designated expert witnesses, Timothy Whealton and Joshua Harrison. See [D.E. 124, 128]. Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702; Kumho

4

Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142–43 (1997); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993); Engilis v. Monsanto Co., __ F.4th __, 2025 WL 2315898, at *3–6 (9th Cir. 2025); United States v. Forrest, 429 F.3d 73, 80–81 (4th Cir. 2005); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275, 2011 WL 6748518, at *5–6 (E.D.N.C. Dec. 22, 2011) (unpublished). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2] "In 2023, Rule 702 was amended to clarify that the proponent of expert testimony bears the burden of establishing its admissibility and to emphasize that an expert's opinion must stay within the bounds of a reliable application of the expert's basis and methodology." EcoFactor, Inc. v. Google LLC, 137 F.4th 1333, 1339 (Fed. Cir. 2025); see also Fed. R. Evid. 702 advisory committee note to 2023 amendment (stating that the 2023 amendment is intended "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology").

---

[2] Although Rule 702 governs trial testimony, a trial court may conduct a Rule 702 analysis in resolving a summary judgment motion and "exclude expert testimony found wanting from its consideration in ruling on [such a] motion." Arsanjani v. United States, No. 19-1746, 2023 WL 3231101, at *3 (D.D.C. May 3, 2023) (unpublished) (quotation and citation omitted).

Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see Engilis, 2025 WL 2315898, at *3–6; Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199–203 (4th Cir. 2001). In other words, Rule 702 requires that a trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." EcoFactor, 137 F.4th at 1339 (internal quotations omitted) (citation omitted); see Daubert, 509 U.S. at 597–98; Engilis, 2025 WL 2315898, at *3–6. Determining admissibility, which falls within the gatekeeping role of the court, is separate from determining "weight and credibility, which are within the province of the jury in a jury case." EcoFactor, 137 F.4th at 1339.

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; see Fed. R. Evid. 104(a); Daubert, 509 U.S. at 592 n.10; Engilis, 2025 WL 2315898, at *5–6; Cooper, 259 F.3d at 199; see also Huddleston v. United States, 485 U.S. 681, 687 n.5 (1988); Bourjaily v. United States, 483 U.S. 171, 175 (1987). Expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). A district court may permit a witness qualified by knowledge, skill, experience, training, or education to testify and state an opinion where the testimony will help the trier of fact understand the evidence or determine a fact in issue and "([1]) the testimony is based on sufficient facts or data, ([2]) the testimony is the product of reliable principles and methods; and ([3]) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Courts have distilled Rule 702's requirements into three crucial inquiries: (1) whether the proposed expert witness is qualified; (2) whether the proposed testimony is relevant; and (3) whether the proposed testimony is reliable. See Kumho Tire Co., 526 U.S. at 141; Daubert, 509 U.S. at 589; Engilis, 2025 WL 2315898, at *5–6; Forrest,

6

429 F.3d at 80. The trial court must perform its special gatekeeping obligation concerning these three requirements. See, e.g., Fed. R. Evid. 702; Kumho Tire Co., 526 U.S. at 147; Engilis, 2025 WL 2315898, at *5–6.

When a party challenges an expert's testimony, the court must "satisfy itself that the proffered testimony meets the relevant standard as a precondition to admissibility." Snell v. Reid, No. 22-1869, 2024 WL 2815061, at *3 (4th Cir. June 3, 2024) (per curiam) (unpublished) (quotations omitted); see Engilis, 2025 WL 2315898, at *5–6; Sardis v. Overhead Door Corp., 10 F.4th 268, 282 (4th Cir. 2021). The court must make explicit findings concerning the challenged preconditions of admissibility either by written order or orally on the record. See Snell, 2024 WL 2815061 at *3; Sardis, 10 F.4th 268 at 283; United States v. Smith, 919 F.3d 825, 835–36 (4th Cir. 2019).

As for qualification, an expert may be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court assesses qualifications in reference to the matter to which the witness seeks to testify. See Daubert, 509 U.S. at 591–93; Gladhill v. Gen. Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984). The witness need not be the most well-known or well-qualified witness. See Gladhill, 743 F.2d at 1052. Nonetheless, a witness does not become an expert simply by claiming to be an expert or because some other court permitted the witness to testify as an expert. See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799–800 (4th Cir. 1989) (holding that a witness with an M.B.A. was not qualified to provide expert opinion testimony on complex economic antitrust matters about which the witness was not qualified by training, experience, or education); United States v. Bahena, 223 F.3d 797, 809–10 (8th Cir. 2000) (holding that a witness who held himself out to be an expert on voice spectrography lacked the required training, experience, or education). Moreover, expertise in one topic does not qualify a

7

witness to testify about another topic. <u>See, e.g.</u>, <u>Engilis</u>, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); <u>Brainchild Surgical Devices, LLC v. GPA Glob. Ltd.</u>, 144 F.4th 238, 254 (4th Cir. 2025) (affirming exclusion of expert with experience in international business and contracts to opine on patent renewal services where the expert lacked training or experience with patent renewal services); <u>Kadel v. Folwell</u>, 100 F.4th 122, 158 (4th Cir. 2025) (en banc) (affirming exclusion of medical doctors' testimony where doctors failed to demonstrate expertise in treating the medical condition at issue in the case), <u>vacated on other grounds by</u> <u>Folwell v. Kadel</u>, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025) (mem.); <u>Sardis</u>, 10 F.4th at 288–90, 295 (affirming exclusion of testimony about an industry standard not sufficiently related to the product at issue and excluding testimony that contradicts standards imposed by governing law); <u>Zellers v. NexTech Ne., LLC</u>, 533 F. App'x 192, 197 (4th Cir. 2013) (per curiam) (unpublished) (affirming exclusion of a neurologist's testimony about the toxicity of certain chemicals used for refrigeration because the neurologist had no training in toxicology); <u>Cooper</u>, 259 F.3d at 200–04 (affirming exclusion of a medical doctor's testimony where the medical doctor based an opinion on a medical device without conducting tests or studying the medical device); <u>Ancho v. Pentek Corp.</u>, 157 F.3d. 512, 519 (7th Cir. 1998) (affirming exclusion of testimony when the expert failed to visit the site of the accident or otherwise familiarize himself with the specific details of the accident at issue).

To be relevant, the proposed expert testimony must be helpful to the trier of fact concerning the evidence or a fact at issue in the case. <u>See</u> Fed. R. Evid. 702(a); <u>Daubert</u>, 509 U.S. at 591–92; <u>United States v. Lespier</u>, 725 F.3d 437, 449 (4th Cir. 2013); <u>Kopf v. Skyrm</u>, 993 F.2d 374, 377

8

(4th Cir. 1993); <u>Persinger v. Norfolk & W. Ry.</u>, 920 F.2d 1185, 1188 (4th Cir. 1990); <u>Scott v. Sears, Roebuck & Co.</u>, 789 F.2d 1052, 1055 (4th Cir. 1986). To be helpful, the proposed expert testimony must fit the facts of the case. <u>See</u> Fed. R. Evid. 702; <u>Silicon Knights, Inc.</u>, 2011 WL 6748518, at *6–17. "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." <u>Daubert</u>, 509 U.S. at 591 (quotation omitted). To be helpful to the trier of fact, the proposed expert testimony must be outside the common knowledge or function of the fact finder. <u>See, e.g.</u>, <u>Lespier</u>, 725 F.3d at 449 (affirming exclusion of expert testimony on how sleep deprivation affects the reliability of an eye witness to a crime); <u>Persinger</u>, 920 F.2d at 1188 (affirming exclusion of expert testimony about the amount of weight that an individual could safely lift based on an easily-applied industry formula); <u>Gladhill</u>, 743 F.2d at 1052 (affirming decision that a police officer who had investigated 600 car accidents and arrived at the car accident scene immediately after the car accident was qualified to opine concerning the cause of the car accident based on his review of the car accident scene); <u>cf.</u> <u>United States v. Hill</u>, 749 F.3d 1250, 1260 (10th Cir. 2014) (holding that an expert witness cannot testify about whether another witness is credible); <u>Nimley v. City of New York</u>, 414 F.3d 381, 398 (2d Cir. 2005) (same).

"[T]he test of reliability is flexible and the law grants a district court" discretion when it decides reliability. <u>United States v. Wilson</u>, 484 F.3d 267, 274 (4th Cir. 2007) (quotations and citation omitted); <u>see</u> <u>Kumho Tire Co.</u>, 526 U.S. at 141–42; <u>Belville v. Ford Motor Co.</u>, 919 F.3d 224, 233 (4th Cir. 2019). Reliability focuses on the fit between the expert opinion and the facts of the case. There is not a fit when a large analytical gap exists between the facts of the case and the opinion. <u>See, e.g.</u>, <u>Joiner</u>, 522 U.S. at 146–47 (affirming exclusion of testimony where the expert's opinion was based on irrelevant testing on animals unrelated to the case at issue); <u>Engilis</u>, 2025

9

WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig., 892 F.3d 624, 634–35, 644 (4th Cir. 2018) (affirming exclusion of testimony when the expert's testing contradicted his opinion); Nease v. Ford Motor Co., 848 F.3d 219, 232–33 (4th Cir. 2017) (affirming exclusion of testimony when expert on vehicle safety failed to test his own hypothesis); Cooper, 259 F.3d at 200–01 (affirming exclusion of testimony on what caused a medical injury when the expert's testing did not provide evidence of causation); Silicon Knights, Inc., 2011 WL 6748518, at *6–17 (excluding expert on damages where the opinions did not fit the facts of the case). Rule 702 does not permit or require "a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Joiner, 522 U.S. at 146; see Small v. WellDyne, Inc., 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"); In re Roundup Prods. Liab. Litig., MDL No. 2741, 2023 WL 7928751, at *2–6 (N.D. Cal. Nov. 15, 2023) (unpublished) ("For an expert to express an opinion that Roundup caused [Non-Hodgkins Lymphoma], that expert must have engaged with the relevant literature enough to assess whether a study is credible, to explain why [he] relied on one study more than another, and to articulate how [he] reached [his] conclusion in the face of conflicting evidence. [The expert in this case] did not do that, so his general causation opinion is excluded."), aff'd sub nom. Engilis, 2025 WL 2315898.

In determining "whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 & n.1 (4th Cir. 1999). Factors that may bear on the reliability of the expert's testimony include (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application, and (4) whether the theory or technique enjoys general acceptance within the relevant community. See Kumho Tire Co., 526 U.S. at 149–50; Daubert, 509 U.S. at 593–94; see, e.g., Engilis, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); Sardis, 10 F.4th at 288–90 (holding testimony about product safety unreliable when expert did not test the product); McKiver v. Murphy-Brown, LLC, 980 F.3d 937, 960 (4th Cir. 2020) (holding that a witness's method for analyzing the origin of swine fecal material was widely used and applied reliably enough to be admitted despite not being subject to peer review); In re Lipitor, 892 F.3d at 644–45 (holding that a medical doctor testifying that Lipitor caused certain diseases was excludable for not factoring in other risk factors, such as age, body mass index, and family history); Baxter v. Comm'r of Internal Revenue Serv., 910 F.3d 150, 157–58 (4th Cir. 2018) (holding that mere disagreement with an expert's otherwise reliable economic methodology is not grounds for exclusion); United States v. Crisp, 324 F.3d 261, 265–70 (4th Cir. 2003) (holding that expert fingerprint analysis was admissible despite defendant's objections to its general scientific accuracy). "Result-driven analysis, or cherry-picking, undermines principles of

11

the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." In re Lipitor, 892 F.3d at 634; see EEOC v. Freeman, 778 F.3d 463, 468–70 (4th Cir. 2015) (Agee, J., concurring) (collecting cases).

A.

Williams offers the report and testimony of Timothy Whealton to opine on the presence of alleged defects in the P320. See [D.E. 125-2] 13–16. Sig Sauer argues that Whealton is not qualified to offer an opinion on firearm design or manufacture. See [D.E. 125] 13. Sig Sauer also argues that even if Whealton were qualified, his opinions are unreliable. See id at 14.

As for Whealton's qualifications, Whealton possesses 55 years of experience as a gunsmith. See [D.E. 125-7] 2. Whealton's experience does not include designing firearms sold to the public. See Whealton Dep. [D.E. 125-5] 304–06. Instead, Whealton's experience consists of firearm repair, modification, and troubleshooting, and the design of firearms for competition. See id.; [D.E. 125-7] 2. Whealton also has instructed students at a Lenoir Community College on firearm repair and refinishing. See [D.E. 125-7] 2; Whealton Dep. 308. Whealton is not an engineer, and Whealton has never worked for a firearm manufacturer. See Whealton Dep. 304, 307.

Williams argues that Whealton is qualified based on his qualifications and experience. See [D.E. 142] 5–9. Whealton's qualifications and experience, however, do not satisfy the court that Whealton is qualified to testify about the alleged defective condition of the P320 at issue in this case. Whealton's experience in firearm repair and modification does not qualify him to testify about the allegedly defective design of the P320 because Whealton has no background or experience in designing firearms for consumer use. See, e.g., Brainchild Surgical Devices, LLC, 144 F.4th at 254; Kadel, 100 F.4th at 158; Sardis, 10 F.4th at 288–90, 295; Thomas J. Kline, Inc.,

12

878 F.2d at 799–800; <u>Higginbotham v. KCS Int'l, Inc.</u>, 85 F. App'x 911, 917 (4th Cir. 2004) (unpublished). Moreover, Whealton's experience in firearm design is limited to competition firearms. <u>See</u> Whealton Dep. 304–06. Competition firearms differ from firearms sold to consumers because competition firearms have lighter trigger pulls, are optimized for accuracy, and are not designed for civilians to carry and use in daily life. <u>See id.</u>

The divergence between Whealton's qualifications and experience and the subject of his testimony is distinguishable from <u>Martin v. Fleissner GMBH</u>. 741 F.2d 61, 63–64 (4th Cir. 1984). In <u>Martin</u>, the court admitted the testimony of two experts who lacked "direct experience" with the allegedly defective product. <u>See id.</u> Unlike Whealton, however, both experts in <u>Martin</u> specialized in product design and were familiar with the engineering principles at issue in the case. <u>See id.</u> Whealton does not have product design experience apart from his limited work on competition firearms. Whealton's qualifications do not equip him to offer testimony about the P320's design. Thus, the court rejects Williams's argument and finds that Whealton is not qualified to offer opinions about the P320's alleged defective design.

Alternatively, even if Whealton were qualified as an expert, Sig Sauer argues that Whealton's opinions about the alleged defects in the P320 and the cause of the accidental discharge in this case are unreliable. <u>See</u> [D.E. 125] 16. The court agrees. Whealton's report lists several alleged "safety-related deficiencies or design defects in the Sig Sauer P320." <u>See</u> [D.E. 125-2] 14–17. Whealton does not, however, describe how the alleged defects he identified could cause the P320 to discharge without the trigger being pulled. <u>See id.</u> Likewise, Whealton does not explain or test how the alleged defects he identified could have caused the P320 to discharge under the facts of this case. <u>See id.</u> For example, Whealton's sole simulation of debris within the internal components of the P320 consisted of manipulating the P320's sear with a plastic straw and

13

"mash[ing]" the front of the P320, which caused the P320 to discharge. See Whealton Dep. 171–72. Although this simulation demonstrates that a P320 may discharge if sufficient debris accumulated near the sear and force is applied to the P320, Whealton did not observe any debris inside of Williams's P320 that rivaled the thickness of the plastic straw. See id. at 177. Whealton's failure to relate the alleged defects he purports to identify to the facts in this case is fatal to admissibility. See Fed. R. Evid. 702(c); Belville, 919 F.3d at 233; In re Lipitor, 892 F.3d at 644–45; Silicon Knights, Inc., 2011 WL 6748518, at *6–17.

Whealton's report and deposition testimony explain his opinion that the P320 could discharge due to debris or foreign matter accumulating on the P320's internal components. See [D.E. 125-2] 18–19; Whealton Dep. 185. Whealton admits, however, that no such debris was present when he inspected the P320 after the accident. See Whealton Dep. 194. Moreover, the P320 functioned properly at the post-accident testing that Whealton attended. See id. at 223. Additionally, Whealton did not test his theory that the P320's safety lock could be rendered inoperable by debris or other foreign objects inside the P320 by simulating the effect that various quantities of debris could have on the P320's internal components. See Joiner, 522 U.S. at 141–42; Engilis, 2025 WL 2315898, at *7–10; Nease, 848 F.3d at 232–33; Cooper, 259 F.3d at 200–01. Whealton's report does not describe how he arrived at his opinions, and it does not explain how the purported defects he identifies could cause the P320 to discharge under the facts of the case. See, e.g., United States v. Bynum, 604 F.3d 161, 167 (4th Cir. 2010).

The court recognizes that expert testimony may be admissible even though it "does not rely on anything like a scientific method." Wilson, 484 F.3d at 274–75; Bynum, 604 F.3d at 167. But the expert must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the

14

facts." <u>Wilson</u>, 484 F.3d at 274. Whealton fails to demonstrate how his experience as a gunsmith led to his conclusions, why his experience suffices to form the basis of the opinions described in his report, and that he reliably applied his experience to the facts of this case.

Williams responds that Sig Sauer's arguments go to the weight of Whealton's testimony rather than admissibility. <u>See</u> [D.E. 142] 7–9. Williams misunderstands Rule 702. The court recognizes that "questions regarding the factual underpinnings of" an expert's opinion "affect the weight and credibility of the witness'[s] assessment, not its admissibility." <u>Sommerville v. Union Carbide Corp.</u>, __ F.4th __, 2025 WL 2383496, at *9 (4th Cir. 2025) (quotation and citation omitted). The proponent of an expert witness, however, must first demonstrate by a preponderance of the evidence that the expert's testimony answers the "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology." Fed. R. Evid. 702 advisory committee note to 2023 amendment; <u>Joiner</u>, 522 U.S. at 141–42; <u>Engilis</u>, 2025 WL 2315898, at *7–10; <u>Sardis</u>, 10 F.4th at 284; <u>Belville</u>, 919 F.3d at 233; <u>In re Lipitor</u>, 892 F.3d at 644–45; <u>Nease</u>, 848 F.3d at 232–33; <u>Cooper</u>, 259 F.3d at 200–01. Williams has failed to prove that Whealton's report and testimony meet this threshold inquiry. Whealton's failure to explain his methodology and apply it to the facts of the case goes to the reliability of Whealton's report and testimony, not the weight.

Williams has failed to prove by a preponderance of the evidence that Whealton's report and testimony satisfy Rule 702. Thus, the court grants Sig Sauer's motion to exclude Whealton's report and testimony.

**B.**

Williams offers Harrison's report and testimony to explain what caused Williams's P320 to discharge and to identify alternative designs. <u>See</u> [D.E. 129-2] 21–26. Sig Sauer argues that

15

Harrison is not qualified to offer his report and testimony about causation or design. See [D.E. 129]. Sig Sauer also argues that Harrison's causation and design testimony is unreliable. See id.

As for qualifications, Sig Sauer argues that Harrison is not qualified to render an opinion on the P320's design because he lacks firearm design experience. See [D.E. 129] 10–11. Harrison holds advanced degrees in mechanical engineering and law. See [D.E. 129-8] 2. Harrison works as a patent attorney, a position he has held at various law firms since 2002. See id. Harrison held several engineering-related positions in academia and industry before he began practicing law. See id. Harrison also served in various roles in the United States Army from 1980 to 1982, and 1987 to 2003. See id. at 3. Harrison does not have employment or other professional experience in gun design or manufacturing but asserts that some of his experience in mechanical engineering concerns firearms. See id. at 2–3; Harrison Dep. [D.E. 129-9] 113–16. For instance, Harrison served as a mechanical engineering professor at a university for three years and taught courses "related to the manufacture of mechanical devices like firearms, but those courses were not specific to firearms." Harrison Dep. 115–16.

Harrison possesses extensive knowledge about mechanical engineering. See [D.E. 145] 6. The relevant inquiry under Rule 702, however, focuses on whether Harrison's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); Kumho Tire Co., 526 U.S. at 156; see Thomas J. Kline, Inc., 878 F.2d at 799–800. Here, Harrison does not have experience in firearm design or manufacturing. Moreover, Harrison does not seek to opine about the application of mechanical engineering principles to the facts in this case. Rather, Harrison seeks to opine on causation based upon three untested hypotheses, but he fails to explain how he eliminated other potential causation mechanisms. See Engilis, 2025 WL 2315898, at *7–10; Brainchild Surgical Devices, LLC, 144

16

F.4th at 254; Kadel, 100 F.4th at 158; Sardis, 10 F.4th at 288–90, 295; Zellers, 533 F. App'x at 197; Cooper, 259 F.3d at 200. Thus, Harrison lacks the qualifications to render an opinion helpful to the jury to understand the evidence or determine a fact in issue.

In opposition to this conclusion, Williams cites United States v. Walker-Bey, 800 F. App'x 161 (4th Cir. 2020) (per curiam) (unpublished). In Walker-Bey, a special agent with expertise in firearms gave limited testimony to explain firearms terminology and to identify the make and model of two handguns. See id. at 165. Harrison, however, seeks to opine on firearm design and causation, not terminology or identification. Here, the court finds that Harrison is not qualified to offer an opinion about causation or the alleged defective design of the P320. See, e.g., Brainchild Surgical Devices, LLC, 144 F.4th at 254; Kadel, 100 F.4th at 158; Sardis, 10 F.4th at 288–90, 295; Higginbotham, 85 F. App'x at 917.

Even if Harrison were qualified to testify about design, Sig Sauer argues that his causation testimony is unreliable. The court agrees. Harrison's report identifies three "plausible and credible causation mechanisms [that] necessarily occurred as a matter of reasonable scientific certainty." [D.E. 129-2] 21. The first mechanism Harrison identified is that the holster in which Williams carried the P320 "deformed under the compression between the plaintiff's rear end and the motorcycle seat," causing the sides of the holster to "contact[] the sides of the trigger of the [P320] within the holster. Id. at 21–22. The second mechanism Harrison identified is that "the subject gun translated longitudinally" inside the holster, depressing the trigger enough to disengage the gun's striker safety. Id. at 21–23. Harrison then opines that with the striker safety disabled, "any incidental disengagement between the sear catching leg and the striker leg would result in the gun firing." Id. at 22. The third mechanism Harrison identified is that "migrating debris could have

17

temporarily prevented the safety lever retraction or the striker safety from retracting all the way to the safe position," causing the P320 to discharge without a trigger pull. Id. at 23.

Harrison did not perform any testing to confirm or disprove whether any of these three potential causation mechanisms manifested to cause Williams's P320 to discharge. As for the first mechanism, Harrison squeezed Williams's damaged holster with his fingers and "saw that it could flex enough under that pressure to contact the sides of the trigger." Harrison Dep. 196–97. Harrison performed this test with the damaged holster and did not perform the same test with an undamaged holster. See id. Harrison's second and third mechanisms involve debris accumulation within the P320. Harrison, however, testified that he did not observe any debris in Williams's P320 that would have affected the internal components' function. See id. at 129–31, 148, 162–63. Moreover, Harrison testified that neither he nor Whealton "add[ed] debris or move[d] debris within the subject gun." See id. at 124. Furthermore, Harrison did not simulate a situation in which the P320 fired without the trigger being at least partially depressed, nor has he ever seen such a discharge occur. See id. Harrison's report and testimony fail to explain how he eliminated other potential causes of the discharge in this case. See Slatowski v. Sig Sauer, Inc., __ F.4th __, 2025 WL 2178533, at *3–4 (3d Cir. 2025) (affirming exclusion of similar causation testimony); Davis v. Sig Sauer, Inc., 126 F.4th 1213, 1225–26 (6th Cir. 2025) (same); Herman v. Sig Sauer, Inc., No. 23-6136, 2025 WL 1672350, at *5–6 (10th Cir. June 13, 2025) (unpublished) (same); see also Engilis, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); Belville, 919 F.3d at 234 (affirming exclusion of expert testimony where "a considerable gap" existed between expert's theory and "any evidentiary proof of causation"); Nease, 848 F.3d at

18

232–33; Cooper, 259 F.3d at 203 (noting that an expert's failure to eliminate other potential causes rendered the expert's opinion "little more than speculation"). Here, Williams has failed to demonstrate by a preponderance of the evidence that Harrison reliably applied his knowledge and experience to the facts of the case. See, e.g., Engilis, 2025 WL 2315898, at *7–10; Slatowski, 2025 WL 2178533, at *3–4; Davis, 126 F.4th at 1225–26; Herman, 2025 WL 1672350, at *5–6; Belville, 919 F.3d at 234; Nease, 848 F.3d at 232–33; Cooper, 259 F.3d at 203.

Williams has failed to prove by a preponderance of the evidence that Harrison's report and testimony satisfy Rule 702. Thus, the court grants Sig Sauer's motion to exclude Harrison's report and testimony.

## III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must

19

view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

North Carolina law applies to Williams's state-law claims. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (citation omitted).[3] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head, 728 F.3d at 398 (quotation and citation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the

---

[3] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

20

highest court of a state would address an issue, this court "should not create or expand a state's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

Sig Sauer moves for summary judgment on all of Williams's claims. Although based on various liability theories, each of Williams's claims premised on the P320's inadequate design and Sig Sauer's failure to warn sound in products liability. See N.C. Gen. Stat. § 99B-1(3) (defining "product liability action" as "any action brought for or on account of personal injury" that is "caused by or resulting from . . . the design . . . [or] warning . . . of any product"); Stoddard v. Wyeth, Inc., 630 F. Supp. 2d 631, 633 (E.D.N.C. 2009) (concluding that plaintiffs' claims for breach of warranty, negligence, fraud, negligent and intentional infliction of emotional distress, unfair or deceptive trade practices, and loss of consortium were products liability claims under N.C. Gen. Stat. § 99B-1(3)); Couick v. Wyeth, Inc., 691 F. Supp. 2d 643, 645 (W.D.N.C. 2010) (noting that although plaintiff's claims "are masked in various legal theories, they are premised on a single claim of product liability"); Morrison v. Sears, Roebuck & Co., 319 N.C. 298, 303, 354 S.E.2d 495, 498 (1987) (concluding that a breach of implied warranty action is a product liability action because "the action is for injury to person or property resulting from a sale of a product"); Lackey v. DePuy Orthopaedics, Inc., No. 5:10-CV-30, 2011 WL 2791264, at *2 (W.D.N.C. July 14, 2011) (unpublished); cf. AT&T Corp. v. Med. Rev. Bd. of N.C., 876 F. Supp. 91, 95 (E.D.N.C. 1995) (holding that claim for inadequate warranty which alleged only economic loss fell outside the scope of section 99B-1).

21

In a products liability action brought against a firearm manufacturer, North Carolina law imposes two additional requirements: the plaintiff must prove that (1) "the actual design of the firearm . . . was defective, causing it not to function in a manner reasonably expected by an ordinary consumer of firearms or ammunition," and (2) "any defective design was the proximate cause of the injury, damage, or death." N.C. Gen. Stat. § 99B-11(b)(1)–(2). Thus, Williams claims based upon the P320's design and Sig Sauer's alleged inadequate warning sound in products liability and must meet the additional requirements of section 99B-11(b)(1)–(2).

Sig Sauer contends that Williams has failed to produce sufficient admissible evidence from which a reasonable jury could find causation and the presence of a defect. See [D.E. 131] 5–9; [D.E. 154] 5–14. The parties agree that North Carolina law requires Williams to introduce expert testimony on the elements of causation and the presence of a defect. See [D.E. 131] 5–6; [D.E. 147-1] 10; Richardson v. Gen. Motors Corp., 223 F. Supp. 2d 753, 756 (M.D.N.C. 2002); Ward v. Am. Med. Sys., Inc., 170 F. Supp. 2d 594, 599 (W.D.N.C. 2001), aff'd, 38 F. App'x 909 (4th Cir. 2002) (per curiam) (unpublished). The court has excluded the testimony of Harrison and Whealton. Absent expert testimony, Williams cannot prove causation and the presence of a defect. See N.C. Gen. Stat. §§ 99B-6, 99B-11; Richardson, 223 F. Supp. 2d at 756; Ward, 170 F. Supp. 2d at 599. Accordingly, no genuine issues of material fact exist about causation or the presence of a defect. Thus, Sig Sauer is entitled to summary judgment on Williams's claims in counts one (design defect), three (defective warning), five (negligence/gross negligence), six (breach of express and implied warranty), eight (fraud), nine (negligent misrepresentation), eleven (unfair and deceptive trade practices), thirteen (intentional infliction of emotional distress), and fourteen (negligent infliction of emotional distress).

Alternatively, Sig Sauer argues that Williams cannot demonstrate proximate causation

22

even if the court admitted his experts' testimony. See [D.E. 131] 7–9. Williams disagrees and cites the opinions of Whealton and Harrison. See [D.E. 147-1] 8–11.

When causation is challenged at summary judgment, the Fourth Circuit has "emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' . . . to guard against raw speculation by the fact-finder." Sakaria v. Trans World Airlines, 8 F.3d 164, 172–73 (4th Cir. 1993) (collecting cases). The proof must consist of "fact-specific and not merely speculative evidence establishing the cause of [plaintiff's] injury." Ross v. FDIC, 625 F.3d 808, 817 (4th Cir. 2010) (quotation omitted). As with all summary judgment motions, the facts asserted by either party must be based on admissible evidence. Fed. R. Civ. P. 56(c)(1)(2); see, e.g., Toll Bros., Inc v. Dryvit Sys., Inc., 432 F.3d 564, 568–69 (4th Cir. 2005); Sakaria, 8 F.3d at 171.

Williams's claims require him to prove proximate causation between the alleged defective design and his injuries. See N.C. Gen. Stat. § 99B-11(b)(2). As for Williams's claims against Sig Sauer premised on the inadequate design of the P320, Williams's experts' testimony consists of speculative evidence insufficient to establish the presence of a defect or causation. See, e.g., Slatowski, 2025 WL 2178533, at *3–4; Davis, 126 F.4th at 1225–26; Herman, 2025 WL 1672350, at *5–6. As for Harrison, Harrison fails to explain how or why he eliminated alternative causes of the P320's discharge on May 25, 2019. As for Whealton, Whealton fails to explain how the defect theories he identifies manifested on May 25, 2019. Williams's evidence fails to create a greater than speculative possibility of the presence of a defect and proximate causation. See, e.g., Ross, 625 F.3d at 817; Sakaria, 8 F.3d at 172–73. Thus, even if the court admitted Whealton and Harrison's testimony, Sig Sauer would be entitled to summary judgment.

As for Williams's claims against Sig Sauer based upon Sig Sauer's alleged failure to warn Williams, Williams cannot show proximate causation as required under North Carolina law. See

23

N.C. Gen. Stat. §§ 99B-5, 99B-11; Fontenot v. Taser Int'l, Inc., 736 F.3d 318, 332 (4th Cir. 2013). Proof of proximate causation requires that Williams demonstrate he relied on the warnings Sig Sauer provided. See Carlson v. Boston Sci. Corp., 856 F.3d 320, 324 (4th Cir. 2017) (holding that defendant was entitled to summary judgment where testimony did not establish that treating physician would have read an adequate warning even if it were provided); Holley v. Burroughs Welcome Co., 74 N.C. App. 736, 743, 330 S.E.2d 228, 233 (1985) (stating where lack of reliance can be proved, "the key element of proximate cause . . . would be defeated"). At his deposition, Williams testified that he did not read the operator's manual for the P320 and that he has never read the operator's manual for any firearm he owned. See DSMF ¶¶ 22–23; PSMF ¶ 23; Williams Dep. 331. Thus, regardless of whether the court admits the report and testimony of Williams's experts, Sig Sauer is entitled to summary judgment on Williams's inadequate warning claims.

B.

Alternatively, Sig Sauer argues that the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901 et seq., bars Williams's claims. The PLCAA provides "[a] qualified civil liability action may not be brought in any Federal or State court," 15 U.S.C. § 7902(a), and defines "qualified civil liability action" as a civil action "brought by any person against a manufacturer or seller of a [firearm] . . . for damages, punitive damages, . . . or other relief, resulting from the criminal or unlawful misuse of a [firearm]." 15 U.S.C. § 7903(4)–(5)(A); Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos, 145 S. Ct. 1556, 1562 (2025). The PLCAA defines "unlawful misuse" as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. § 7903(9). The "PLCAA generally establishes that gun manufacturers and distributors cannot be held civilly liable for harm caused by their products when that harm stems from the criminal or unlawful actions of others." Nat'l

24

Shooting Sports Found., Inc. v. James, 144 F.4th 98, 103 (2d Cir. 2025); Ileto v. Glock, Inc., 565 F.3d 1126, 1135 & n.6 (9th Cir. 2009) (explaining that, by enacting the PLCAA, "Congress clearly intended to preempt common-law claims, such as general tort theories of liability" despite California's codification of its common law).

Sig Sauer argues that the PLCAA bars Williams's claims because he violated N.C. Gen. Stat. § 14-269 when the P320 discharged on May 25, 2019. Section 14-269 prohibits the concealed carry of a "pistol or gun" without a permit. See N.C. Gen. Stat. § 14-269(a1)(1)–(3). "[T]he elements of the offense are: (1) the accused must be off his own premises; (2) he must carry a deadly weapon; and (3) the weapon must be concealed about his person." State v. Best, 214 N.C. App. 39, 45, 713 S.E.2d 556, 561 (2011) (cleaned up); see State v. Gayton, 185 N.C. App. 122, 127, 648 S.E.2d 275, 279 (2007); see also State v. Williamson, 238 N.C. 652, 654, 78 S.E.2d 763, 765 (1953); State v. Sauls, 199 N.C. 193, 154 S.E. 28, 28 (1930).

At his deposition, Williams testified that someone looking at him from behind on May 25, 2019, would not see the holstered P320 but "would actually see the back of [his] vest because the vest goes over [his] back pocket." Williams Dep. 167. Notwithstanding Williams's deposition testimony, Williams opposes summary judgment and argues that photographs of him wearing a vest taken under different conditions and photographs of a model that one of Sig Sauer's experts submitted create a genuine issue of material fact about whether Williams concealed his holstered P320 on May 25, 2019. See [D.E. 147-1] 11–14.

"[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806–07 (1999); see In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011);

25

Rohrborough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); Swindell v. CACI NSS, Inc., No. 5:17-CV-617, 2020 WL 5824024, at *3 n.3 (E.D.N.C. Sept. 30, 2020) (unpublished), aff'd, No. 20-2179, 2022 WL 3754531 (4th Cir. Aug. 30, 2022) (per curiam) (unpublished). Although this principle usually applies where a party submits a declaration contradicting earlier deposition testimony, it also applies here. Williams's uncontroverted deposition testimony establishes that Williams's clothes concealed the P320 on May 25, 2019, when the P320 discharged, and the parties agree that Williams did not have a North Carolina concealed carry permit. See PSMF ¶ 6; DSMF ¶ 6. Thus, the elements of N.C. Gen. Stat. § 14-269 are met. Specifically, Williams was not on his own premises at the time of the discharge on May 25, 2019, he carried a deadly weapon (i.e., his pistol), and his clothes concealed the pistol. See N.C. Gen. Stat. § 14-269(a1)(1)–(3). Moreover, the court rejects Williams's suggestion that his deposition testimony is "not plausible" because he "could not know what would be seen of him from behind by another person." [D.E. 147-1] 15 n.4; cf. Anderson, 477 U.S. at 248–49.

Williams also argues that the PLCAA does not apply because he was not charged with a crime under N.C. Gen. Stat. § 14-269 for his conduct on May 25, 2019. See [D.E. 147-1] 13. Section 7903(5)(A)'s definition of qualified civil liability action, however, mentions "criminal or unlawful misuse." See 15 U.S.C. § 7903(5)(A) (emphasis added). To exclude uncharged criminal conduct from section 7903(5)(A)'s definition renders superfluous Congress's use of the words "or unlawful." Thus, the court applies the surplusage canon and rejects Williams's proposed statutory construction. See Yselta Del Sur Pueblo v. Texas, 596 U.S. 685, 698–99 (2022) (relying on the "longstanding canon[] of construction . . . that we must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or

26

insignificant" (quotation and citation omitted)); <u>TRW, Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001); <u>Nero v. Mosby</u>, 890 F.3d 106, 124–25 (4th Cir. 2018); <u>United States v. Briley</u>, 770 F.3d 267, 273–74 (4th Cir. 2014).

Other parts of the PLCAA bolster the conclusion that Williams did not have to be charged with violating N.C. Gen. Stat. § 14-269(a1)(1)–(3) in order for section 7903(5)(A) to apply. In section 7903(5)(A)(i), Congress defined qualified civil liability action and excluded "action[s] brought against a transferor <u>convicted</u> under section 924(h) of title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is <u>so convicted</u>." 15 U.S.C. § 7903(5)(A)(i) (emphasis added). The court draws a "negative inference" from Congress's use of the term "convicted" in section 7903(5)(A)(i) and its failure to do so in section 7903(5)(A). <u>See</u> 15 U.S.C. § 7903(5)(A)(i); <u>Bittner v. United States</u>, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning . . . ."); <u>Gallardo ex rel. Vassallo v. Marstiller</u>, 596 U.S. 420, 431 (2022); <u>William v. Gonzales</u>, 499 F.3d 329, 333 (4th Cir. 2007) (applying the canon against surplusage and meaningful variation). Section 7903(5)(A) applies regardless of whether a criminal conviction resulted from the criminal or unlawful conduct. <u>See Gustafson v. Springfield, Inc.</u>, 333 A.3d 651, 667–669 (Pa. 2025), <u>petition for cert. filed</u>, No. 25-120 (U.S. July 31, 2025); <u>Travieso v. Glock, Inc.</u>, 526 F. Supp. 3d 533, 546–47 (D. Ariz. 2021); <u>Adames v. Sheahan</u>, 233 Ill. 2d 276, 311, 909 N.E.2d 742, 761–62 (2009). Thus, Williams's civil action meets section 7903(5)(A)'s definition of a qualified civil liability action.

Next, Williams argues that the PLCAA does not bar his design defect claims because his claims meet section 7903(5)(A)(v)'s exception for design defect claims. The PLCAA exempts

27

from section 7903(5)(A)'s definition, in relevant part, civil actions for

> [p]hysical injuries resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage.

15 U.S.C. § 7903(5)(A)(v) (emphasis added). Sig Sauer responds that Williams's design defect claims fall outside this exception because Williams's concealed carry was a volitional act that constituted a criminal offense, and that volitional act is defined in 15 U.S.C. § 7903(5)(A)(v) to be "the sole proximate cause of any . . . personal injuries." Id.

As explained, Williams violated N.C. Gen. Stat. § 14-269 on May 25, 2019. Therefore, his concealed carry "constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v).

As for whether Williams's criminal concealed carry was a "volitional act," the court examines the ordinary meaning of the statutory text. See Alvarez Ronquillo v. Bondi, __ F.4th __, 2025 WL 2371033, at *2 (4th Cir. 2025); Lovo v. Miller, 107 F.4th 199, 207 (4th Cir. 2024); Lee v. Norfolk S. Ry., 802 F.3d 626, 631 (4th Cir. 2015). Because the PLCAA does not define volitional, the court consults dictionaries published close in time to the PLCAA's enactment in 2005. See Alvarez Ronquillo, 2025 WL 2371033, at *3; Lovo, 107 F.4th at 207; Lee, 802 F.3d at 631. In ordinary usage, "volitional" means "of, relating to, or of the nature of volition." Webster's Third New Int'l Dictionary 2562 (2002). In turn, volition means "the ability to make a choice or determine something." Volition, Black's Law Dictionary (8th ed. 2004); see also Webster's Third New Int'l Dictionary 2562 (2002) (defining volition as "the act of willing or choosing; the exercise of will").

Here, the discharge of Williams's P320 on May 25, 2019, was caused by a volitional act that constituted a criminal offense. See 15 U.S.C. § 7903(5)(A)(v). Under the PLCAA's design defect exception, Congress has determined that Williams's criminal concealed carry is "considered

28

the sole proximate cause of" his "personal injuries." See id. Thus, the PLCAA bars Williams's design defect claims.

C.

As for Williams's claim under the MMWA, the court assumes without deciding that the claim may proceed despite the PLCAA. Williams asserts claims under the MMWA predicated on North Carolina law and a federal cause of action under 15 U.S.C. § 2302(a), (b)(1)(A). See Am. Compl. ¶¶ 208–14.

As for Williams's MMWA claims predicated on North Carolina law, the MMWA provides a federal remedy for breach of warranty. See Schimmer v. Jaguar Cars, Inc., 384 F.3d 402, 405 (7th Cir. 2004). The act "supplements, rather than supplants state law." Doll v. Ford Motor Co., 814 F. Supp. 2d 526, 545 (D. Md. 2011); see Carlson v. Gen. Motors Corp., 883 F.2d 287, 291 (4th Cir. 1989). "When the MMWA claim is premised on borrowed state-law warranty claims, MMWA claims stand or fall with the state-law claims." Sandoval v. PharmaCare US, Inc., 145 F. Supp. 3d 986, 998 (S.D. Cal. 2015) (quotations omitted); see Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 & n.3 (9th Cir. 2008); Sasso v. Tesla, 584 F. Supp. 3d 60, 76 (E.D.N.C. 2022), aff'd sub nom Challenge Printing Co. of the Carolinas v. Tesla, Inc., No. 22-2057, 2024 WL 2795180 (4th Cir. May 31, 2024) (per curiam) (unpublished). Moreover, to the extent Williams seeks to recover for personal injury, "the MMWA does not create a federal cause of action for personal injury damages based solely on a breach of warranty." Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1066–67 (5th Cir. 1984); Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 525 (7th Cir. 2003) ("[P]ersonal injury claims based on a breach of warranty are not cognizable under the Magnuson-Moss Act."). Accordingly, because Sig Sauer is entitled to summary judgment on Williams's state-law claims, Sig Sauer is entitled to summary judgment on

29

Williams's derivative MMWA claim.

As for Williams's substantive claim under the MMWA, the statutory cause of action in the MMWA states that "a consumer who is damaged" by the warrantor's failure to comply with the MMWA's provisions may bring suit. See 15 U.S.C. § 2310(d). Under the MMWA, Williams must show that "he has sustained actual damage, proximately caused by" Sig Sauer's failure to comply with the MMWA. See, e.g., Sasso, 584 F. Supp. 3d at 77–78; Atchole v. Silver Spring Imports, Inc., 379 F. Supp. 2d 797, 801–02 (D. Md. 2005). As explained, Williams has not demonstrated a genuine issue of material fact about causation. Thus, Sig Sauer is entitled to summary judgment on Williams's substantive MMWA claim.

Finally, as for Williams's claim for punitive damages, it is not a stand-alone claim. See Sykes v. Health Network Sols., Inc., 372 N.C. 326, 329, 828 S.E.2d 467, 469 (2019); Funderburk v. JPMorgan Chase Bank, N.A., 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015); Hawkins v. Hawkins, 101 N.C. App. 529, 400 S.E.2d 472, 474 (1991); Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009). Because Williams's other claims fail, the court also dismisses Williams's claim for punitive damages.

IV.

In sum, the court GRANTS defendant's motions to exclude plaintiff's expert witnesses [D.E. 124, 128], GRANTS defendant's motion for summary judgment [D.E. 130], and DISMISSES WITH PREJUDICE plaintiff's claims against defendant. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk SHALL close the case.

30

SO ORDERED.  This 8 day of September, 2025.

JAMES C. DEVER III
United States District Judge

31